# In the United States Court of Federal Claims

No. 08-133 C
(Filed Under Seal: May 29, 2009)
(Reissued: July 24, 2009)*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| GLOBAL COMPUTER ENTERPRISES, INC.,    * | Bid Protest; Cross-Motions for |
|    * | Judgment on the Administrative |
| Plaintiff,    * | Record; RCFC 52.1; Federal |
|    * | Acquisition Streamlining Act of |
| v.    * | 1994; Subject Matter Jurisdiction; |
|    * | RCFC 12(b)(1); Standing; Laches; |
| THE UNITED STATES,    * | Competition in Contracting Act; |
|    * | <u>Ramcor Services Group, Inc.</u>; |
| Defendant,    * | <u>AT&T Communications, Inc.</u>; |
|    * | Contract Interpretation to Determine |
| and    * | Scope of Solicitation and Prospective |
|    * | Bidders' Expectations; FAR |
| QSS GROUP, INC.,    * | § 19.502-2; "Rule of Two" Small |
|    * | Business Set-Aside; Injunctive |
| Defendant-Intervenor.    * | Relief |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>Jonathan J. Frankel</u>, Washington, DC, for plaintiff.  John P. Janecek, Ariel B. Waldman, Timothy R. Schnabel, and Sara K. Kasper, of counsel.

<u>William P. Rayel</u>, United States Department of Justice, Washington, DC, for defendant.

<u>J. Scott Hommer, III</u>, Vienna, VA, for Defendant-Intervenor.  William L. Walsh, Jr., Keir X. Bancroft, Patrick R. Quigley, and Peter A. Riesen, of counsel.

## OPINION AND ORDER

**SWEENEY**, Judge

      This bid protest comes before the court on Defendant's Motion to Dismiss or, in the Alternative, Motion for Judgment Upon the Administrative Record, and Defendant's Opposition to Plaintiff's Motion for a Preliminary Injunction and Application for Temporary Restraining Order ("government's motion and opposition"); Defendant-Intervenor's Memorandum in

---

     \* This reissued decision incorporates the redactions proposed by the parties on July 1, 2009, as well as minor, nonsubstantive corrections.  Redactions are indicated with a bracketed ellipsis ("[. . .]").

Support of Intervenor QSS Group, Inc.'s Motion to Dismiss for Lack of Jurisdiction, Opposition to Plaintiff's Motion for Preliminary Injunction and Application for Temporary Restraining Order and, Alternatively, Motion for Judgment on the Administrative Record ("QSS's motion and opposition"); and Plaintiff's Cross-Motion for Judgment on the Administrative Record and Motion for Permanent Injunctive Relief ("cross-motion for judgment on the administrative record" and "motion for permanent injunctive relief").  Plaintiff Global Computer Enterprises, Inc. ("GCE") protests the issuance of two modifications to a task order awarded to defendant-intervenor, QSS Group, Inc. ("QSS"), by the United States Coast Guard ("Coast Guard") to perform software engineering and technical services at the Coast Guard's Operations Systems Center ("OSC") in Kearneysville, West Virginia.  Specifically, GCE maintains that Modifications P00030 ("Modification 30") and P00032 ("Modification 32") to the Systems Engineering and Technical Services ("SETS") II task order, which involved the provision and maintenance of audit-supporting federal financial management systems, exceeded the scope of the SETS II task order, thereby resulting in an unlawful standalone, sole-source procurement that extended the underlying Information Technology Omnibus Procurement ("ITOP") II contract beyond its ordering period.  For the reasons discussed below, GCE's cross-motion for judgment on the administrative record is granted, GCE's motion for permanent injunctive relief is granted, the government's motion and opposition is denied in part, and QSS's motion and opposition is denied in part.[1]

Due to the length of this opinion, the court provides the following table of contents:

I. FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
  A.  Audit-Supporting Federal Financial Management Systems. . . . . . . . . . . . . . . . . . . . 6
    1.  Nature of Audit-Supporting Federal Financial Management Systems. . . . . . . . 7
      a.  Definitions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
      b.  Regulatory Framework. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    2.  Market for Audit-Supporting Federal Financial Management System Services
        and Related IT Work. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    3.  Government Procurement Practices for Audit-Supporting Federal Financial
        Management Systems Services and Related IT Work. . . . . . . . . . . . . . . . . 13
      a.  Examples of Agency Procurements Outside the Coast Guard. . . . . . . 13
      b.  Recent Coast Guard Procurements. . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
  B.  The Coast Guard's OSC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
  C.  The ITOP II Contract. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    1.  The Scope of the ITOP II Contract. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    2.  Task Order Provisions Contained Within the ITOP II Contract. . . . . . . . . . . 23
    3.  Labor Categories and Qualifications Set Forth Within the ITOP II Contract
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

_____

[1] In its concurrent ruling granting GCE's motion to supplement the administrative record, the court denied the remaining portions of the government's motion and opposition and QSS's motion and opposition.

4. Limitations Under the ITOP II Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
5. The SETS I Task Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
D. The SETS II Task Order and Solicitation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
1. The Scope of the SETS II Task Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
  a. General Contract Services Under the SETS II Task Order . . . . . . . . . 28
  b. System Services Under the SETS II Task Order . . . . . . . . . . . . . . . . . 29
    i. Functional Area Management, Help Desk Support, and Software
       Development and Maintenance . . . . . . . . . . . . . . . . . . . . . . 29
    ii. Hardware Maintenance, System Administration, and Database
       Administration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
    iii. Network Administration, Data Management, and System
       Downtime . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    iv. Technical Writing, System Transition, and Computer System
       Fielding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    v. Application System Training and Technical Field Support . . . 31
  c. OSC System Requirements Under the SETS II Task Order . . . . . . . . . 32
    i. Automated Aid Positioning System ("AAPS"); Aids to
       Navigation Information System ("ATONIS"); Integrated-
       ATONIS ("I-ATONIS") . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
    ii. Automated Mutual Assistance Vessel Rescue ("AMVER")
       System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    iii. Abstract of Operations System ("AOPS"); Training
       Management Tool ("TMT"); Automated Requisition
       Management System ("ARMS"); and ASG . . . . . . . . . . . 33
    iv. Auxiliary Data ("AUXDATA"); Certification and
       Accreditation ("C & A"); and CASP . . . . . . . . . . . . . . . . 34
    v. BelManage ASM Support and Business Intelligence-Enterprise
       Data Warehouse ("BI-EDW") . . . . . . . . . . . . . . . . . . . . . 34
    vi. CG Help ("CGHELP") and Coast Guard List Server ("CGLS")
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
    vii. Coast Guard Recruiting Command ("CGRC") and
       Configuration Management ("CM") . . . . . . . . . . . . . . . . 35
    viii. Data Center Support; G-O CITRIX Farm ("CITRIX"); and
       Configuration Management Plus Client Server
       ("CMPLUS") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
    ix. DHS Directory Services ("DIRSERV") and Disaster Recovery
       Business Continuity ("DRBC") Support Services . . . . . . . 36
    x. Emerging Technologies Technical Team ("ETTT") . . . . . . . . 37
    xi. Electronic Program Management Office ("EPMO")
       System/Deepwater Program, FLS, and Geospatial
       Information System ("GIS") . . . . . . . . . . . . . . . . . . . . . . . 37
    xii. Housing Management Information ("HMI") and Local Area
       Network ("LAN") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

   xiii. Long Range Aid to Navigation Operations Information
     System ("LOIS") and MMLD. . . . . . . . . . . . . . . . . . . . 38
   xiv. Marine Safety Network ("MSN"); Panorama Business Views
     ("PB-Views"); Naval and Electronic Supply Support
     System ("NESSS"); and Enterprise Management Support
     ("EMS"). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
   xv. Point of Presence ("POP"); Business Intelligence-Readiness
     Management ("BI-RM"); and Shore Asset Management
     ("SAM"). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
   xvi. Ship Arrival Notification ("SAN") and SLDMB. . . . . . . . . 41
   xvii. System Performance Tiger Team ("SPERTT"); Systems
     Resource Management ("SRM"); Vessel Documentation
     System ("VDS"); and WEB Services. . . . . . . . . . . . . . . 41
  2. Evaluation Factors For Award of the SETS II Task Order. . . . . . . . . . . . . . . 42
 E. The Coast Guard's Audit-Supporting Federal Financial Management Systems and
  Related Services. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
  1. The Coast Guard's Unified Mission Support Initiative. . . . . . . . . . . . . . . . 45
  2. Efforts to Create an Audit-Supporting Federal Financial Management Systems
   and Related Services Procurement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
  3. The August 15, 2007 Sole-Source Bridge Contract to GCE. . . . . . . . . . . . . . 50
  4. The Coast Guard's August 2007 Solicitation and September 2007 Contract
   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
  5. Use of the SETS II Task Order to Transition Audit-Supporting Federal
   Financial Management Systems and Related Services to the OSC. . . . . . 52
   a. Modification 30 to the SETS II Task Order. . . . . . . . . . . . . . . . . . . . 53
   b. Modification 32 to the SETS II Task Order. . . . . . . . . . . . . . . . . . . . 55
  6. GCE Expresses Concern to the Coast Guard. . . . . . . . . . . . . . . . . . . . . . . . 56

II. PROCEDURAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
 A. Proceedings Before the GAO. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
 B. Proceedings Before The United States Court of Federal Claims ("Court of Federal
  Claims"). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

III. LEGAL STANDARDS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
 A. Bid Protests. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
 B. Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
 C. Motion to Dismiss for Lack of Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
 D. Judgment on the Administrative Record. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
 E. Injunctive Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

IV. DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
 A. Whether the Court Possesses Subject Matter Jurisdiction. . . . . . . . . . . . . . . . . . . 72
  1. The Purpose of the FASA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

      2. The Plain Language of the FASA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

          a. An Interpretation of the Scope of a Phrase in One Statute Does Not Control the Interpretation of Identical Language in a Separate Statute. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

          b. The FASA Only Bars Protests "In Connection With" Either the "Issuance" or "Proposed Issuance" of a Task Order, Not Modifications Thereto. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

          c. Alternatively, Even if the FASA Bar Applies, GCE's Protest Falls Within the Statutory Exception Contained Therein. . . . . . . . . . . 87

B. Whether GCE Possesses Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

C. Whether the Equitable Doctrine of Laches Applies. . . . . . . . . . . . . . . . . . . . . . . . . 93

      1. Standards for a Laches Defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

      2. GCE's Argument That Laches Does Not Apply. . . . . . . . . . . . . . . . . . . . . . 94

      3. The Government's and QSS's Arguments That GCE's Delay Was Unreasonable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

      4. Neither the Government nor QSS Demonstrates That the Application of Laches Is Appropriate Under the Circumstances Presented in This Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

D. GCE's Claim That the Coast Guard Violated the CICA. . . . . . . . . . . . . . . . . . . . 100

      1. The Court Engages in a Two-Part Inquiry to Determine Whether Modifications 30 and 32 Exceeded the Scope of the SETS II Task Order. . . . . . . . . . . 100

      2. Modification 30 Added Systems and Services That Materially Changed the Scope of the SETS II Task Order. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

          a. The SETS II Task Order Did Not Contemplate an Unlimited Expansion of Computer Systems. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

          b. Modification 30 Added Audit-Supporting Federal Financial Management Systems, Which Differ Substantially From Those Computer Systems Described in the SETS II Task Order. . . . . . 109

          c. Modification 30 Substantially Changed the Type of Services to Be Performed Under the SETS II Task Order by Adding Audit-Supporting Federal Financial Management Systems. . . . . . . . . 116

      3. A Reasonable Offeror Would Not Have Anticipated That Audit-Supporting Federal Financial Management Systems Under Modification 30 Would Fall Within the SETS II Task Order's Changes Clause. . . . . . . . . . . . . . 124

      4. The Coast Guard's Issuance of Modifications 30 and 32 to the SETS II Task Order Extended the Ordering Period of the ITOP II Contract. . . . . . . . . 128

E. GCE's Claim That the Coast Guard Violated the "Rule of Two". . . . . . . . . . . . . . 129

F. The Coast Guard's Actions Prejudiced GCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

G. GCE Is Entitled to Judgment on the Administrative Record. . . . . . . . . . . . . . . . . . 137

H. Award of a Permanent Injunction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

      1. Success on the Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

      2. Irreparable Injury.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

      3. Balance of Hardships. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

a.  The Coast Guard's Harms Are Overstated. . . . . . . . . . . . . . . . . . . . 145
b.  QSS's Harms Do Not Outweigh GCE's Harms. . . . . . . . . . . . . . . . 149
4.  Public Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

V.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

Appendix of Acronyms. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

## I.  FACTUAL BACKGROUND[2]

### A.  Audit-Supporting Federal Financial Management Systems

In this protest, GCE alleges that the work it has performed for the Coast Guard, which "involves the provision and maintenance of highly specialized audit-supporting financial management systems using government-certified financial management systems software,"[3] Compl. ¶ 10, was unlawfully shifted to QSS without competition and in violation of applicable

_____

[2]  The facts are derived from: (1) the administrative record ("AR"); (2) GCE's complaint ("Compl."); (3) the parties' briefs and exhibits appended thereto; (4) transcripts from a (a) preliminary injunction hearing conducted on March 26, 2008, and (b) permanent injunction hearing conducted on May 28, 2008; and (5) materials that the court determined in its concurrent ruling were appropriate for supplementation of the administrative record.  Because GCE's appendices are paginated consecutively, see GCE's App. Mem. P. & A. Supp. Pl.'s Mot. Prelim. Inj. & Application TRO; GCE's Supplemental App. Mem. Supp. Pl.'s Cross-Mot. J. Administrative R. & Mot. Perm. Injunctive Relief; App. Mem. Pl. Global Computer Enterprises, Inc. Filed Pursuant Ct.'s Apr. 7, 2008 Order, the court considers those materials submitted with its motion for preliminary injunction and temporary restraining order, its cross-motion for judgment on the administrative record and motion for permanent injunctive relief, and its memorandum filed pursuant to the court's April 7, 2008 order as one appendix, hereinafter cited as "Pl.'s App."

[3]  Founded in 1998 by Raed Muslimani, GCE's President and Chief Executive Officer, GCE provides information technology ("IT") services to the federal government "primarily through building enterprise-wide prototypes of systems capable of serving whole federal agencies and departments."  Pl.'s App. 1 (Decl. Raed Muslimani ("Muslimani Decl.") ¶ 4); see also Compl. ¶ 4 (alleging that GCE "provides the federal government [with] highly specialized information technology support services for systems that create federal agencies' financial statements of record").  GCE "regularly competes in agency procurements conducted through competitions set aside for small businesses," Compl. ¶ 4, and employs approximately [. . .] individuals, Pl.'s App. 1 (Muslimani Decl. ¶ 4).  Since 2000, GCE "has developed and maintained financial management systems of the United States Coast Guard that create the Coast Guard's financial statements of record for audits using government-certified financial management systems software."  Compl. ¶ 4.

statutory and regulatory requirements, id. ¶¶ 10, 32, 49-63.  In addition to recounting the facts giving rise to this action, this portion of the court's decision provides a background of audit-supporting federal financial management systems IT, as well as the nature of and market for this work.

### 1.  Nature of Audit-Supporting Federal Financial Management Systems

### a.  Definitions

A financial system, as defined by the Office of Management and Budget ("OMB") in Circular No. A-127 (1993), is an "information system, comprised of one or more applications," that is used for any of the following: collecting, processing, maintaining, transmitting, and reporting data about financial events; supporting financial planning or budgeting activities; accumulating and reporting cost information; or supporting the preparation of financial statements.  Pl.'s App. 262.  Such a system

> supports the financial functions required to track financial events[ and] provide[s] financial information significant to the financial management of the agency, and/or required for the preparation of financial statements.  A financial system encompasses automated and manual processes, procedures, controls, data, hardware, software, and support personnel dedicated to the operation and maintenance of system functions.  A financial system may include multiple applications that are integrated through a common database or are electronically interfaced, as necessary, to meet defined data and processing requirements.

Id.  The OMB defines a financial management system as "the financial systems and the financial portions of mixed systems necessary to support financial management."[4]  Id.  By contrast, a "non-financial system" is "an information system that supports non-financial functions of the Federal government or components thereof and any financial data included in the system are insignificant to agency financial management and/or not required for the preparation of financial statements."[5]  Id.

---

[4]  A mixed system is "an information system that supports both financial and non-financial functions of the Federal government or components thereof."  Pl.'s App. 262.

[5]  GCE cites mission and administrative systems support service work, which have non-financial primary objectives, as examples of nonfinancial systems.  Compl. ¶ 12.  It alleges that while mission and administrative systems may collect and feed financial data to an agency's core financial management systems, these systems do not create financial statements of record that are subject to an audit.  Id.  According to David Lucas, GCE's Chief Strategy Officer, "mission-related and administrative IT systems do not create the financial statements of record and do not meet audit requirements.  Either they lack financial data fields altogether, or they merely collect and feed financial data to the agency's core financial management system(s)."  Pl.'s App. 15

According to the OMB, financial management in the federal government "requires accountability of financial and program managers for financial results of actions taken, control over the Federal government's financial resources and protection of Federal assets." Id. at 263. In order to comply with these requirements, financial management systems "must be in place to process and record financial events effectively and efficiently, and to provide complete, timely, reliable[,] and consistent information . . . ." Id. Consequently, the OMB implemented a financial management system policy for the federal government in order

> to establish government-wide financial systems and compatible agency systems, with standardized information and electronic data exchange between central management agency and individual operating agency systems, [and] to meet the requirements of good financial management. These systems shall provide complete, reliable, consistent, timely and useful financial management information on Federal government operations to enable central management agencies, individual operating agencies, divisions, bureaus[,] and other subunits to carry out their fiduciary responsibilities; deter fraud, waste, and abuse of Federal government resources; and facilitate efficient and effective delivery of programs through relating financial consequences to program performance.

Id. The OMB directed each agency to "establish and maintain a single, integrated financial management system." Id. Each financial management system must, among other things, comply with an agency-wide financial information classification structure; design effective and efficient interrelationships between software, hardware, personnel procedures, controls, and system data; apply the requirements of the United States Government Standard General Ledger at the transaction level; maintain accounting data in accordance with accounting standards; and conform with existing applicable functional requirements for the design, development, operation, and maintenance of financial management systems. Id. at 263-65.

Additionally, the OMB set forth financial management system design requirements in order to "reflect an agency-wide financial information classification structure . . . ." Id. at 263. Financial management system designs "shall support agency budget, accounting and financial management reporting processes by providing consistent information for budget formulation, budget execution, programmatic and financial management, performance measurement and financial statement preparation." Id. These systems, the OMB indicated, "shall be designed to provide for effective and efficient interrelationships between software, hardware, personnel procedures, controls, and data contained within the systems." Id. at 263-64.

### b.  Regulatory Framework

According to GCE, "highly specific regulations govern[] the maintenance of federal financial systems . . . ." Pl.'s Mot. Prelim. Inj. & TRO 5; see also Pl.'s App. 15 (Lucas Decl.

---

(Decl. David Lucas ("Lucas Decl.") ¶ 12).

¶ 11 ("Audits of federal financial management systems assess compliance with highly specific requirements.")). Following a determination that "[f]ederal accounting standards have not been uniformly implemented in financial management systems for agencies," Congress enacted the Federal Financial Management Improvement Act of 1996 ("FFMIA"), Pub. L. No. 104-208, 110 Stat. 3009-389 to 3009-393 (codified at 31 U.S.C. § 3512 (2006)), in order to, inter alia, provide for consistency of accounting by an agency from one fiscal year to the next, and uniform accounting standards throughout the Federal Government," Pl.'s App. 209. The definition of "financial system" contained in the FFMIA is identical to the definition contained in OMB Circular No. A-127. See Pl.'s App. 211, 262. Although the FFMIA and OMB Circular No. A-127 also contain similar definitions of the term "financial management system," id. at 211, 262, the FFMIA's definition was broader. Under the FFMIA, a financial management system also "includ[es] automated and manual processes, procedures, controls, data, hardware, software, and support personnel dedicated to the operation and maintenance of system functions." Id. at 211. According to GCE, the FFMIA, along with other federal laws and regulations, requires that federal executive branch entities submit annual audited financial statements to both the President and Congress. Pl.'s Mot. Prelim. Inj. & TRO 3.

GCE alleges that audit-supporting federal financial management systems services are "provided by a contractor using specialized government-certified software to support a federal agency's core financial system."[6] Compl. ¶ 11. An agency's core financial system, GCE states, "produce[s] audited financial statements of records[, which] are governed by an extensive regulatory and statutory regime specific to federal financial management systems." Pl.'s Mot. Prelim. Inj. & TRO 4; see also Pl.'s Cross-Mot. J. Administrative R. & Mot. Perm. Injunctive Relief ("Pl.'s Cross-Mot. & Mot. Perm. Inj.") 16 ("[A]udit-supporting financial management systems are governed by extensive regulatory and statutory requirements[.]"); Pl.'s App. 276-79 (containing "Core Financial System Requirements," a publication of the Office of Federal Financial Management that lists government-wide accounting standards, laws, and regulations, and provides other guidance related to financial system requirements). OMB Circular No. A-123 (2004) indicates that "[f]ederal managers have been subject to . . . internal control reporting requirements for many years," Pl.'s App. 247, and the Sarbanes-Oxley Act of 2002, Pub. L. No.

---

[6]  David Winslow, GCE's Director of Financial Systems, states that "specialized software used in audited financial management systems . . . must be [Financial Systems Integration Office ("FSIO")]-certified before being used to create financial statements of record." Pl.'s App. 40-41 (Decl. David Winslow ("Winslow Decl.") ¶ 35); see also id. at 14 (Lucas Decl. ¶ 6 ("Agencies are required to procure only core financial management software certified by FSIO.")). According to GCE, these products are considered "distinct." Pl.'s Mot. Prelim. Inj. & TRO 5. For example, GCE states that Oracle Federal Financials is a FSIO-certified program. Id. at 41 (Winslow Decl. ¶ 39); see also Pl.'s Mot. Prelim. Inj. & TRO 5 (citing Oracle Federal Financials as one type of specialized software used in audited financial systems). Since "[t]he industry recognizes Oracle Federal Financials developers/analysts as a specialized position," GCE states that " job solicitations will specifically seek Oracle Federal Financials developers and analysts." Pl.'s App. 41 (Winslow Decl. ¶ 39).

107-204, 116 Stat. 745 (codified as amended in scattered sections of 11, 15, 18, 28, and 29 U.S.C.), "served as an impetus for the Federal government to reevaluate its current policies relating to internal control over financial reporting and management's related responsibilities," Pl.'s App. 246.

In September 2007, the OMB issued Bulletin No. 07-04, which addresses "Audit Requirements for Federal Financial Statements." Id. at 213-42. Applicable to "audits of financial statements of executive departments, agencies, and government corporations . . . and certain components of these agencies," OMB Bulletin No. 07-04 "establishes minimum requirements for audits of Federal financial systems." Id. at 213. Among the provisions set forth within OMB Bulletin No. 07-04 are requirements for annual audits, id. at 218; open, timely, and frequent communication concerning the audit timetable and potential audit findings, such as indications of material misstatements or unsupported amounts in the financial statements, id. at 219; and specific parameters that address the scope of an audit and audit report, id. at 222-32.

## 2. Market for Audit-Supporting Federal Financial Management System Services and Related IT Work

GCE represents that because audits of federal financial management systems assess compliance with specific statutory and regulatory requirements, "federal agencies use a common set of evaluation criteria to award contracts for federal financial management system IT support services." Id. at 15 (Lucas Decl. ¶ 11). According to GCE, "[t]wo of the most important criteria in each application are specific experience and technical expertise with federal financial management systems or specially certified core financial management system software." Id. In this regard, and "[b]ecause of the unique and exacting standards for properly collecting, maintaining, and producing audited financial information," Pl.'s Mot. Prelim. Inj. & TRO 5, GCE states that audit-supporting federal financial management systems services and related IT work constitute "a small and sharply defined niche market separate from the broader market for general IT support and software development work," id. at 5-6; see also AR 2576-77 (identifying [. . .] companies that, based upon "[m]arket research and past experience[,] . . . possess the required technical expertise necessary" to manage the Coast Guard's Financial Center information systems).[7] But see QSS Group's Opp'n Pl.'s Mots. (1) J. on the Administrative R., (2) Perm. Inj., & (3) Supplement the Administrative R., & Reply Supp. QSS Group's Mot. Dismiss &, Alternatively, J. Administrative R. ("Def.-Intervenor's Opp'n & Reply") App. Ex. E (Supplemental Decl. William R. Bowen ("Bowen Supp'l Decl.") ¶ 11 ("During all my years of experience in Federal Government procurement, I have never encountered any small 'niche

---

[7] These [. . .] companies include GCE; [. . .]. AR 2577. These contractors, "selected by technical personnel of the [Coast Guard,] . . . have displayed the most experience in managing the [Coast Guard] Finance Center information systems." Id. at 2576; see also id. at 2587-88 (describing these [. . .] contractors as possessing "unique qualifications to provide the required service" and an "ability to assist and provide seamless Federal Financial Information Technology (IT) system software development").

market' of audit-supporting federal financial management systems.  I would have expected to have seen evidence of such a market, if it existed.")).

GCE maintains that contractors must "have experience with FSIO-certified software, knowledge of the regulatory environment in which audited financial systems operate, and subject matter expertise in accounting, budgeting, and procurement."  Pl.'s Cross-Mot. & Mot. Perm. Inj. 16.  Consequently, according to GCE, these contractors "possess distinct expertise," Pl.'s Mot. Prelim. Inj. & TRO 5; <u>accord</u> Compl. ¶ 14 ("Government contractors capable of providing federal financial systems work possess a distinct set of expertise . . . .").  During oral argument on GCE's motion for a preliminary injunction and temporary restraining order, GCE explained:

> Federal Financial Systems [work] requires different expertise and is subject to different regulatory requirements than other kinds of information technology work.  This work is performed by different companies.  When you put a solicitation out, different groups of companies bid depending [upon] whether it is one of these solicitations for Federal Financial Systems work or other kinds of IT work.

Prelim. Inj. Hr'g Tr. 6:14-22, Mar. 26, 2008.  GCE alleges that this expertise includes:

> a.  A thorough knowledge of the federal regulatory and statutory scheme with which those audited financial management systems must comply;
>
> b.  Specific subject matter expertise in federal accounting, budgeting, finance, procurement, and related fields;
>
> c.  Technical expertise in working with government-certified commercial-off-the-shelf ("COTS") software tools specific to federal financial systems work; [and]
>
> d.  A pool of employees who have experience with configuring and maintaining audited financial systems.

Compl. ¶ 14.  According to GCE, "[o]nly a limited pool of companies have the requisite expertise to participate in this specialized field as prime contractors."  Pl.'s Mot. Prelim. Inj. & TRO 6; <u>see also</u> Pl.'s App. 14 (Lucas Decl. ¶ 6 (stating that a "small number of contractors in the federal financial management systems market . . . have the specialized experience and expertise needed to win work as a prime contractor to support audited financial management systems")).  Members of this small group of contractors, GCE alleges, "regularly team together to compete for and perform contracts to implement and provide IT support for federal financial systems of record."  Compl. ¶ 15; <u>accord</u> Pl.'s App. 14 (Lucas Decl. ¶ 7).  GCE states that it "specializes in providing information technology services to federal agencies in the implementation and ongoing support of federal procurement and FSIO-compliant financial management systems," Pl.'s App. 2 (Muslimani Decl. ¶ 8), and, as such, is part of a niche market, Compl. ¶ 15.  GCE represents that

"only those contractors in the niche market for financial management systems work compete for contracts in that area, while those who do not have a specialty in financial management systems do not."  Pl.'s App. 20 (Lucas Decl. ¶ 24); see also id. at 14 (Lucas Decl. ¶ 8 ("[T]he number of companies that can bid successfully as a prime contractor for federal financial management systems work is generally limited to a few . . . .")).

        The specialization of audit-supporting federal financial management systems and related services, as well as the contractors providing those services, is illustrated by the federal government's recent plans to certify Shared Service Providers ("SSPs"),[8] which are "capable of providing support services for federal financial systems in accordance with accounting, business, and technical requirements that are standardized across the federal government." Id. at 3 (Muslimani Decl. ¶ 13).  The OMB established the Financial Management Line of Business ("FMLoB"), which is managed by both the FSIO and the OMB, id. (Muslimami Decl. ¶ 12), in order "to guide the acquisition of and business processes for federal financial management systems," id. at 13 (Lucas Decl. ¶ 3).  One goal of the FMLoB, which is "recognized by the federal government and the government contracts industry as an independent line of business," id. at 3 (Muslimani Decl. ¶ 12), is "to move federal agencies towards procuring financial management systems IT support work from specially certified Shared Service Providers who are capable of supporting financial management systems in accordance with standardized, government-wide business and technical requirements," id. at 13 (Lucas Decl. ¶ 4 (citation omitted)).

        In order to achieve that objective, the FSIO developed a Due Diligence Checklist to be utilized by the OMB, the FSIO, and "customer agencies to assess the abilities of potential and current [SSPs] in several areas, including but not limited to past performance, overall capabilities, and experience in . . . operating a customer-focused, modern financial operation." Id. at 878.  The Due Diligence Checklist is comprised of five parts.  Four of these parts, which address the minimum criteria for an SSP candidate to become qualified to offer SSP services and for an existing SSP to remain compliant, determine: (1) whether an SSP candidate should have the authority to operate as an SSP; (2) whether an existing SSP remains in compliance with the Due Diligence Checklist; (3) which SSP candidates "are most qualified to serve as an SSP and to meet the goals and objectives of the FMLoB initiative"; and (4) the stability and capability of SSP candidates.  Id.  The fifth part "is used to better understand the capabilities of the SSP and assist Agencies in choosing between multiple SSP candidates." Id.  Although the FSIO "has announced plans to certify FMLoB Shared Service Providers . . . capable of providing support services for federal financial systems in accordance with accounting, business, and technical requirements that are standardized across the federal government," the FSIO has not yet released

---

        [8] An SSP "is a separate and distinct organization established to provide technology hosting and administration, application management services, system implementation and[,] where appropriate, business process services to other entities." Pl.'s App. 878 (containing the "Financial Management Line of Business (FMLoB) Federal Shared Service Provider (SSP) Due Diligence Checklist").

an FMLoB solicitation.  Id. at 3 (Muslimani Decl. ¶ 13); accord id. at 13 (Lucas Decl. ¶ 4).
Nonetheless, GCE anticipates that federal agencies will procure work from certified FMLoB
SSPs in the future because "[s]ome agencies already require bidders for financial management
system work to submit this 'Due Diligence' checklist as part of the competition . . . ."  Id. at 13
(Lucas Decl. ¶ 4).

### 3.  Government Procurement Practices for Audit-Supporting Federal Financial Management Systems Services and Related IT Work

        While federal agencies may eventually procure audit-supporting federal financial
management systems services and related IT work from certified FMLoB SSPs in the future, the
prior and current government procurement practices for this type of work warrant discussion.
GCE states that "[c]onsistent with the facts that federal financial management systems IT work is
unlike other kinds of IT work, and that different groups of contractors compete for the two kinds
of work," Pl.'s Mot. Prelim. Inj. & TRO 6; supra Part I.A.2, federal entities "consistently bid out
their IT work for their audited financial systems separately from their mission-focused or other IT
work," Pl.'s Mot. Prelim. Inj. & TRO 6.  For example, GCE states that "[r]equirements regarding
FSIO-certified software products, subject-matter expertise and technical expertise specifically
relating to federal financial management systems are regularly included in federal financial
management system IT support contracts."  Pl.'s App. 42 (Winslow Decl. ¶ 45).  As a result,
these specifications, according to GCE, "would not . . . generally be required for support services
for mission or administrative systems support work."  Id.

### a.  Examples of Agency Procurements Outside the Coast Guard

        GCE states that the Coast Guard has "never bid" federal financial systems work and other
types of IT work together in one solicitation.  Prelim. Inj. Hr'g Tr. 6:23-25.  In fact, GCE
indicates that the Coast Guard kept "this work . . . on parallel and separate tracks," a course of
conduct that it states comported with "a universal practice among virtually all federal agencies."
Id. at 6:25-7:4.  In support of this contention, GCE "identified seventeen examples of . . .
solicitations from 1990 through 2008 that called for specialized expertise or otherwise made
clear the highly specialized nature of these financial management systems procurements."  Pl.'s
Mot. Prelim. Inj. & TRO 7.  Of those seventeen, GCE represents that "at least fourteen federal
entities issued competitive solicitations for audited financial management systems IT work
separate from any mission-focused or other kinds of IT work."  Id. at 6; see also id. at 17
(indicating that procurements for financial management systems work after 2005 "have also been
limited in scope to financial management systems, have excluded mission-related and other IT
work, and have required technical expertise and past performance experiences specific to
financial management systems").  The entities issuing such solicitations include the Agency for
International Development ("AID"), the Environmental Protection Agency ("EPA"), the Federal
Communications Commission ("FCC"), the Office of Personnel Management ("OPM"), the
Pension Benefit Guaranty Corporation ("PBGC"), the National Aeronautics and Space
Administration ("NASA"), the United States Secret Service ("USSS"), as well as the

-13-

Departments of Agriculture ("USDA"), Commerce ("DOC"), Energy ("DOE"), Homeland Security ("DHS"), Housing and Urban Development ("HUD"), the Interior ("DOI"), Justice ("DOJ"), and Labor ("DOL").  Pl.'s App. 16-18 (Lucas Decl. ¶¶ 14-16).

For example, a 1990 solicitation issued by the USDA sought an integrated financial management information system in which "management and program accounting system functions shall be fully integrated with a core financial system" and in compliance with all Joint Financial Management Improvement Program ("JFMIP") functional and interface requirements. Id. at 302.  Similarly, the AID issued a solicitation in 1999 in which it sought "to explore ways to improve agency financial management" and to invite "all firms which offer financial management system software for the Federal environment" to demonstrate a product that would comply with JFMIP core requirements and AID-specific requirements.  Id. at 307.  Other solicitations GCE identifies that demonstrate separate procurements of audit-supporting federal financial management systems work include:

- A 2000 solicitation, see id. at 311-14, wherein NASA sought the acquisition and implementation of "Core Financial software to serve as the backbone for other functional areas.  Core Financial consists of standard general ledger, accounts receivable, accounts payable, budget execution, purchasing, fixed assets, project accounting, and cost allocation," id. at 312.

- A 2000 solicitation from the DOE, see id. at 315-16, that sought "to replace its legacy financial systems with a single integrated system that meets current government standards," id. at 316.

- A 2003 solicitation from the DOC, see id. at 317-23, that involved the agency's Oracle-based Commerce Administrative Management System, which was composed of a standard Core Financial System that "capture[s] financial transactions and/or support[s] ledger improvements," id. at 318, 321.

- A 2004 solicitation from the DOI, see id. at 324-25, that sought systems integration and "deployment of a unified financial management system . . . [that] will be able to eliminate multiple bureau-level management information and desktop applications," id. at 324-25.

- A 2005 solicitation from the DOJ, see id. at 326-28, that sought to improve financial performance through a unified financial management system, id. at 327.  The scope of work included providing functionality in several core financial management system areas, namely core financial management, cost management, receivable management, funds management, payment management, reporting, and general ledger

management.  Id. at 326-28.

•       A 2005 solicitation, see id. at 329-45, wherein the PBGC sought an
        overhaul of its financial and accounting programs that would replace
        current performance accounting, trust accounting, and financial reporting
        ledgers with "an accounting classification structure that is Oracle Federal
        Financials based," id. at 330-31.

•       A 2005 solicitation from the USDA, see id. at 346-63B, that sought "[t]o
        address challenges and opportunities in the rapidly changing federal
        financial management and technology environment" and "to improve
        financial management performance by efficiently providing USDA
        agencies with a modern, core financial management system that both
        complies with federal accounting and systems standards and provides
        maximum support to the USDA mission," id. at 347.

•       A 2006 solicitation from the EPA, see id. at 364-77, that sought the
        implementation of an agency-wide financial management system that "will
        result in an integrated solution composed of a COTS product or suite of
        products.  The core financial system will be JFMIP-certified," id. at 366;
        see also id. at 372 (containing special contract requirements reserving the
        EPA's right to issue task orders for "services required to implement new,
        federally-mandated requirements for federal financial management
        systems").

•       A 2006 solicitation, see id. at 378-92, wherein the USSS sought "expert
        technical and operational knowledge" of various financial software
        applications "in order to develop and enhance interoperability of these
        products . . . while ensuring security and enhancing reliability,"[9] id. at 380.
        Contractors would be required to provide "software development and
        maintenance services, training, production operations services[,] and help
        desk services . . . ."  Id. at 382.

•       A 2006 solicitation from the HUD, see id. at 393-423, that sought the
        "replace[ment of] the current core financial system with a solution that
        includes all financial management organizations and financial systems that
        provide financial information to HUD's consolidated financial
        statements," id. at 418.  One of the system integration objectives HUD
        identified was a single, scalable, integrated financial management system
        that "processes and reports all core financial events enterprise-wide from

---

        [9]  These applications included, among others, Oracle Federal Financials, which the USSS
used to support its core financial management.  Pl.'s App. 378-79.

point of origin to point of dissemination." Id. at 420.

- A 2007 solicitation, see id. at 424-36, wherein the DOI sought "an industry partner(s) to assist providing support to current and potential client agencies of the Oracle Federal Financials accounting system," id. at 425, as well as a contractor with: (1) "in-depth knowledge of Oracle Federal Financial"; (2) experience "integrating other Oracle applications . . . with the core Oracle Federal Financials accounting system"; and (3) "[k]nowledge of Federal accounting concepts and standards, Chief Financial Officer (CFO) Act, (GRPA), Government Management Reform Act (GMRA), Federal Information Security Management Act (FISMA)[,] and relevant [OMB] circulars and bulletins on financial accounting and internal and system controls," id. at 429.

- A 2007 solicitation from the FCC, see id. at 437-50, that focused upon "the replacement of those processes and systems that are considered a consolidated 'core' based on FCC financial operations and FSIO standards," id. at 439.  The FCC indentified numerous objectives, which included, among other things, establishing an "integrated core financial management system that meets FSIO and FCC-specific requirements as well as the financial management system requirements set forth in Section 7 of OMB Circular A-127" and improving "financial processes that complement financial management systems operational efficiency and effectiveness[.]" Id. at 440.

- A 2007 solicitation from the DHS, see id. at 451-70, that sought to establish the "Oracle Baseline as a services platform to support DHS components migrated from their existing financial management systems," id. at 455, and to transition components onto the Transformation and Systems Consolidation Oracle Baseline "to support the Department's financial management systems consolidation effort," id. at 456.

- A 2007 solicitation, see id. at 471-91, wherein the OPM sought to "replace . . . two core financial systems with a single, integrated financial system under the Financial Systems Modernization Project (FSM)," id. at 478, and required the contractor "to have a comprehensive knowledge of federal regulations, policies, and guidance that will impact the design and implementation of the FSM solution," id. at 482.  This solution included compliance with forty-eight publications related to financial management systems, core financial system requirements, financial and accounting services, and information technology systems. Id. at 482-84.

•       A 2008 solicitation from the DOL, see id. at 492-504, that sought to migrate its Accounting and Related Systems mainframe accounting system "to a new core financial management system" that would be conducted "in compliance with all applicable financial systems regulations and guidance," id. at 493.  The solicitation sought the services of a federal or commercial financial management SSP in the following areas: (1) technology hosting and administration services, which included providing the IT infrastructure; (2) application management services, which included providing software and services for running and managing financial management software, as well as feeder systems that provided data to the financial management software; and (3) system implementation services, which included services to assist with the migration of current financial management operations to the financial management SSP environment. Id. at 495.

According to GCE, these solicitations contained "specific and detailed expertise requirements," including specific regulatory and compliance requirements.  Perm. Inj. Hr'g Tr. 16:18-20, May 28, 2008.  GCE proffers these examples because it believes that these solicitations reveal a "practice across the Federal Government . . . [of] what a typical solicitation for financial systems IT work looks like and what it contains."  Id. at 16:11-14.  The government acknowledges that federal agencies "may very well be procuring other IT systems separately" from financial management IT systems.  Prelim. Inj. Hr'g Tr. 30:11-12.

        GCE notes that it is aware of "only one counterexample . . . where an agency attempted to procure IT work for both financial- and non-financial systems in a single, integrated solicitation": a 2000 Department of Veterans Affairs ("VA") competition valued at over $400 million that was known as the Core Financial and Logistics System ("CoreFLS").[10]  Pl.'s Mot. Prelim. Inj. & TRO 6-7; accord Pl.'s App. 18 (Lucas Decl. ¶ 17).  GCE suggests that examination of the VA's solicitation is "very instructive" because it "combined financial systems IT work and other kinds

---

[10]  GCE speculates that the reason it has only been able to offer one counterexample results from the fact that

        [f]rom 1987 through 1999, there was a separate financial management software system schedule that Federal agencies had to use for their audit supporting IT procurements.  It just underscores the point that . . . procurements across the Federal Government for these kinds of IT services have always been seen as distinct and separate.

Perm. Inj. Hr'g Tr. 19:11-19.

of IT work.  It did so very, very explicitly."[11]  Prelim. Inj. Hr'g Tr. 27:6-9.

### b.  Recent Coast Guard Procurements

According to GCE, "the Coast Guard has competed IT support services work for its financial management systems independently of its other IT work . . . ."  Pl.'s App. 20 (Lucas Decl. ¶ 25); see also Compl. ¶ 13 (alleging that the Coast Guard's solicitations for audit-supporting federal financial management systems services and related IT work have, "[s]ince at least 1995, . . . been issued separately and distinctly from solicitations for mission and administrative systems work").  It notes that the Coast Guard possesses an "eight year history of procuring IT services on separate tracks for financial and non-financial systems work," Perm. Inj. Hr'g Tr. 13:19-22, during which time the agency "procured federal financial systems IT support services through competitions restricted in scope to financial systems," Pl.'s App. 9 (Muslimani Decl. ¶ 35).  GCE represents that it is unaware "of any instance in which the Coast Guard has mixed IT support services for JFMIP/FSIO-compliant financial systems management work with mission and administrative systems work [from] . . . 1995 to the present."  Id. (Muslimani Decl. ¶ 36).

GCE "has won competitive awards to provide federal financial management systems IT support services to the Coast Guard since 2000."  Id. at 33 (Winslow Decl. ¶ 3).  In 2000, the Coast Guard awarded to GCE a task order related to the replacement of an obsolete financial information system with a new system based on Oracle Federal Financials.  Id. (Winslow Decl. ¶¶ 4-5); see also id. at 697-717 (containing the contract).  One year later, the Coast Guard competitively awarded to GCE a contract for software maintenance of its financial acquisition system.  Id. at 34 (Winslow Decl. ¶ 8); see also id. at 718-28 (containing the contract).  In 2002, GCE won a solicitation for work designed to upgrade the Coast Guard's enterprise financials systems, id. at 34 (Winslow Decl. ¶ 9), and it was awarded a contract in 2004 to perform continued maintenance of the Coast Guard's Core Accounting System ("CAS"), which included "resolution of software bugs, performing upgrades, and configuring the systems in accordance with changing federal financial accounting regulations and guidelines,"[12] id. at 34-35 (Winslow Decl. ¶ 10).  Additionally, in 2005 the Coast Guard awarded to GCE a contract to provide software maintenance for the Coast Guard's Finance and Procurement Desktop and Contract

---

[11]  The CoreFLS system utilized three software packages, including Oracle Federal Financials, Pl.'s App. 832, and was conceived as being "used by every financial and logistics office within [the] VA" as a means of "integrat[ing] financial and logistics activities," id. at 308A.  The VA encountered substantial difficulties with the CoreFLS system's implementation and, in 2004, abandoned the program.  Id. at 18 (Lucas Decl. ¶ 17); accord id. at 831-38; Pl.'s Mot. Prelim. Inj. & TRO 7 n.3.

[12]  The CAS was "the primary accounting system for the [Coast Guard] Financial Managers" and "consist[ed] of [a] highly complex set of Commercial Off-The Shelf (COTS) and Government Off-The Shelf (GOTS) products."  AR 2312.

Information Management System programs.  Id. at 35 (Winslow Decl. ¶ 12).

## B.  The Coast Guard's OSC

In 1991, the Coast Guard established the OSC, a "government-owned, contractor-operated software development facility."  AR 3014.  The OSC was a field unit of the Coast Guard Chief Information Officer ("CIO").  Id. at 304.  "From inception, the OSC organizational model has been based on government oversight of an in-house contracting staff."  Id.  Its primary function is to provide full life cycle support[13] for operationally-focused Coast Guard Automated Information Systems that supported the Coast Guard's five strategic missions.[14]  Id. at 532-33, 1230.  In this capacity, the OSC "engineers, develops, fields, maintains, operates[,] and provides user support for Coast Guard enterprise information systems.  Such systems include navigation systems, electronic systems, sensor systems[,] etc."  Id. at 3017.  "When the OSC was established, it was a data center with five operational systems."  Id. at 280.  Shortly thereafter, it began running enterprise systems.  Id.

In July 2000, the OSC was designated the "Systems Development Center for the Coast Guard."  Id. at 292.  This designation "spearheaded the change of the OSC from a data center only to a Center of Excellence focused on Systems Development along with data floor operations."  Id. at 3014.  As a System Development Center, the OSC "specifically focuses on systems with Coast Guard-wide scope."  Id. at 305.  To that end, the OSC developed a "thorough process for vetting requests for system support to ensure that those systems brought into their charge have an enterprise-level focus, or support mission critical to Homeland Security[,] as well as having a strong and effective business sponsorship."  Id.  The OSC's function was subsequently narrowed from a "'systems' development center to a 'software' development center" out of a recognition that Coast Guard "'systems' development encompassed much more than software, which was the OSC's area of expertise."  Id. at 304.  In August 2004, the OSC was renamed the Software Development Center, which "provides project management expertise to all enterprise application development to ensure standards are followed and products are aligned

---

[13] Full life cycle support "means managing all technical aspects of a specific [Automated Information System,] including computer operations, system development, maintenance, enhancement, and technical administration of designed systems.  AR 1088.  Full life cycle support for systems hosted at the OSC included, among other things, providing: (1) twenty-four hour on-site security and system monitoring; (2) climate-controlled computer floor space; (3) primary and backup power; (4) full system operations and administration support; (5) computer security support; (6) and customer service support.  Id. at 1088-89.

[14] These five strategic missions are: (1) Protection of Natural Resources; (2) National Defense; (3) Maritime Safety; (4) Mobility; and (5) Security.  AR 532.

with the Enterprise Architecture."[15]  Id. at 304-05.

Since 2000, the OSC "has become an established software engineering center for enterprise applications providing standardized lifecycle development processes, a highly productive system engineering and software development performance environment, and an efficient use of government resources in managing contractor performance."  Id. at 3014.  When it was established, the OSC employed forty-five full-time personnel who supported five mission-critical information systems.  Id. at 280, 532.  By 2004, over 340 full-time personnel "operat[ed], maintain[ed], develop[ed], and/or provid[ed] user support for over 40 enterprise-wide information systems."  Id. at 532, 1230; cf. id. at 280, 305 (indicating over fifty-one systems).  In 2005, the OSC was considered "the Coast Guard's largest and most successful Government Owned-Contractor Operated facility."  Id. at 2911.

The OSC has utilized four major contract vehicles for supporting Coast Guard mission areas since it was commissioned in 1991.  Id. at 280, 305.  The first contract vehicle, the Operations and Maintenance Contract ("O & M"), expired in 1996 and was succeeded by O & M II.  Id. at 305.  During performance of the O & M II contract, the number of systems at the OSC increased from five to approximately twenty-four.  Id. at 306.  The third and fourth contract vehicles, the SETS I and SETS II task orders, were competed and issued under the Department of Transportation ("DOT") ITOP II contract.[16]  Id. at 306, 497.

## C.  The ITOP II Contract

The ITOP II contract was a multiple-award, indefinite-delivery/indefinite-quantity ("ID/IQ") GWAC issued in 1999 with a base contract period of seven years.  Id. at 4864; accord Pl.'s App. 535, 543.  It contained provisions for firm fixed-price,[17] cost-plus-fixed-price, cost-

---

[15]  Although the OSC "has a different name designation," it appears that it is nonetheless still referred to as the OSC.  AR 305.

[16]  In September 2004, the ITOP II contract was transitioned from the DOT to the General Services Administration ("GSA") Enterprise Government Wide Acquisition Contract ("GWAC") Center.  AR 306, 497.  Federal Acquisition Regulation ("FAR") section 2.101 defines a GWAC as a "task-order or delivery-order contract for information technology established by one agency for Governmentwide use . . . ."  48 C.F.R. § 2.101 (2007).

[17]  A firm fixed-price contract as one that "provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract."  48 C.F.R. § 16.202-1.  It is "suitable for acquiring commercial items . . . or for acquiring other supplies or services on the basis of reasonably definite functional or detailed specifications . . . when the contracting officer can establish fair and reasonable prices at the outset . . . ."  Id. § 16.202-2.

plus-award-fee,[18] time and materials,[19] and fixed-price-award-fee[20] task orders.[21]  AR 4747.
Awarded to thirty-five large, small, and small-disadvantaged businesses, the ITOP II contract
expired on January 13, 2006, thereby precluding the placement of additional orders after that
date.  Id. at 4864.  Existing task orders under the ITOP II contract, however, could "have a
performance period of five years beyond the expiration of the ITOP II GWAC."  Pl.'s App. 543.

## 1.  The Scope of the ITOP II Contract

The ITOP II contract was designed "to provide federal agencies and the Department of
Defense with Information Technology (IT) integrated solutions to include technical services,
hardware and software."  Id.; accord AR 497.  Its Statement of Work ("SOW") indicated that the
ITOP II contract was "intended to cover the gamut of IT efforts," AR 4711; see also id. at 4763
(indicating that the ITOP II contract presented a "wide diversity of work possible"), and
identified three "primary functional areas" along with examples of the types of tasks included
under each area, id. at 4711; see also id. at 4864 (stating that the ITOP II contract "divided the
range of available IT solutions into three functional support areas).  These three functional areas
included: (1) Information Systems Engineering ("ISE"); (2) Systems Operations and
Management ("SOM"); and (3) Information Systems Security Support Services ("ISS").  Id. at
4711-12.  Together, the three functional areas "provide[d] the flexibility and the wide range of
technical and/or contracting resources necessary to help with meeting all Information Technology
program requirement(s)."[22]  Pl.'s App. 543.

---

[18]  A cost-plus-award-fee contract is "a cost-reimbursement contract that provides for a
fee consisting of (a) a base amount (which may be zero) fixed at inception of the contract[,] and
(b) an award amount, based upon a judgmental evaluation by the Government, sufficient to
provide motivation for excellence in contract performance."  48 C.F.R. § 16.305.

[19]  A time and materials contract "provides for acquiring supplies or services" based upon
"(1) [d]irect labor hours at specified fixed hourly rates that include wages, overhead, general and
administrative expenses, and profit; and (2) [a]ctual cost for materials . . . ."  48 C.F.R.
§ 16.601(b).

[20]  Award-fee provisions "may be used in fixed-price contracts when the Government
wishes to motivate a contractor and other incentives cannot be used because contractor
performance cannot be measured objectively."  48 C.F.R. § 16.404(a).

[21]  A task order is "an order for services placed against an established contract or with
Government sources."  48 C.F.R. § 2.101.

[22]  The ITOP II contract SOW indicated that "[o]ther IT efforts, as required, can be
obtained" in addition to these primary functional areas.  AR 4711.

The first functional support area, ISE, "addresse[d] the system life cycle needs for information and computing resources at all organization levels." AR 4713. Examples of tasks incorporated under ISE included:

> (1) IT Strategic Planning, Program Assessment, and Studies; (2) Business Process Reengineering (BPR); (3) Software Life Cycle Management (SLCM); (4) Software Engineering; and (5) Software Maintenance and Licensing[;] (6) . . . Support Electronic Commerce (EC)/Electronic Data Interchange [(EDI)]; (7) Independent Verification and Validation; (8) IT Research and Development[;] and (9) Other ISE Tasks.[23]

Id. (footnote added). The second functional support area, SOM, "addresse[d] the overall system operations and management needs for information and computing resources at all organizational levels." Id. at 4720. Examples of tasks incorporated under SOM included:

> (1) Office Automation/Help Desk; (2) Network Support; (3) Computer Center Technical Support Services; (4) Media/Learning Center Support; (5) Telecommunications Support; (6) Seat Management; (7) Independent Verification and Validation; (8) Acqui[sition] and manage[ment of] software maintenance and/or software licenses from 3rd party sources[;] and (9) Other [SOM] Tasks.[24]

Id. (footnote added). The third functional support area, ISS, "addresse[d] the security of information and computing resources at all organizational levels." Id. at 4730. Examples of tasks incorporated under ISS included:

> (1) Mainframe Automated Information Security Systems; (2) Disaster Recovery, Continuity of Operations, and Contingency Planning; (3) Computer Security Awareness and Training; (4) Computer Security Incident Response; (5) Virus Detection, Elimination, and Prevention; (6) Computer Security Plan Preparation; (7) Certification of Sensitive Systems; (8) Quantitative Risk Analysis of Large Sensitive Systems; (9) Security for Small Systems, Telecommunications, and Client Server; (10) Hot-site, Cold-site Services; (11) Independent Verification and Validation; (12) Acqui[sition] and manage[ment of] software/hardware maintenance and/or software licenses from 3rd party sources[;] and (13) Other ISS Tasks.

---

[23] The ITOP II contract SOW provided specific examples of expectations for each category. AR 4713-20.

[24] As with ISE tasks, the ITOP II contract SOW provided specific examples of expectations for each category of SOM tasks. AR 4720-29.

Id.  The ITOP II contract SOW indicated that the contractor was required to provide resources to support other ISE, SOM, and ISS tasks "that may not have been specifically mentioned."  Id. at 4720, 4729, 4736.  It also stated, along with previously discussed ISE, SOM, and ISS tasks, that the contractor "shall be capable of providing the broad range of IT services and keep current with emerging technologies" because "[t]he contract [was] intended to cover all types of IT services [and it] would be impossible to identify all requirements and/or anticipate how technology will evolve over the life of the contract . . . ."  Id.

The ITOP II contract SOW indicated that "[u]nder any of the three functional areas, a task order may be used to acquire hardware/software that is integral to the services being provided." Id. at 4712.  It contained a nonexhaustive list of examples of envisioned hardware/software components, including network devices, switches, routers, bridges, hubs, protocol translators, models, cabling, wiring closet hardware, wireless access devices, IT infrastructure hard/software utilities, CASE tools (examples of which included Oracle Case and Netscape), personal computers, servers, printers, CD-ROMs, COTS items, and general supplies.  Id.; see also id. at 4766 (noting that these are "examples" of items that can be obtained").  The ITOP II contract SOW noted that the ITOP II contract was not intended to "become a shopping center" for an endless supply of hardware and software acquisitions.  Id. at 4765.  Rather, the ITOP II contract was designated as a "solutions based contract" in which any hardware or software "must be considered to be critical and related to the services being acquired under the Task Order."  Id. at 4766.

## 2.  Task Order Provisions Contained Within the ITOP II Contract

The ITOP II contract provided that "[a]ll [task orders] are subject to the terms and conditions of the contract.  In the event of conflict between a [task order] and the contract, the contract will take precedence."  Id. at 4747; see also id. at 4771 (indicating that the contract shall control in the event of a conflict between a delivery order or task order).  The ITOP II contract did not require that task orders be issued competitively.  Id. at 4749.  Instead, task orders "may be issued on either a competitive or non-competitive basis," subject to the terms of the ITOP II contract.  Id.

The government intended "to compete all [task orders] among the contractors awarded a contract within the designated functional area."  Id. at 4748.  However, awardees were not necessarily given an opportunity to be considered for a particular task order if the contracting officer determined that:

> (1)  The agency need for such supplies or services is of such urgency that providing such opportunity would result in unacceptable delays;
>
> (2)  Only one such contractor is capable of providing such supplies or services required at the level of quality required because the supplies or services ordered are unique or highly specialized;

(3)  The order should be issued on a sole source basis in the interest of economy and efficiency as a logical follow-on to a [task order] already issued under the contract or through exercise of option periods specified in the original [task order], provided that all awardees were given fair opportunity to be considered for the original [task order]; or

(4)  It is necessary to place a Task Order to satisfy a minimum guarantee . . . .

Id.  The contracting officer's "selection decision on each [task order] shall be final and shall not be subject to the protest or disputes provisions of the contract, except for a protest that the [task order] increases the scope, period, or maximum value of the contract."  Id.  Although the task order "methodologies explained [in the ITOP II contract] represent the Government's initial approach to Task Order issuance, hopefully, through Government and Contractor cooperation and innovation, these methodologies will regularly evolve to incorporate lessons learned and to become more efficient and effective."  Id. at 4748-49.

Additionally, the ITOP II contract placed time limitations upon the performance of task orders in accordance with FAR § 52.216-18, which was incorporated by reference:

a.      No task order shall exceed a 5 year period of performance.

b.      The period of performance, deliverables, and milestones shall be specified in each [task order].  No [task order] shall be issued after the date for placement of task orders as cited in Section I, FAR 52.216-18, "Ordering[.]"

Id. at 4739.  Pursuant to FAR § 52.216-18, the ITOP II contract set forth the following ordering clause, which addressed each contract line item number ("CLIN"):

(a) Any supplies and services to be furnished under this contract shall be ordered by issuance of Delivery Orders or Task Orders by the individuals or activities designated in the Schedule.  Such orders may be issued as follows:

| CLINs | Ordering Period |
|-------|-----------------|
| All CLINs | Seven (7) years from date of contract execution; |

Id. at 4771.  Delivery or performance "shall be made only as authorized by orders issued in accordance with the Ordering clause."  Id. at 4772.

Additional contract clause provisions contained within the ITOP II contract made the determination by the Government Fee Determination Official of an award fee earned both binding and "not . . . subject to appeal under the 'Disputes' clause or to any board or court."  Id.

at 4774.  Furthermore, the ITOP II contract required that "[e]ach employee of the Contractor shall be a citizen of the United States of America, or an alien who has been lawfully admitted for permanent residence . . . or who presents other evidence from the Immigration and Naturalization Service that employment will not affect his/her immigration status."  Id. at 4776.

### 3.  Labor Categories and Qualifications Set Forth Within the ITOP II Contract

The ITOP II contract set forth twenty-four labor categories and qualifications, ranging from ITOP II Program Manager to Imaging Specialist.  Id. at 4779-83.  The descriptions of these labor categories provided the scope of various responsibilities expected to be encompassed under the ITOP II contract.  For example, a Computer System Analyst, among other things, "review[ed] computer software possessing a wide range of capabilities, including numerous engineering, business, and records management functions" and provided "support for the installation, testing, implementation, and ongoing maintenance of the hardware/software . . . ."  Id. at 4779.  A Systems Engineer, as part of his or her work, "[a]pplie[d] software, hardware, and standard[] information technology skills in the analysis, specification, development, integration, and acquisition of systems for information management applications" and ensured that those systems were "compliant with standards for open systems architectures, reference models, and profiles of standards . . . ."  Id. at 4780.  An Information Systems Engineer, among other things, "[e]valuate[d] analytically and systematically problems of workflow, organization, and planning and develop[ed] appropriate corrective action," as well as developed and applied organization-wide information models to design and build integrated, shared software and database management systems.  Id. at 4781.  It is noteworthy that none of these labor categories or job qualifications specifically referenced knowledge or expertise in audit-supporting federal financial management systems.  Cf. id. at 4780 (describing a functional expert in a particular subject matter who "[p]ossesses requisite knowledge and expertise so recognized in the professional community that the Government is able to qualify the individual as an expert in the field for an actual [task order]").

### 4.  Limitations Under the ITOP II Contract

The ITOP II contract also included a provision governing a contractor's exclusion from future government contracts.  Id. at 4761-62.  Because work performed under the ITOP II contract "may [have] provide[d] the Contractor with access to advance information about future Government procurement, which information is not generally available to other persons or firms," the ITOP II contract imposed several restrictions upon the contractor's ability to participate in future competitions "in order to prevent a potential bias, unfair, competitive advantage, or other potential conflict of interest . . . ."  Id. at 4761.  For example, the contractor was excluded from, among other things, competition for, or award of, any government contract "which call[ed] for the evaluation of system requirements, systems definitions, or other products developed by the Contractor under this contract" or "which call[ed] for the construction or fabrication of any system, equipment, hardware, and/or software for which the Contractor

participated in the development of requirements or definitions pursuant to this contract."[25]  Id.
However, these restrictions did "not exclude the Contractor from performing work under any
amendment or modification to this contract or from competing for an award for any future
contract for work which is the same or similar to work performed under this contract," and the
government reserved the right to waive any of these provisions "if deemed in the best interest of
the Government."  Id. at 4762.

### 5.  The SETS I Task Order

As noted above, the third and fourth contract vehicles utilized by the OSC were competed
and issued under the ITOP II.  See supra Part I.B.  The third contract vehicle, the SETS I task
order, was competitively awarded to QSS in July 2001, with the final option expiring in June
2005.  AR 497.  During the four-year base and option periods under the SETS I task order, the
OSC grew from supporting twenty-four critical, mission-essential systems to forty-one systems.
Id. at 306; cf. id. at 497 (stating that the OSC began with twenty-one critical, mission-essential
systems).

### D.  The SETS II Task Order and Solicitation[26]

In 2004, the Coast Guard identified a "need to provide all supplies and services required
to support Information Technology (IT) functions and equipment hosted by" the OSC.  Id. at 497.
Those functions included:

> primary software development and software maintenance activities, but also
> include[d] the software development and maintenance support functions such as:
> project management; software engineering; system life cycle management review
> and audits; quality assurance; configuration management; security; hardware
> maintenance and systems integration; database administration; system
> administration; network administration; database management; computer
> operations; technical writing; computer system fielding; system training; technical
> field support; data center analysis and capacity planning; and disaster recovery
> business continuity.

Id.  The Coast Guard analyzed "potential contract vehicles for the SETS re-compete" in order to
determine a "'best fit' recommendation for the anticipated tasking at [the] OSC."  Id. at 503.

---

[25]  This exclusion also prevented the contractor from serving "as a subcontractor, at any
tier, on such contract."  AR 4762.

[26]  The SETS II task order was previously named O & M Services III.  Pl.'s App. 547; see
supra Part I.B.  "The change of name from Operations & Maintenance (O&M) to Systems
Engineering and Technical Services (SETS) reflect[ed] an expanded focus over time from
operations and maintenance to system engineering."  AR 280.

After researching various government contract vehicles, the Coast Guard determined that "[t]he opportunity to use a GWAC or Multiple Award Contract (MAC) was attractive since this was a prime example of an acquisition streamlining technique as opposed to a full and open competition." Id. at 503-04.  Utilizing a GWAC vehicle, the Coast Guard reasoned, "would be in place with a pool of the best-qualified vendors.  In short, a competed infrastructure of qualified companies, known to have the technical capabilities would be in place, with an added level of competition among eligible contractors.  Selection procedures are flexible, efficient, and less susceptible to protest." Id. at 504.  Ultimately, after researching nineteen contract vehicles, the Coast Guard determined that the ITOP II contract would "best suit [the] OSC's needs based on criteria such as the number of eligible [Small Business Administration section] 8(a) companies, available ceiling over a 5-year period, support for a performance based statement of work, suitability in supporting a 5-year contract, references, analysis of labor rates, and customer service." Id.

On March 3, 2005, the Coast Guard issued a Task Order Request for Proposal ("RFP") under the ITOP II contract in "Functional Areas 1 and 2," id. at 512, ISE and SOM, respectively, which it noted were the functional areas that "represent the majority of services/support necessary at the OSC," id. at 503; see supra Part I.C.1.  As a "follow-on to replace the existing four-year task order," AR 498, the Coast Guard "anticipated that this competition will be among eligible 8(a) firms under the GSA ITOP II contract," id. at 503.  Specifically, the SETS II acquisition plan listed "five qualified [section] 8(a) firms eligible to compete for providing the required services," id., and indicated that the solicitation would be competed among these five firms,[27] id. at 504; cf. id. at 512 (stating that the SETS II task order would be competed among seven eligible 8(a) contractors, one of which was QSS).  The SETS II task order solicitation would be evaluated in accordance with FAR Part 16.505, id. at 512, and would be awarded on a combination fixed-price and cost-plus-award-fee basis, id. at 532.  Its period of performance was five years, including a one-month phase-in period, an initial six-month base period, four one-year option periods, and a final five-month option period. Id. at 533.

### 1.  The Scope of the SETS II Task Order

The SETS II task order Performance Work Statement ("PWS") indicated that the purpose of the task order was to obtain IT systems engineering and technical services to support the OSC. Id. at 532.  According to Patricia A. Thompson, Chief of the Office of IT Systems and

---

[27]   The five firms listed in the SETS II task order acquisition plan were [. . .].  AR 503.  According to the acquisition plan, these companies were deemed "strong 8(a) firms eligible to compete for providing the required services," but other "[i]nterested 8(a) firms will have sufficient time to perfect their teaming and subcontracting relationships." Id. at 502.  The acquisition plan further noted that "[h]istorically, the individuals performing under the contract have remained the same, simply moving from one contractor to another as the awardee has changed." Id.  In another planning document, the Coast Guard identified [. . .] as "eligible 8(a) Contractors under [the] ITOP II in Functional Areas 1 and 2." Id. at 512.

Infrastructure at the Coast Guard, the strategy for the SETS II task order "was to have one contractor provide all development and maintenance services for all of the systems at OSC, as well as allow for the growth in the number of systems supported during the term of the task order."  Def.'s Mot. Dismiss or, Alternative, Mot. J. Administrative R. & Def.'s Opp'n Pl.'s Mot. Prelim. Inj. & Application TRO ("Def.'s Mot. & Opp'n") Ex. 3 at 3 (Decl. Patricia A. Thompson ("Thompson Decl.")) ¶ 4).  A "single contractor approach . . . ensure[d] that there would be a consistent enterprise focus on all development work and not put OSC in the position of managing multiple contracts with various vendors[,] which is counter productive to managing from an enterprise perspective."  Id.

The contractor was required to demonstrate "[a]ppropriate systems engineering technical proficiency and experience," AR 501, in order to "provide software engineering and technical services that apply to existing and future computer systems and communications networks designated by the OSC for SETS II support under this Task Order," id. at 532.  Specifically, the SETS II task order PWS indicated that the contractor would

> provide software engineering and technical services that apply to existing and future computer systems and communications networks designed by the OSC for SETS II support under this Task Order.[28]  The Contractor shall respond to changing regulatory and mission requirements of the Coast Guard that may result in new computer systems and communications networks that [the] OSC hosts.

Id. (footnote added).

### a. General Contract Services Under the SETS II Task Order

The SETS II task order PWS required the contractor to "provide a broad range of services . . . ."  Id. at 543.  These services, "applicable to the Task Order overall[ and] not unique to a specific area," id., included: (1) Contract Program Management; (2) Technical and Business Area Management; (3) Human Resources Management; (4) Quality Assurance; and (5) Property Management, id. at 543-50.  Specific responsibilities were enumerated within these categories. For example, one component of Technical and Business Area Management services included "provid[ing] direct supervision of system management in the performance of the requirements of this PWS."  Id. at 546.  Property Management services required the contractor to (1) "establish and maintain agreements with vendors of software and hardware as required for and used by the systems covered under the SETS II Task Order," (2) "establish software licensing and

---

[28] The term "computer system," as defined within the SETS II task order PWS, "consists of a functional unit of one or more computers and associated hardware and software components including system software, application, communication and database software systems, databases, and files."  AR 632.  The term "communications network," as defined within the SETS II task order PWS,"is a collection of interconnected functional units that provides data communications service among stations attached to the network."  Id. at 631.

maintenance agreements for all commercial-off-the-shelf software (COTS) required for the systems specified in this PWS," id. at 549, and (3) "establish and maintain hardware licenses and maintenance agreements required to meet or exceed system availability for each system specified in this PWS," id. at 550.

### b.  System Services Under the SETS II Task Order

In addition to enumerating general contract services, the SETS II task order PWS listed specific "services to be provided for [Coast Guard] systems under this Task Order." Id. at 561. Contractor-provided IT services included:

> SETS II project management, system life cycle management, software engineering, software development, software upgrade and maintenance, quality assurance, configuration management, security, hardware upgrade and maintenance, hardware/software integration, database administration, system administration, network administration, data management, computer operations, technical writing services, customer hotline support, computer system fielding services, application system training, application technical field support, data center environmental monitoring and control, data center analysis and capacity planning, data center infrastructure reconfiguration, disaster recovery business continuity support, technical reference library support, property management, magnetic media support, and system transitions.

Id. at 532.  Many of these services can be classified within fourteen broad categories, all of which contained specific responsibilities: (1) Functional Area Management; (2) Help Desk Support; (3) Software Development and Maintenance; (4) Hardware Maintenance; (5) System Administration; (6) Database Administration; (7) Network Administration; (8) Data Management; (9) System Downtime; (10) Technical Writing; (11) System Transition; (12) Computer System Fielding; (13) Application System Training; and (14) Technical Field Support.  Id. at 550-60; see also Part I.D.1.b.i-v, infra (describing each of these categories. Appendix 5 of the SETS II task order PWS–"Additional Computer Systems Scenario"–outlined "general assumptions that can be made concerning the future for each general contract service area and system for the entire period of contract performance" and "assumed that none of the currently supported general contract services will be removed from the contract." Id. at 839. Although the Coast Guard anticipated that "[n]o changes in requirements are anticipated," the SETS II task order PWS indicated that "future systems may require an additional general contract service level of effort." Id.

### i.  Functional Area Management, Help Desk Support, and Software Development and Maintenance

Functional area management included the employment of functional area managers, who "shall act as department heads of contract work groups assigned to specific OSC systems." Id. at

550.  The contractor was required to furnish managers who "shall be qualified to manage and supervise the day-to-day operation of the assigned OSC system . . . ." Id.  According to the SETS II task order PWS, help desk support service was "currently not a SETS II service," except to the extent that this service related to a particular system discussed within the PWS. Id.  Thus, unless otherwise indicated, the contractor was not responsible for help desk support. Id.

Software development and maintenance services required that the contractor "develop, maintain, update and change application, system and [commercial-off-the-shelf] software for the systems specified in this PWS," as well as "provide software development and maintenance services for systems in this PWS." Id.  Specifically, the contractor was expected to "[p]erform software engineering (e.g.[,] analysis, design, development, testing, installation and implementation) to create software required to meet new or modified functional requirements," and "[d]evelop and submit . . . detailed, step-by-step software testing procedures for software changes to each system covered by this Task Order." Id. at 551.

### ii.  Hardware Maintenance, System Administration, and Database Administration

The SETS II task order PWS indicated that the contractor would perform hardware maintenance, which included "any preventative, corrective, and remedial hardware maintenance not covered by any hardware maintenance agreement with an outside vendor.  This maintenance shall adhere to recommendations of original or equivalent replacement equipment manufacturers and to system availability requirements as defined for each individual system under this PWS." Id. at 552.  Examples of hardware maintenance included hardware testing (e.g., quality assurance), documentation (e.g., updating manuals, diagrams, and depicting logical and physical designs of each system), performance level and efficiency (e.g., analyzing capacity levels and utilization), and improvement (e.g., installing, testing, and evaluating new hardware). Id. at 552-53.

The contractor was also required to perform system administration activities, which were designed to maximize system availability and to provide monthly progress reports for the status of these activities. Id. at 553.  As part of its system administration duties, the contractor was expected to engage in systems resource management support (e.g., developing parameters and procedures for responding to alarms and warnings, and recovering and restoring operations from backups) and to establish procedures (1) "to ensure the security, control and auditing of each system" (e.g., maintaining user access control lists to delineate authorized access to computer systems and provide data security)," (2) "to provide for the organization and availability of . . . data (e.g., data management)," (3) "to provide for effective and efficient production control," (4) "to provide for effective and efficient performance monitoring and resource accounting (e.g., monitoring system activities such as memory consumption, response time, resource usage requirements)," and (5) "to provide user account administration." Id. at 553-54.  Additionally, the contractor assumed database administration responsibilities, which included maintaining data element dictionaries, updating documentation depicting logistical and physical designs of databases, delivering a Database Activity Report, and implementing proposed database

improvement alternatives.  Id. at 554.

### iii.  Network Administration, Data Management, and System Downtime

The contractor's network administration responsibilities required it to "operate, maintain, and update network hardware, software, and configuration files required for the operation and maintenance of each system specified in this PWS."  Id. at 555.  Transmission Control Protocol and Internet Protocol software, for example, constituted one of several components incorporated into network administration.  Id.  Data management required the contractor to perform various tasks related to data entry and validation (e.g., ensuring correct and valid data are entered into each system), data analysis and validation (e.g., checking and correcting errors), and data retrieval and transfer.  Id. at 555-56.

The contractor also would perform system downtime services, which required "provid[ing] system-wide on-line access to authorized system users, allowing access to simultaneously logged in users."  Id. at 556.  As such, the contractor was required to schedule maintenance and other downtime services during hours specified within the SETS II task order PWS.  Id.; accord id. at 557 (setting forth parameters related to scheduled system downtime). Additionally, the SETS II task order PWS contained provisions related to unscheduled system downtime and provided examples of systems, such as the monthly calculation of actual system availability, that must be performed during downtime periods.  Id. at 556, 558.

### iv.  Technical Writing, System Transition, and Computer System Fielding

As part of its technical writing services, the contractor was required to "prepare, update, and maintain documents necessary to facilitate . . . use, operation, development, and maintenance."  Id. at 558.  In addition to listing specific materials that must be included within contractor-developed documentation, the SETS II task order PWS indicated that the contractor must "follow [the] OSC's existing templates, document formats, and style guidelines."  Id.  The contractor's system transition services included support for each system as specified.  Id. at 559. Computer system fielding services required, among other things, that the contractor prepare and distribute release packages, as well as other materials, to accredited user sites.  Id.

### v.  Application System Training and Technical Field Support

Finally, the contractor was responsible for providing application system training and technical field support.  Id. at 559-60.  Application system training involved the contractor training government-approved field users and systems managers.  Id. at 559.  Technical field support services included the contractor "providing technical expertise and problem resolution" and "configur[ing] and maintain[ing] an online database functional test environment" that would support development contractors, student access, and program manager testing.  Id. at 560.

### c. OSC System Requirements Under the SETS II Task Order

In Parts I.D.1.b.i-v, supra, the court described system services that the contractor was required to provide for Coast Guard systems under the SETS II task order. This section details each system encompassed by the SETS II task order in order to provide an understanding of the types and functions of the systems hosted by the OSC. For each system, the SETS II task order PWS designated which system services were applicable, identified additional requirements that the contractor must apply to each system when necessary, and specified any other pertinent performance requirements. Id. at 561. Each system was represented by a sub-CLIN. See id. at 561-618.

As mentioned in Part I.D.1.b, supra, Appendix 5 of the SETS II task order PWS outlined "general assumptions that can be made concerning the future for each general contract service area and system for the entire period of contract performance." AR 839. The categories into which a particular system was classified depended upon the system's size.[29] Id. The SETS II task order PWS also detailed future assumptions for systems and indicated that the Coast Guard anticipated the addition of twenty-five computer systems to the SETS II task order over its performance period.[30] Id. at 841-42. Each new system was likened to a comparable, existing system for illustrative purposes.[31] Id.

### i. Automated Aid Positioning System ("AAPS"); Aids to Navigation Information System ("ATONIS"); Integrated-ATONIS ("I-ATONIS")

AAPS "collect[ed] positioning information from a differential global positioning system . . . receiver to determine whether an aid [was] on or off station and create[d] an assigned positioning report when the servicing [was] complete." Id. at 561. The Coast Guard utilized

---

[29] Systems were classified as small, medium, or large. AR 839. A small system contained four or fewer full-time employees. Id. A medium system contained greater than four but less than ten full-time employees, and a large system contained ten or more full-time employees. Id.

[30] Eleven of these anticipated new computer systems were small systems, ten were medium systems, and four were large systems. AR 841-42; see supra note 29.

[31] For example, four of the proposed new systems would be comparable to the Application Support Group ("ASG") I and one would be comparable to ASG II, see infra Part I.D.1.c.iii, six would be comparable to the Computer Assisted Search Planning ("CASP") I system, see infra Part I.D.1.c.iv, four would be comparable to the Fleet Logistics System ("FLS"), see infra Part I.D.1.c.xi, one would be comparable to the Merchant Mariner Licensing and Documentation ("MMLD") I system, four would be comparable to MMLD II, see infra Part I.D.1.c.xiii, and five would be comparable to the Self-Locating Datum Marker Buoy ("SLDMB") system, see infra Part I.D.1.c.xvi. AR 524-25, 841-42.

ATONIS, a database management system, id. at 2742, "to manage aids to navigation data," which included "tracking and scheduling aid inspections and service visits, managing power systems, and performing administrative functions," id. at 561. I-ATONIS, a web application, replaced ATONIS. Id. The contractor was required to provide "limited services for systems resource management, system licensing and maintenance agreements, and data support" for these applications. Id. When combined together, I-ATONIS and AAPS comprised a centralized OSC application. Id. at 2742.

### ii.  Automated Mutual Assistance Vessel Rescue ("AMVER") System

AMVER was "a unique computer-based and voluntary global ship reporting system used worldwide by Search and Rescue (SAR) authorities to arrange for assistance to persons in distress at sea." Id. at 562. It was a "mission-critical computer system," id. at 2743, that enabled rescue coordinators to "identify participating ships in an area of distress and divert the best-suited ship or ships to respond," id. at 562. AMVER's mission was "to quickly provide [Search and Rescue] authorities, on demand, accurate information of the positions and characteristics of vessels near a reported distress." Id. Contractor responsibilities associated with AMVER included availability "on an on-call basis 24 hours a day, 365 days a year (366 days during leap year) to assist in the resolution of any [AMVER] hotline calls involving an active Coast Guard Search and Rescue (SAR) mission." Id. at 563. The contractor was also required, among other responsibilities, to "perform error checking," verify and correct incoming data, track errors in AMVER reports, and plot vessel routes for vessels from their departure to destination ports. Id. at 565.

### iii.  Abstract of Operations System ("AOPS"); Training Management Tool ("TMT"); Automated Requisition Management System ("ARMS"); and ASG

The Coast Guard utilized AOPS, a web-based software application, to "track[] Cutter and Small Boat resource hours expended performing operational missions." Id. at 566, 2743. One AOPS component, the Resource Management Module, "create[d] an inventory of Cutter and Small Boat resources and . . . manage[d] these resources across the entire [Coast Guard]." Id. at 566. TMT "assist[ed] units in planning, tracking, and reporting personnel and unit level training activities." Id. Together, AOPS and TMT "provide[d] mobile access for underway cutters" so that they could synchronize data. Id. The contractor was required to perform data management services, as well as data entry validation, for these systems. Id. at 567.

The Coast Guard utilized ARMS to track "requisition transactions sent by Coast Guard field units . . . to the Defense Logistics Agency's system," id. at 568, by following the status of requisitions, "including whether the requested item has been shipped, received, back-ordered, etc.," id. at 2744. ARMS received requisitions from Coast Guard field units, checked requisitions for validity, entered requisitions into its database, and forwarded these requisitions to a separate system for filing. Id. ARMS also "generate[d] obligation accounting data for transmittal to the Coast Guard Oracle Financials (CGOF) accounting system." Id. at 568. The

contractor was required to "provide limited services for systems resource management, system licensing and maintenance agreements, and data center support only," as those services related to ARMS. Id.

ASG "provide[d] technical support for IT infrastructure for the OSC and enterprise business services . . . ." Id. The contractor's ASG responsibilities included "maintain[ing] and configur[ing] the OSC's Production Domain Controllers that are responsible for use and machine authentication across the OSC [Local Area Network]." Id. at 568.  Additionally, the contractor was advised that each system within ASG must maintain a ninety-nine percent availability rate, thereby requiring the contractor to schedule system downtown only during specific time frames. Id. at 569.

**iv.  Auxiliary Data ("AUXDATA"); Certification and Accreditation ("C & A"); and CASP**

AUXDATA "track[ed] [Coast Guard] Auxiliary activities, performance, membership, training, and resource management." Id. at 570.  Its goal was "to provide the Auxiliary management information needed to bring greater unity to Auxiliary and [Coast Guard] activities and missions." Id.; see also id. at 2745 (indicating that AUXDATA permitted the Coast Guard to track, analyze, and report Auxiliary activity in a timely manner).  C & A "[e]nsure[d] that all major applications and general support systems [we]re certified and accredited in accordance with Federal, [DHS], and Coast Guard security policies and guidelines." Id. at 571.  A C & A team was required to "audit each system periodically to ensure C & A requirements are met." Id. Although the C & A team "d[id] not currently utilize a specific [COTS] application as part of the C & A process," the SETS II task order PWS indicated that this team "may [have] be required to do so during the life of this contract." Id.

CASP was a "mission-critical computer system" utilized for search and rescue purposes. Id. at 572.  Its software "support[ed] [Coast Guard] customers by generating probability data sets or 'drift models' used to locate objects (ships, rafts, people) adrift at sea." Id.  Utilized for developing search plans, CASP "improve[d] the chances of saving lives and property" by "developing search patterns [and] by using advanced techniques to help predict the most likely areas where a distressed vessel might be located." Id.  The contractor was required to be available on an "on-call basis 24 hours a day, 365 days a year (366 days during leap year) to assist in the resolution of any CASP hotline calls involving an active Coast Guard Search and Rescue mission." Id. at 573.

**v.  BelManage ASM Support and Business Intelligence-Enterprise Data Warehouse ("BI-EDW")**

BelManage ASM Support "provide[d] real-time data for hardware and software assets deployed through the Coast Guard enterprise to a central collection/database server." Id.; see also id. at 2746 (indicating that BelManage ASM Support "allow[ed] users to simplify and automate the management of all user desktops, servers and laptops . . . using a single database

and Intranet server"). BelManage ASM Support was comprised of several functions, including: (1) ensuring software-licensing compliance; (2) capturing detailed hardware profiles for all systems running the BelManage agent; (3) providing detailed reports for all hardware and software assets; (4) improving help desk efficiency; and (5) providing easy access to asset management reporting functions. Id. at 574.

BI-EDW, described as "a central repository for enterprise information captured by numerous [Coast Guard] systems," was intended to provide "'one-stop shopping for Coast Guard information' via a self-service, web-based tool." Id. at 575. The contractor was required to "provide tools and perform systems, performance, tuning, and capacity analysis studies for specified applications" by using "modeling and/or prototyping techniques to size and quantify data." Id. at 576. Additionally, the contractor was expected to perform technology assessments, including studies aimed at migrating secure application data. Id.

### vi. CG Help ("CGHELP") and Coast Guard List Server ("CGLS")

CGHELP was "an automated help desk used by Coast Guard personnel, world wide [sic], to report problems with or request assistance . . . ." Id. at 577. It exported information to the Coast Guard information system for reporting purposes. Id. The contractor was required to "primarily provide limited services for systems resource management, system licensing and maintenance agreements, and data center support"; however, the contractor was also expected "to perform other services in support of the application when specifically requested." Id. The SETS II task order PWS described CGLS as "a mailing list manager" that enabled elements within the Coast Guard to "send notices via email out to a mailing list." Id. at 578. The contractor would provide "limited services" in relation to this system, id., and would ensure that system availability was maintained at a ninety-nine percent level, id. at 579.

### vii. Coast Guard Recruiting Command ("CGRC") and Configuration Management ("CM")

CGRC provided access to recruiting centers across the country and was "used to provide centralized access to the Coast Guard Message System, Coast Guard email, and other . . . services for Coast Guard recruiters." Id. The OSC's CGRC support team provided system administration support and computer security support for hardware, functional software, and the operating system. Id. The contractor was expected to provide specifically enumerated services, with the exceptions of computer system fielding, application system training, and technical field support. Id. at 579-80.

CM activities "include[d] but [we]re not limited to document reviews; requirement reviews; [and] maintaining and updating OSC CM policy and associated documentation . . . ." Id. at 580. The contractor was required to "[e]nsure all published instructions; handbooks; and procedures are consistent with Coast Guard Configuration Management Policy . . . ." Id. According to the SETS II task order PWS, a CM auditor would schedule and perform

configuration status accounting activities for each functional area on an annual basis, id., perform a physical configuration audit, which "consist[ed] of determining that all items identified as being part of the configuration [we]re present in the product baseline," id. at 581, and perform a formal functional configuration audit that "ensure[d that] the development of a Computer Software Configuration Item . . . ha[d] been completed satisfactorily and . . . [had] achieved the performance and functional characteristics" specified in documentation, id.  These audits were designed to "verify that the [Coast Guard's Computer Software Configuration Item] complie[d] with . . . developmental specifications," id.

### viii.  Data Center Support; G-O CITRIX Farm ("CITRIX"); and Configuration Management Plus Client Server ("CMPLUS")

The contractor was required to perform "centralized data center support" using an automated Systems Resource Management system.  Id. at 582.  These responsibilities included, among other things: (1) maintaining daily operations and system performance logs, as well as other record keeping documentation; (2) establishing management procedures; (3) maintaining a supply of computer consumables used in support of each system; (4) maintaining an unclassified Magnetic Media Library; (5) providing help desk support via a hotline; (6) procuring and replenishing computer supplies; and (7) monitoring and adjusting computer room air handling equipment controls to maintain temperature and humidity specifications.  Id. at 582-83.  The contractor was also expected to provide support for the Coast Guard's Customer Service Division functions "during primary work hours up to 1.5 hours during a normal workweek."  Id. at 584.

CITRIX was "a load balanced Citrix Metaframe environment."  Id.  The contractor was required to "primarily provide limited services for systems resource management, system licensing and maintenance agreements, and data center support" for CITRIX.  Id. at 585. CMPLUS, which was an online configuration-based supply and maintenance system for updating and maintaining baseline configuration data and replacement materials, id. at 2749, "allow[ed] cutters and selected shore units to manage local configuration, maintenance, and supply information," id. at 585.  The contractor was expected to maintain and support several peripheral applications that supported CMPLUS and assume responsibility for augmenting training of the Vessel Logistics System Support Branch, which was "the primary training source for the program to provide training to the field . . . ."  Id. at 586.

### ix.  DHS Directory Services ("DIRSERV") and Disaster Recovery Business Continuity ("DRBC") Support Services

DIRSERV "provide[d] 24x7 mission critical email relay and directory services to the Department of Homeland Security."  Id. at 587.  This system "[a]ssign[ed] uniform email address[es] to all 22 DHS agency employees and route[d] email traffic to, from, and between all agencies and the Internet."  Id.  A DIRSERV team provided on-site staffing at the OSC.  Id. DIRSERV utilized COTS products, and the contractor was expected to perform activities that

"may include modifications to the commercial products for improved efficiencies or to align the products with DHS business practices."  Id. at 587-88.

The contractor was expected to provide support for DRBC services and be "primarily responsible for the establishment and continued support and development of a DRBC capability for systems supported at the OSC."  Id. at 588.  A DRBC contractor team was responsible for developing and maintaining the OSC's overall DRBC and IT contingency plans, and for assisting "each business system's functional area with developing specific contingency and disaster recover[y] plans relevant to each such system . . . ."  Id.  The contractor was required to "test each plan at least annually," evaluate each test, and make recommendations for improvements. Id.

### x. Emerging Technologies Technical Team ("ETTT")

The SETS II task order PWS described the responsibilities of the ETTT as follows:

The Emerging Technologies technical team researches, prototypes, integrates and develops new technologies for the Operations System Center and the Coast Guard enterprise.  The objective of Emerging Technologies is to assist the Coast Guard in keeping abreast of the latest IT . . . and [to] assess how these technologies can be employed in the Coast Guard environment.  Emerging Technologies may be employed to assess IT compatibility and interoperability in the Coast Guard environment.  Emerging Technologies may be employed to assess IT compatibility and interoperability in the Coast Guard to ensure the Coast Guard is getting the best value for IT procurements.

Id. at 590.  The contractor was required to provide various services related to the ETTT, with the exception of data management and system transition.  Id. at 590-91.

### xi. Electronic Program Management Office ("EPMO") System/Deepwater Program, FLS, and Geospatial Information System ("GIS")

EPMO was a web-based application "used to manage the project office of the Deepwater program and to host web sites for various other organizations."  Id. at 591.  EPMO "servers replicate[d] information between the production and backup servers and the third party contractor server."  Id.  The contractor was required to provide system administration services for EPMO. Id. at 592.

As a "web-based application designed to automate the management of [Coast Guard] vessel logistics," id., FLS was designed to provide an "integrated, automated system to support . . . Coast Guard vessel logistics needs," id. at 2752.  FLS incorporated "configuration management activities, maintenance actions, procurement and supply activities, and associated financial transactions."  Id. at 592.  The contractor was required to "provide support for

-37-

maintaining [the] integrity and quality of FLS common tables" and to schedule system downtime while maintaining particular percentages of system availability.  Id. at 593.

GIS "provide[d] an array of geospatial data, map services and images for Coast Guard Enterprise GIS usage."  Id.  The contractor was required to, among other things, develop and maintain GIS data, update GIS map services, and "[a]nalyze vector, raster, and imagery data as it relates to a GIS and the geospatial environment."  Id. at 594.  Additionally, the contractor was expected to "provide access to 250 simultaneously logged in GIS users."  Id.

### xii.  Housing Management Information ("HMI") and Local Area Network ("LAN")

An intranet web application serving the Coast Guard's housing community, HMI "include[d] over 90 housing sites and 250 end users . . . [and was] used to manage leased and owned housing inventory to include barracks."  Id.  HMI tracked occupancy and provided information for ease of transfers between housing sites and Coast Guard facilities.  Id. Contractor-provided network administration services for HMI included the following components: (1) WEB server software; (2) HMI system host application; and (3) HMI system database server software.  Id. at 595.

The LAN team "provide[d] data communications technical support throughout the OSC" and was responsible for "the physical connectivity, designing and managing the devices (switches and routers), and software . . . required for a local area network."  Id. at 596.  Services included items such as address management, name resolution, time, connectivity, server load balancing, and statistical data gathering.  Id.  The contractor was required to manage and administer a LAN in order to provide "complete data networking connectivity" between various systems.  Id. at 597.  Additionally, the contractor was expected to monitor capacity and performance, and to make recommendations for handling increased usage.  Id.

### xiii.  Long Range Aid to Navigation Operations Information System ("LOIS") and MMLD

LOIS was designed to assist Long Range Aid to Navigation personnel "in their daily reporting on the operation of the LORAN-C system."  Id. at 598.  This application supported "data entry, calculations, query functions, plotting/graphing, and reporting capabilities needed to record and analyze station performance."  Id.  Although the contractor was required to perform limited services, such tasks included "resource management, system licensing and maintenance agreements, and data support."  Id.

MMLD "automate[d] the various marine licensing and documentation processes, including record keeping of merchant mariners" of the United States.  Id.  These records included documentation, licenses, "employment information on each U.S. mariner[,] and World War II Merchant Mariner Veteran's Status information."  Id.  The contractor was required to perform various network administration services and to provide coverage for (1) terminal servers and software and (2) modem drivers and configurations.  Id. at 599.

xiv.  **Marine Safety Network ("MSN"); Panorama Business Views ("PB-Views"); Naval and Electronic Supply Support System ("NESSS"); and Enterprise Management Support ("EMS")**

MSN was "a [Coast Guard] Intranet application" with a database that resided at the OSC. Id. at 600.  It provided management information systems that supported Coast Guard programs, including Marine Safety, Law Enforcement, Search and Rescue, Response, Legal, and Finance. Id.  The contractor was required to provide various network administration services, as well as coverage for the terminal server and software, for MSN.  Id. at 601.

PB-Views was created in order to permit the Office of the Chief of Staff to evaluate COTS packages in order "to determine the feasibility and usefulness of the software . . . ." Id. The contractor, in addition to satisfying specific system availability requirements in accordance with PB-Views specifications, was required to ensure accessibility of the system for fifteen simultaneously logged in users while maintaining an availability level of ninety-six percent for the primary system.  Id. at 602.  Additionally, the contractor was directed to schedule system unavailability for specific times unless prior approval was obtained from a project officer.  Id.

NESSS was an Oracle-based database system used primarily by the Coast Guard Yard and the Engineering Logistics Center.  Id.  The contractor was responsible "for the software development and maintenance of the NESSS system."  Id. at 603.  Additionally, the contractor was required to provide network administration services and coverage for the following components: (1) X-terminal server and terminal software; (2) modem drivers and configurations; and (3) NESSS mail server to host application.  Id. at 603-04.  Furthermore, the contractor "shall provide access to 500 simultaneously logged in NESSS users" in order to ensure that system availability, measured monthly, remained at levels of ninety-nine percent for the primary system and ninety-eight percent for the secondary system.  Id. at 604.

An EMS team "provide[d] technical support for IT infrastructure and enterprise business services for OSC."  Id.  EMS

> buil[t], test[ed], patche[d], deploy[ed] and perform[ed] system life cycle management on OSC resources such as: file, application, email and print servers, enterprise system servers, desktop systems and SWIII Testing Laboratory. Additionally, the EMS manages the PADLOC authentication domain, and the TISCOM mail hub, which provides internal email throughout the Coast Guard.

Id.  The contractor was required to provide EMS servers system availability at a level of 99.9% during normal working hours and to schedule maintenance at specific hours.  Id.  Furthermore, the contractor

> participate[d] in monitoring established network and EMS service levels and contribute[d] to any OSC reports, notifications, tracking, and performance

statistics as appropriate.  The contractor . . . participate[d] in supporting . . .
services at levels that achieve OSC's availability requirements.  This support . . .
include[d] quick response to changes in technology, dynamic requirements[,] and
system, equipment, software, service, and carrier outages.

Id.  The contractor was expected to provide on-call support, which also included "response[s] to
automated pager systems," twenty-four hours each day, seven days a week.  Id.

### xv.  Point of Presence ("POP"); Business Intelligence-Readiness Management ("BI-RM"); and Shore Asset Management ("SAM")

A POP team was "tasked with managing the external interface between the Coast Guard
Data Network and the Internet."  Id. at 605.  POP involved, among other things, the following:
(1) wide area network technical support and configuration management; (2) mail distribution; (3)
anti-spam; (4) anti-virus; (5) network security, including access control lists maintenance,
firewall management, and intrusion detection; and (6) asset management of project equipment.
Id.  According to the SETS II task order PWS, the POP team "work[ed] with a large assortment
of networking, email, firewall, and security hardware, software, and middleware products, and
[was] responsible for building, testing, patching, and performing system life cycle management
on all POP resources."  Id.  Additionally, the POP system team's engineers were required to
provide twenty-four hour, seven days per week Internet availability for the entire Coast Guard.
Id. at 605-06.  The contractor was also responsible for providing functional area management,
customer hotline support, system availability at a level of ninety-eight percent per month, and
technical writing services.  Id. at 606-07.

The Coast Guard utilized BI-RM, a web-based reporting tool, "to monitor, assess, and
manage [Coast Guard] readiness," to "mine data from existing [Coast Guard] systems[,] and
report on six facets of readiness according to mission, organization, and unit."  Id. at 607.  BI-
RM business lines included GIS, Cubes, Reports, Score Card, and Portlets.  Id.  The contractor,
in addition to providing various services, was required to ensure access to 300 simultaneously
logged in BI-RM users and to maintain a monthly availability level of ninety-nine percent.  Id. at
608.

SAM "provide[d] core information about the [Coast Guard] facility and civil engineering
and [was] used to track activities and assist in management of the Facility Engineering (FE) and
Civil Engineering (CE) Programs."  Id.  The contractor was required to provide various network
administration services, plus coverage for the following components: (1) WEB server software;
(2) SAM host application; and (3) SAM database server software.  Id. at 608-09.  The contractor
was required to ensure access to one hundred simultaneously logged in SAM users and to
maintain a monthly system availability level of 97.5%.  Id. at 609.

**xvi.  Ship Arrival Notification ("SAN") and SLDMB**

SAN "collect[ed], store[ed,] and disseminate[d] information regarding vessels arriving to[] and departing from US ports."  Id.  It was comprised of three subsystems: (1) Internal SAN, or iSAN, which was an Active-X website used for data entry and as a decision support tool; (2) DHS-SAN, which was a system transactionally replicated from iSAN; and (3) Electronic Notice of Arrival/Departure, or eNOAD, which allowed the public to submit electronically formatted data directly to the government.  Id. at 609-10.  The contractor was required to perform data entry and data validation services for SAN, id. at 610, which included the following functions: (1) verification that each notice of arrival/departure report received contained required information; (2) entry of the minimum required information into the SAN database for each SAN report received; and (3) entry of the minimum required information into the SAN database for each High Interest Vessels/Special Interest Vessels Report received.  Id. at 611.  In addition, the contractor was required to: (1) perform SAN data entry modifications in order to ensure that requested changes to reports were entered into the SAN database; and (2) implement quality assurances measures to ensure the accuracy of SAN data.  Id.  The SETS II task order PWS also set forth performance standards for ship arrival report processing and additional contractor expectations and requirements.  Id. at 611-12.

SLDMB was designed to "track[] buoys that [we]re deployed by various surface vessels and aircraft into areas," id. at 612, and "to track the upper three feet of surface currents . . . to estimate the movement of a search object," id. at 2759.  SLDMB received positioning data that was utilized by SAR Mission Controllers "to locate lost objects or provide environmental data." Id. at 612.  The contractor was expected to, among various responsibilities, provide non-stop on-call support to assist in the resolution of any SLDMB hotline calls involving an active Coast Guard search and rescue mission.  Id. at 613.  Additionally, the contractor was required to ensure access to sixty simultaneously logged-in SLDMB users and to provide a system availability level of 99.5%, measured monthly.  Id.

**xvii.  System Performance Tiger Team ("SPERTT"); Systems Resource Management ("SRM"); Vessel Documentation System ("VDS"); and WEB Services**

SPERTT performed the following responsibilities: (1) development of system performance baselines that were used for comparative analysis to determine how system changes or enhancements affect system performance; (2) troubleshooting in order to determine why system performance was degraded; and (3) application modeling and assessment in order to analyze how a system or technology would perform in a new configuration or environment.  Id. at 614.  The contractor was required to provide various services to other systems at the OSC or off-site, as requested, in order to measure and evaluate system performance.  Id.  These services included, but were not limited to, system administration, database administration, and network administration.  Id. at 614-15.

An SRM team was responsible for "building, testing, and managing OSC enterprise applications used for system backups, system monitoring, storage area networks, and system notification." Id. at 615. The SETS II task order PWS enumerated specific availability requirements for backup service, enterprise monitoring and notification services, and enterprise storage services, including availability rates and time periods during which the contractor must schedule downtime. Id. at 616.

VDS was "an imaging and workflow system used to capture documentation information for U.S. owned vessels." Id. Specifically, VDS collected certificates of documentation, vessel title information, and vessel ownership information. Id. The contractor was required to ensure that VDS would support 110 simultaneously logged in users and was expected to maintain a monthly availability level of 99.5%. Id. at 617.

Lastly, WEB Services, which included CG Central Portal, CG Web, WWW, and Homeport Portal, provided intranet and internet web content information, as well as services for the entire Coast Guard. Id. WEB Services Intranet was comprised of two components, CG Central Portal and CG Web. Id. CG Central Portal provided services "for the entire [Coast Guard] enterprise of approximately 80,000 employees and volunteers, located throughout the country, on afloat units, and in foreign lands." Id. Its goals were to "provide a secure, flexible, single point of entry to [Coast Guard] intranet information and services, and a means for Team [Coast Guard] to gain a sense of community and involvement in the organization." Id. CG Central Portal was designed to "bring [Coast Guard] Intranet-web presences into one unified, consistent, user-friendly interface." Id. In addition, Homeport Portal, one component of WEB Services Intranet, would provide "a secure, flexible, single point of entry to [Coast Guard] internet information and services," would also address port security and marine safety, id., and was designed as a "sole source interface with the public," id. at 618. The contractor's requirements included, among other things, ensuring a monthly availability level of 99.5% and scheduling downtime that did not coincide with CG Central Portal working hours. Id.

## 2. Evaluation Factors For Award of the SETS II Task Order

The Coast Guard based its award decision for the SETS II task order upon an evaluation of each offeror's complete proposal submission, which included a technical proposal and a cost/price proposal. Id. at 951. Although offerors' technical proposals and cost/price proposals were evaluated, neither proposal was rated. Id. Of the two proposals, the Coast Guard considered technical proposals "significantly more important in the evaluation process than Cost/Price Proposals." Id. By contrast, the Coast Guard both evaluated and rated each offeror's past performance.[32] Id. The Coast Guard's award was made to the offeror "whose proposal

---

[32] "The intent of the past performance is to ascertain how successful Offerors have been in the past in completing all aspects of the SOW/PWS and, therefore, to indicate how well Offerors can be expected to successfully meet the requirements of any Task Order issued hereunder." AR 952.

[was] determined to best meet the need of [the] Government after consideration of all information.–i.e., provides the 'best value,'" which was defined as "the procurement process that results in the most advantageous acquisition decision for the government and is performed through an integrated assessment and trade-off analysis between the technical and cost factors." Id.  Offerors were "reminded that any award under the ITOP II program [was] not subject to protest."  Id. at 800.

According to the SETS II task order acquisition plan, the contractor was required to follow the OSC System Life Cycle Management Policy, a document that "outline[d] the life cycle phases of all IT business systems and denote[d] how . . . testing requirements [we]re integrated into other key life cycle phases."  Id. at 508.  Additionally, the contractor was required to follow the OSC's Security and Risk Management Program Plan when performing all IT activities, including software development and maintenance.  Id. at 509.  The SETS II task order acquisition ultimately presented "no classified security considerations," although any security considerations would be addressed by the contracting officer at his or her discretion.  Id.

The period of performance for the SETS II task order was "five years, including a one-month phase-in period, an initial six-month base period, four one-year option periods, and a final five-month option period."[33]  Id. at 533; supra Part I.D.  "A key part of the contractor phase-in plan [was] the obligation of the contractor to demonstrate technical capability prior to the assumption of Task Order responsibility."  AR 507.

On June 9, 2005, the Coast Guard awarded the SETS II task order to QSS, id. at 954, which became "the single largest contractor on site . . . responsible for operating and maintaining over 35 Coast Guard Mission Essential systems,"[34] id. at 2911.  Through various modifications to the SETS II task order between June 2005 and December 2007, the Coast Guard added at least ten new systems.  Id. at 4155.  "Task order modifications that add[ed] systems [did] not expand any of the services included in the umbrella SETS II task order scope."  Id.  On September 25, 2007, Modification 30 incorporated Coast Guard Financials into the SETS II task order.  Id. at

---

[33]  The initial phase-in period commenced on June 9, 2005, and ended June 30, 2005, with the base period spanning July 1, 2005, through December 31, 2005.  AR 955-56.  Option period one commenced on January 1, 2006, and ended December 31, 2006.  Id. at 957-58.  Option periods two, three, and four spanned calendar years 2007, 2008, and 2009, respectively.  Id. at 958-63.  Option period five was set to begin on January 1, 2010, and end on May 31, 2010.  Id. at 964-65.

[34]  In a press release, QSS indicated that it would "provide software engineering and technical services on existing and future computer systems and communications networks designated by [the] OSC" and noted that the primary services it would provide would include: (1) system life cycle management; (2) software engineering, development, upgrade, and maintenance; (3) hardware and software integration; (4) systems and network administration and computer operations support; and (5) data management and customer hotline support.  AR 2911.

4155.  Through issuance of Modification 32 on December 31, 2007, the Coast Guard exercised option period three.  Id. at 4153; supra note 33.  Modifications 30 and 32, which are the subject of this action, are discussed in Parts I.E.5.a-b, infra.

### E.  The Coast Guard's Audit-Supporting Federal Financial Management Systems and Related Services

The Coast Guard's Office of Financial Systems Management Division provided Coast Guard management "with reliable financial information for managing and making day-to-day decisions[,] thus resulting in improved financial management systems and controls to safeguard the government's assets."  AR 2651.  The Coast Guard's CAS "operate[d] on a 24/7 basis providing financial management services," id., and "also maintain[d] a variety of financial feeder systems, information, and document management systems," id. at 2652.  CAS supported approximately 25,500 users and serviced 2,400 operational Coast Guard units and commands. Id.

CAS applications included Oracle Federal Financials, the Finance and Procurement Desktop ("FPD"), FPD-to-go, Contract Information Management System ("CIMS"), Sunflower, Markview, Workflow Imaging Network System ("WINS"), Informatica, and a Remote Test Facility.  Id. at 2652-53.  Oracle Federal Financials maintained the Coast Guard's General Ledger and "contain[ed] modules that contribute[d] to the transactions in the General Ledger . . . ."  Id. at 2652.  The FPD, which was used "to commit and obligate funding and interface" into Oracle Federal Financials, provided procurement and accounting functions for units throughout the Coast Guard.  Id.  FPD-to-go was a portable, "lite version" of the FPD.  Id.  CIMS was a contracting management system that created and managed large contracts, id., while Sunflower was a "property management system, which provide[d] the primary business function[s] like Acquisitions, Transfers, Retirements, Modifications, and Asset tracking," id. at 2653.  The Coast Guard utilized Markview, an imaging and workflow program, to manage invoices.  Id.  WINS, an imaging and document processing system, permitted images and scanned documents to be processed for verification, reconciliation, and payment.  Id.  Informatica generated reports from Oracle, FPD, CIMS, and Sunflower.  Id.  Finally, the Remote Test Facility was designed to test these and other Coast Guard financial applications.  Id.

Prior to September 25, 2007, the Coast Guard did not procure audit-supporting federal financial management systems and related services via the SETS II task order.  Id. at 4865. "Rather, the agency had separately procured these services from GCE . . . ."[35]  Id.  As noted in

---

[35]  The practice of separately procuring audit-supporting federal financial management systems and related services supports GCE's allegation that "federal agencies' solicitations for financial systems work have generally been used separately and distinctly from solicitations for mission and administrative systems work.  The Coast Guard itself has consistently followed this practice, maintaining two independent processes for procuring financial systems work and for procuring its mission and administrative systems work."  Compl. ¶ 13; see supra Parts I.A.2-3.

Part I.A.3.b, <u>supra</u>, GCE has "developed and maintained financial management systems of the [Coast Guard] that create[d] the Coast Guard's financial statements of record for audits using government-certified financial management systems software" for nearly a decade.  Compl. ¶ 4; <u>see also</u> AR 2860 ("GCE has been the systems integrator for the [Coast Guard] financial enterprise since 2000.").  The Coast Guard awarded contracts to GCE for the maintenance of CAS and FPD in 2000 and 2001, respectively.  Compl. ¶ 19; <u>see also</u> AR 477 (stating that GCE "provide[d] the current support and development" of the FPD application and "ha[d] a separate Task Order contract to provide software maintenance on CAS").  GCE was awarded contracts for CAS and FPD support work when both were recompeted in 2004 and 2005, respectively.[36]  Compl. ¶ 19.  These contracts, GCE alleges, were set to reach their maximum value on August 15, 2007, after which the Coast Guard "planned to re-compete the financial systems work under a [Department of Homeland Security]-wide multiple [ID/IQ] IT-procurement contract vehicle."  <u>Id.</u> ¶ 20.  According to GCE, "[a]t no time during any of the Coast Guard competitions did the Coast Guard indicate that the financial management systems work might fall under some other contract or task order . . . ."  Pl.'s App. 22 (Lucas Decl. ¶ 34).

GCE's multiple prime contracts with the Coast Guard were worth approximately sixty million dollars.  AR 2860.  GCE indicated that its relationship with the Coast Guard enabled it to gain "unparalleled experience" in Coast Guard financial management processes and systems, as well as in federal accounting business processes.  <u>Id.</u>  Part of this work involved past Coast Guard transitions "from being serviced by the [DOT] accounting system to becoming the owner and operator of its own financial systems."  <u>Id.</u>

### 1. The Coast Guard's Unified Mission Support Initiative

The Coast Guard began an "extensive modernization effort aimed at providing unified mission support to optimize mission execution."  <u>Id.</u> at 3011.  In 2004, the Coast Guard's Financial Systems Transition Work Group ("FSTWG") commenced "initial planning for the consolidati[on] of Information Systems . . . ."  <u>Id.</u> at 474.  The FSTWG compiled information related to "financial information systems, lifecycle documentation, contract vehicles, budgets and funding, configurations and related items," and met with GCE in early 2005.  <u>Id.</u> at 475; <u>see also</u> <u>id.</u> at 3014 (noting that a work group was chartered to "study the state of Coast Guard Financial systems with the intended goal of determining a path to transition the management and oversight

---

[36]  In September 2005, the Coast Guard competitively awarded to GCE the FPD and Contract Information Management Systems Technical and Maintenance Support Services contracts.  AR 2376-77.  The Coast Guard attributed an "exceptional" rating to GCE on three of four technical evaluation factors, <u>id.</u> at 2375-76, and noted that it "ha[d] been impressed with the technical expertise and the process improvements" GCE brought to its work.  <u>Id.</u> at 2376.  With respect to the fourth factor, the Coast Guard gave GCE a "[g]ood" rating, noting that GCE's approach to the Software Development Life Cycle and change management process was "very solid" and "yield[ed] significant benefits to the . . . Coast Guard to minimize negative impacts to future releases of our software."  <u>Id.</u> at 2375.

. . . activities for all financial and mixed IT systems"). The FSTWG determined:

> The current state of systems development, support, maintenance, testing and
> systemic lifecycle practices for financial information systems are completely
> separate and apart from any connection to the Coast Guard [CIO's] office. While
> some of the lifecycle practices employed for financial application systems closely
> mirror the best practices of industry, . . . there are some significant gaps that are
> likely to lead to problems in the longer term.

Id. at 476. The FSTWG recommended that "[b]etter alignment and stricter compliance with
Coast Guard system lifecycle practices . . . [was] needed for the long-term stability and viability
of [Coast Guard] financial systems." Id.

On August 31, 2006, the Coast Guard issued "Commandant's Intent Action Order #10-
eCG Service Oriented Architecture Implementation" ("Order Number 10"). Def.'s Mot. &
Opp'n Ex. 3 (Thompson Decl. Ex. 1 at 1-2). Order Number 10 called for the "consolidation of
all associated development, operation, and maintenance resources." Id. (Thompson Decl. Ex. 1
at 1). Specifically, the consolidation contemplated by Order Number 10 included "new system
development as well as any upgrades and revisions to existing systems and applications
regardless of in-house or COTS sources." Id. Order Number 10 emphasized that the effort to
consolidate was "not solely on billets or specific IT applications." Id. Rather, "[i]t [was] critical
that [the Coast Guard] assertively chart a course to consolidate functional responsibilities." Id.;
see also AR 3011 (indicating that the Coast Guard was "undergoing an extensive modernization
effort aimed at providing unified mission support to optimize mission execution"). In November
2006, the Coast Guard conducted another review of financial and mixed IT systems in order "to
evaluate significant changes, issues, and gaps," and a working group evaluated recommendations
in light of the issuance of Order Number 10. AR 3014.

Pursuant to the mandate set forth in Order Number 10, the Coast Guard's Chief Financial
Officer ("CFO") and CIO began working together with the OSC "to effect the transition of
financial systems development work." Def.'s Mot. & Opp'n Ex. 3 at 2 (Thompson Decl. ¶ 3).
The Coast Guard recognized that the "transition of CG Financials to OSC ha[d] high visibility."
AR 2844. As a result, it established a Financial Systems Working Group ("FSWG") Charter in
or about January 2007.[37] Def.'s Mot. & Opp'n Ex. 3 (Thompson Decl. Ex. 2 at 1-3). The FSWG
Charter created the FSWG, which was a "cross-organizational team [tasked with] develop[ing]
an information system plan for Coast Guard Financial Systems to include a single general ledger,
single property system and eventually a single logistics system that will be compliant with
Federal financial accounting and reporting requirements." Id. (Thompson Decl. Ex. 2 at 1).
"The specific objective which must be achieved," according to the FSWG Charter, was "the

---

[37] The earliest date indicated by one signatory to the FSWG Charter was January 30,
2007. Def.'s Mot. & Opp'n Ex. 3 (Thompson Decl. Ex. 2 at 3). Aside from a second signature
bearing a March 6, 2007 date, no other dates appear on the document. See id.

creation of a financial system which [would] allow the Coast Guard to effectively and efficiently obtain unqualified audit opinions on its external financial reports and internal controls over financial reporting."  Id.  The FSWG Charter set May 1, 2007, as the target date for the development and delivery of a Plan of Action and Milestones.  Id. (Thompson Decl. Ex. 2 at 2).

## 2.  Efforts to Create an Audit-Supporting Federal Financial Management Systems and Related Services Procurement

According to GCE, the Coast Guard "planned to re-compete the financial systems work under a [DHS]-wide multiple [ID/IQ] IT-procurement contract vehicle" at some point between January 2007 and May 2007.  Compl. ¶ 20; see also AR 285 ("[T]he original plan was to try to compete the work for the period beginning August 15, 2007[,] under the DHS [Enterprise Acquisition Gateway for Leading-Edge Solutions ("EAGLE")] contract."[38]), 2917 ("In light of the fact that GCE's contract was nearing the end of the period of performance, an acquisition plan for the [Coast Guard] Enterprise Financial Systems was developed by the [Coast Guard] contracting office."[39]).  To that end, the Coast Guard developed an acquisition plan in order "to compete the services provided for by the current GCE contract for the [Coast Guard] Enterprise Financial Systems."  AR 2917.  Ultimately, however, "[t]hat plan rapidly ran into problems," including the fact that "the GCE work crossed . . . four functional areas," thereby raising concerns that there might be a lengthy process to obtain a waiver in order to cross functional areas."[40]  Id. at 286.  Ultimately, the Coast Guard preferred to utilize the EAGLE vehicle for its acquisition.[41]  Id. at 2422; see also id. at 2919 (noting, in a November 7, 2007 memorandum from

_____

[38]  The DHS EAGLE contract vehicle is a "department-wide platform for acquiring IT service solutions . . . ."  AR 2575; see also Mem. Supp. Intervenor QSS Group, Inc.'s Mot. Dismiss Lack Jurisdiction, Opp'n Pl.'s Mot. Prelim. Inj. & Application TRO &, Alternatively, Mot. J. Administrative R. ("Def.-Intervenor's Mot. & Opp'n") App. Ex. C at 2 (reproducing a copy of the EAGLE Ordering Guide, which "contains the information required to use this contract vehicle to obtain IT services throughout the DHS").

[39]  The Coast Guard's Enterprise Financial Systems "consist[s] of millions of lines of code and hundreds of documents."  AR 2933.

[40]  The four functional areas were: (1) Infrastructure, Engineering Design, Development, Implementation, and Integration; (2) Operations and Maintenance; (3) Independent Test, Validation, Verification, and Evaluation; and (4) Management Support Services.  AR 286.  The EAGLE contracting officer "discourage[d] the crossing of functional categories."  Id. at 2381.  A waiver could have been obtained to cross functional categories; however, that process "may or may not [have ]be[en] . . . lengthy . . . ."  Id.

[41]  In mid-June 2007, Coast Guard personnel indicated that while "[w]e have another acquisition that may not lend itself to the EAGLE program[,] . . . our preference is to go EAGLE if we can . . . ."  AR 2520.  In its initial protest before the Government Accountability Office

GCE to the Coast Guard contracting officer, that the Coast Guard "demonstrate[d] clear intent . . . to compete the work of the [Coast Guard] Financial Systems under the DHS EAGLE contract"). However, by mid-June 2007, the goal of making an award by August 15, 2007, seemed "unlikely."  Id. at 286; see also id. (noting that the EAGLE vehicle could not handle anticipated changes to the contract and that plans were shifted to the GSA schedule instead), 2416 ("The Eagle Contract vehicle does not provide the flexibility to have continuity of service with the same vendor when requirements change.").[42]

Even as early as February 2007, the Coast Guard encountered challenges in preparing the solicitation.  For example, it was unclear whether the Coast Guard would issue "an unrestricted solicitation (large and small vendors) or [a] set-aside for the small vendors only . . . ."  Id. at 2381.  A preference for large vendors was advanced on account of "[t]he complexity of Federal Financial Oracle Information system development required under this requirement to consolidate IT systems where systems perform duplicate functionality, achieve real time integration of

------------------------------------------------

("GAO"), GCE suggested that as of November 16, 2007, the Coast Guard intended to utilize the EAGLE vehicle: "Currently, the DHS EAGLE website reflects the [Coast Guard's] intention to competitively acquire the Federal Financial IT support services.  The [Coast Guard] forecasted [the] protestor's contract on the DHS EAGLE website for competitive acquisition."  Id. at 6. Indeed, GCE's November 7, 2007 memorandum to the Coast Guard stated: "Our contracts are forecasted on the EAGLE website for re-compete purposes.  The fact that our contracts are forecasted under EAGLE provides clear indication that [the Coast Guard] and DHS procurement offices ha[d] already recognized that competing our contracts under EAGLE is the proper course of contracting action."  Id. at 2917; see also id. at 2919 (arguing that information contained on the EAGLE web site "demonstrates clear intent by the [Coast Guard] to compete the work of the [Coast Guard] Enterprise Financial Systems under the DHS EAGLE contract").

[42]  The Coast Guard

    anticipated that utilizing the EAGLE contract vehicle will not meet all of the
    [Coast Guard] IT-related requirements since the EAGLE contract vehicle requires
    issuance of new task orders for any new requirements that are out of scope of an
    existing PWS.  In the case of IT-related financial services, the CG-841 anticipates
    numerous future new system development requirements that are undefined and
    unable to price at this point . . . .  It is not feasible for the [Coast Guard] to change
    contractors when operating, maintaining and performing system development on
    [CAS] for the [Coast Guard] financial management and procurement
    community. . . .  Therefore, for acquisitions in these areas, . . . the [Coast Guard]
    plans to develop a single award . . . and award the first task order requirements
    under the GSA Federal Supply Schedule (FSS) 70 contract vehicle.

AR 2575.

financial IT systems, and . . . consolidate to a single core accounting system general ledger."[43]  Id.
However, it was recommended that the Coast Guard not restrict competition to large businesses
because the Coast Guard believed it was "going to have some problems with [the] Small
Business Administration representative . . . since small business[es] could team with a large
business and do the work as well."  Id. at 2380.  Nevertheless, recognizing that existing task
orders issued to GCE were set to expire on August 15, 2007, the Coast Guard continued its
efforts to issue an award effective August 16, 2007, in order "to have a follow on contract for
system development and on-going technical maintenance support.  Any break in technical
maintenance support services for the CAS w[ould have] negatively impact[ed] the operations of
the [Coast Guard]."  Id. at 2397.

        The Coast Guard devised a risk mitigation plan comprised of three alternatives for its
Federal Financial System Development and Technical Maintenance Support Requirement.  Id. at
2406.  One alternative proposed the award of a new contract under the GSA schedule.  Id. at
2407.  A second alternative proposed modification of the existing GCE task orders for
FPD/CIMS and Coast Guard Oracle Federal Financials through September 25, 2007, and the
exercise of an option to issue new task orders–commencing on September 26, 2007, and ending
on September 25, 2008–to GCE.  Id.  A third alternative proposed modifying the existing GCE
task orders through September 25, 2007, and exercising an option on the GCE contract to issue
task orders for performance ending March 11, 2008.  Id. at 2408; cf. id. at 2415 (indicating that
two options were contemplated: the first to modify the existing task orders through September
25, 2007, and the second to exercise existing options through September 25, 2008).  These
alternatives were deemed practicable for three reasons:

        1) Provides the time/flexibility to work through the contracting and
        DHS/[EAGLE] issues that are presenting major challenges for award of a new
        combined maintenance and development contract by 16 August [2007].

        2) Continued service under the existing contractor[] enables the [Coast Guard] to
        address immediate pressing audit remediation system development requirements
        (milestones in the financial and mixed system initiative comprising $5.2M) and
        provides critical technical maintenance support services for the Core Accounting
        System (CAS) through September 2008.

        3) On or about September 2008, the [Coast Guard] will have completed a business
        analysis and process review of the Core Accounting System by an independent
        contractor . . . [and] will have more clearly definable system development
        requirements (to move our current CAS financial system(s) to a single "out of the

_____

        [43]  According to the Coast Guard, audit-supporting federal financial management system
services would include "numerous future new system development requirements [that are]
undefined (and unable to [be] price[d]) at this point.  Many of these will be in the area of critical
audit remediation system development requirements."  AR 2520.

box" Oracle system) and will have a more clearly definable project plan.

Id. at 2415-16.  While the Coast Guard wanted to avoid changing contractors working on CAS, see supra note 42, it nevertheless characterized retention of GCE beyond the August 15, 2007 performance date as a "fall back" plan, AR 2426.

By late June 2007, the Coast Guard determined that "EAGLE [was] not a practicable strategy of procuring Federal Financial Systems Development and technical maintenance support."[44]  Id. at 2420.  It also concluded that "it is most unlikely that the new requirement will be awarded by August 16, 2007," id. at 2415, and determined that the GSA Schedule would be utilized in lieu of the EAGLE contracting vehicle, id. at 2431.  But see id. at 2918 (indicating that the DHS EAGLE opportunities website forecasted a Coast Guard solicitation).  Despite its apparent inability to utilize the EAGLE contracting vehicle, the Coast Guard remained committed to issuing a solicitation for competition: "[W]e want to pursue the contracting strategy that will optimize our chance for success.  The BEST way to get there is to recompete the current contract and have it awarded in time to use FY-07 funds."  Id. at 2432; see also id. (noting that the Coast Guard's "preferred method [was] to pursue the recompete").

### 3.  The August 15, 2007 Sole-Source Bridge Contract to GCE

In July 2007, the Coast Guard began pursuing the following "strategic direction": "extending the current GCE contract for 6 months (31 March [2008] makes for a 'cleaner' transition point, but we can live with 6 months)."  Id. at 2439; accord id. at 286 (indicating that the Coast Guard began developing a strategy to "extend[] GCE['s work] to March 31, 200[8,] and transition[] the software work to OSC").  Because GCE "maintain[ed] the financial management systems test, development, and training environments[, which were] required to support the [Coast Guard's] financial management system's production environment," and possessed an "intimate knowledge of the [Coast Guard's] financial management system [that] provide[d] the ability to promptly remediate identified deficiencies," the Coast Guard determined that a sole-source bridge contract with GCE would alleviate the problem that "another vendor could not immediately establish and provide these environments."  Id. at 2618.  The Coast Guard determined that extending the GCE contract represented "the least risky way to proceed."  Id. at

---

[44]  This determination was considered a "business decision."  AR 2422.  According to the DHS representative with whom the Coast Guard was working,

> [i]f you feel that you need to issue subsequent orders, the use of . . . an [ID/IQ] would certainly serve you well, unless those orders could make use of the "logical follow-on" exception to fair opportunity, in which case EAGLE could be viable. If the work is such that a single order could be modified or make use of options, EAGLE could also work.  But again, the strategy is ultimately your judgment.

Id.

2444.

The primary purpose of the Coast Guard's August 15, 2007 sole-source bridge contract to GCE was "to assist the [Coast Guard's] Office of Financial Policy and Systems . . . and the Office of Financial Systems Management Division . . . in complying with: federal financial management systems requirements; applicable federal accounting standards; U.S. Government Standard General Ledger at the transaction level; and Federal Financial Management Improvement Act (FFMIA) requirements." Id. at 2618.  Specifically, the Coast Guard required:

> a wide-range of Federal Financial Information Technology (IT) system development, technical maintenance, project management, audit remediation[,] technical assistance, training, administration, software maintenance, configuration management, migration, user support, and database administration support. . . . This support is required to implement, maintain and comply with: federal financial management systems requirements; applicable federal accounting standards; and U.S. Government Standard Ledger at the transaction level.

Id. at 2619.  The bridge contract "enable[d] the [Coast Guard] to transition the System Development Agent (SDA) role from a contractor provided facility to a Government provided facility," a transition that was "part of the overall plan to transition all information technology to the Office of Information Systems and Infrastructure . . . ." Id. at 2618.

In order to meet its needs, the Coast Guard required "comprehensive project management, audit remediation, and support for the completion of ongoing Federal Financial IT systems development as well as continuous support and maintenance of the activities involved with these production systems on a 24/7 basis." Id. at 2622.  As a result, GCE was required to "provide a wide-range of ongoing Federal Financial IT systems development, technical maintenance, project management, audit remediation, technical assistance, training, administration, software maintenance, configuration management, migration, user support, database administration support, and certification and accreditation for the [Coast Guard] Financial System." Id. at 2622-23.  With respect to audit remediation responsibilities, the Coast Guard expected that "Federal Financial IT systems development . . . [would] meet Initiative Action Plan (IAP) milestones for the ongoing audit remediation effort." Id. at 2623.

The Coast Guard estimated that this transition would require seven and one-half months of planning, acquisition, and integration. Id. at 2618.  On August 15, 2007, it awarded to GCE the bridge contact, which "provide[d] contractor assistance in Federal Financial Information Technology (IT) system, software development, technical maintenance, project management and database administration support for the [Coast Guard] as well as [DHS] and its components['] financial and mixed IT systems." Id. at 2607.  The performance period under the contract spanned from August 16, 2007, through March 31, 2008. Id. at 2645.

### 4.  The Coast Guard's August 2007 Solicitation and September 2007 Contract

In August 2007, the Coast Guard issued a solicitation for financial systems expertise, business process development, and project management support to migrate its financial systems to "a single 'out of the box' Oracle™ system," an effort that required the contractor to demonstrate "extensive knowledge of Oracle software and a comprehensive understanding of best practices for accounting and financial reporting business processes using Oracle." Id. at 2820.  The solicitation noted that the Coast Guard was "currently engaged in a major Financial Management Transformation Project to create world-class accounting, business information, and financial processes." Id. at 2821.  Among the goals enumerated in the solicitation were: (1) efficient financial operations; (2) an "unqualified Statement on Auditing Standards (SAS) 70 opinion for [Coast Guard Finance Center] operations"; (3) an "unqualified financial statement audit"; and (4) an "unqualified opinion on internal controls over financial reporting." Id.

GCE, the incumbent contractor, expressed an interest in bidding on this contract. Pl.'s App. 24 (Lucas Decl. ¶ 43).  However, according to GCE, the Coast Guard "informed GCE that [it] would compete the software development tasks separately, and that GCE should wait for that competition."[45] Id.  In fact, GCE was unable to compete for this work because the solicitation prohibited software developers from participating in the competition. Id.; see also AR 2835 (indicating that the contractor "shall be an independent entity of the software developers used for development and maintenance of the system.  The Contractor shall also be an independent entity of the contractor operational staff that operates the system").  After the solicitation was awarded to PricewaterhouseCoopers in September 2007, see AR 2799-802, GCE believed that it would work with PricewaterhouseCoopers to perform this contract and that a separate solicitation would be issued for related software development tasks, Pl.'s App. 25 (Lucas Decl. ¶ 43).

### 5.  Use of the SETS II Task Order to Transition Audit-Supporting Federal Financial Management Systems and Related Services to the OSC

In July 2007, the "OSC SETS [II task order] was being evaluated as a possible alternative [for the Coast Guard] to meet [its] contracting needs." AR 2431; see also id. at 286 (indicating that in August 2007, the SETS II task order was mentioned as a vehicle through which to implement the transition to the OSC), 2618 ("[A] new contract modification is planned to be made under the SETS [II task order] at OSC Martinsburg, West Virginia.").  One month later, "an agreement was reached between the [CFO] and [CIO] . . . to shift responsibility for Financial Management Systems . . . ." Id. at 2710.  Although this transition would "be a huge and monumental effort," it "demonstrate[d] the importan[t], far reaching and long-range implications of this decision for the entire Coast Guard." Id.; see also id. (stating that a change order implementing this transition "is in the best interest of the Coast Guard").  Any "transition of the

---

[45]  GCE later characterized the Coast Guard's representations "that a competition for the financial management systems work was imminent" as a "head fake." Pl.'s Mot. Prelim. Inj. & TRO 11.

operations and maintenance of the enterprise financial system" was required to "include a thorough analysis of the current systems maintenance function . . . ." Id. at 3012.  According to the Coast Guard, this transition "of financial systems software development to [the] OSC . . . ensure[d] that the Coast Guard can meet its customers' needs while at the same time work[] in partnership with the DHS . . . on its initiative to develop a department-wide shared financial application baseline." Id.

The Coast Guard ultimately utilized the SETS II task order to procure services for its audit-supporting federal financial management systems.  See id. at 2929 ("[T]he OSC Contracting Officer and legal counsel determined the financial systems requirement to be within [the] scope of the SETS II Contract.").  GCE alleges that despite this determination, Coast Guard personnel "raised concerns regarding the propriety of using SETS II" as the contract vehicle beginning in late June 2007.  Compl. ¶ 27.  Beginning in August 2007, GCE learned that the Coast Guard began considering a noncompetitive transfer of financial management work to QSS.  Pl.'s Mot. Prelim. Inj. & TRO 11.  GCE states that these rumors persisted into October 2007, at which time the Coast Guard "denied the rumors."  Pl.'s App. 25 (Lucas Decl. ¶ 44).

### a.  Modification 30 to the SETS II Task Order

A September 25, 2007 Coast Guard memorandum announced the issuance of a change order "to establish a new Sub-CLIN for Financial Management Systems (FMS)" within the SETS II task order and "direct[ed] the SETS II Contractor, QSS, to immediately begin tasking to initiate the transition of Financial Management Systems to the OSC."  AR 2710.  The memorandum explained:

> Several weeks ago an agreement was reached between the [CFO] and [CIO] of the Coast Guard (CG-6 and CG-8[, respectively]) and a plan was devised to shift responsibility for Financial Management Systems to CG-6.  CG-6 directed that [the] OSC, as the Coast Guard's Software Development Center of Excellence, would take on the responsibility for all Financial Management Systems. Meanwhile, the current task order with Global Computer Enterprises, Inc. (GCE) was extended by the Contracting Officer . . . from October 15, 2007[,] through 31 March 2008.
>
> The transition of tasking to the OSC will be a huge and monumental effort and the on-going negotiations, agreements, and discussions between CG-6 and CG-8 demonstrate the importance, far reaching and long-range implications of this decision for the entire Coast Guard.

Id.; see also id. at 2295-313 (containing Modification 30 to the SETS II task order).  Although this decision was made in September 2007, the Coast Guard apparently did not seek general counsel's opinion as to whether audit-supporting federal financial management systems fell

within the scope of the SETS II task order until after November 7, 2007.  See infra note 52.

    The period of performance for Modification 30 spanned through May 31, 2010, AR 2296, the date on which the final, five-month option period under the SETS II task order terminated. See supra note 33.  A new section added to the SETS II task order PWS indicated that

> [t]he purpose of this Change Order under the SETS II Task Order is to facilitate the transition of Financial Information Technology (IT) systems, software development, technical maintenance, project management, technical analysis/assistance, training, incidental administration, trouble shooting, software bugs correction, new system components installation, configuration management, migration, user support, and data base administration support for all [Coast Guard] as well as [DHS] and its components financial and mixed IT systems to the [OSC] on or before 31 March 2008.[46]

AR 2312 (footnote added); cf. id. at 4140 (enumerating the following services: Federal Financial Information Technology (IT) system development, software development, technical maintenance, project management, audit remediation, technical assistance, administration, software maintenance, configuration management, migration, user support, and database administration support).  These tasks were part of a "wide-range" of work.  Id. at 4140.  Modification 30 also included the following labor categories: Applications Programmer, Communications Network Specialist, Data Analyst, Database Analyst, Document Management Specialist, Functional Area Manager IV, Software Systems Specialist, Systems Analyst, Systems Administrator/Operator, and Word Processor.  Id. at 284.

    Additionally, the new section of the SETS II task order PWS enumerated milestone events that would be included in a draft transition plan, some of which included:

- The deployment, installation, and configuration of new hardware . . . .  At a minimum this will include a development and a test environment for the affected systems . . . .
- Establishment of an automated source code repository for effective source code management.  This will include migration of baselined and fully-documented source code to this new repository.

    . . . .

- The establishment of the exchange of staffs between the OSC contract staff and [GCE's] staff as established mutually during the Scoping

---

[46]  The OSC "assume[d] the role of Software Development Agent (SDA) for all enterprise financial systems" and had the "sole authority to make decisions regarding the continuance or replacement of all development contracts and activities."  AR 4139.

Session.  It is a requirement for effective transition that appropriate
numbers of cleared/qualified staff from the OSC be stationed temporarily
at [GCE's] facility.

•  The successful build of a deployable, executable version of the
system code baseline.  This build must be performed by OSC staff
to be considered a success . . . .

•  The transfer of all Government-owned software licenses from the
servers/workstations at the contractor's site to the OSC, or other
location designated by the Government.

Id. at 2313.  The draft transition plan would "detail all steps necessary, to include staffing,
hardware and software configurations, milestone dates for major activities, and related tasks such
that the systems are successfully transitioned prior to the expiration of the period of performance
of this PWS."  Id.  Timing was "imperative" in order "to get the Contractor working on the
critical tasks to achieve the required outcome by 31 March 2008 . . . ."  Id. at 2710.

In summary, Modification 30 "was a change order transaction . . . [that] incorporate[d]
the transition work and equipment necessary to transition [Coast Guard] Financials to OSC," id.
at 2841, and reflected "a direction to get started on transition,"[47] id. at 284.  It required that QSS
conduct an on-site scoping session at GCE's facility "for the express purpose of collecting copies
of system documentation, system code libraries and repositories, and for allowing the Contractor
to observe the breadth and scope of the effort to maintain, build[,] and deploy a working copy of
the system software involved."  Id. at 2312-13.  Furthermore, Modification 30 required that QSS
provide a final transition plan identifying milestone dates for major activities and detailing all
steps necessary to successfully transition staffing, hardware and software configurations, and
related tasks.  Id. at 2313.

### b.  Modification 32 to the SETS II Task Order

In November 2007, the OSC "sent the SETS II Contractor, QSS[,] written notice of the
Government's intent to exercise Option Period 3 of the SETS II task order."  Id. at 4153.  On
December 5, 2007, the Coast Guard "direct[ed] the transition of software development and
support for the financial IT systems from the current program-centric software development
model to a CIO-centric development model . . . ."  Id. at 3011.  It then issued Modification 32 to
the SETS II task order on December 31, 2007.  Id. at 3963, 4153.  Through Modification 32, the
Coast Guard exercised "Option Period 3 for the period January 01, 2008–December 31, 2008" of
the QSS task order.  Id. at 3963, 4153; supra note 33.  Modification 32 reflected the Coast

---

[47]  The change order associated with Modification 30 was "the only SETS II [task order]
action associated with [Coast Guard] Financials to date . . . .  There have been no other actions
nor [were] there any in the works as of [October 26, 2007]."  AR 2855.

Guard's determination that the "exercise of Option Period 3 [was] most advantageous to the
government" and that "[f]ailure to exercise the option . . . result[ed] in diminished capability of
the [Coast Guard OSC] to perform [its] functions." AR 4158.  The contracting officer further
determined that in accordance with FAR § 6.001(c), Modification 32 was "exempted from the
competition requirement because it [was] determined the requirement [came] under the scope of
the existing contract." Id.

## 6.  GCE Expresses Concern to the Coast Guard

GCE alleges that the Coast Guard never informed it about Modification 30.  Compl. ¶ 34.
On October 25, 2007, after GCE learned of the issuance of Modification 30, it "raised its own
concerns with the . . . SETS II modification strategy." Id. But see AR 3 (indicating that GCE
first learned about Modification 30 from the Coast Guard on November 8, 2007).  GCE
"repeatedly expressed concern about [its] role post transition" to Coast Guard officials, who
believed that GCE "was looking for a venue to engage the OSC in a direct contractual
arrangement." AR 2854.  GCE's concerns can be separated into three categories: (1)
competition; (2) contract scope; and (3) adverse impact to the Coast Guard. Id. at 2863.

First, GCE "expressed concern that the work was given to [the] OSC 'without
competition.'" Id. at 2854; see also Compl. ¶ 32 (alleging that the Coast Guard issued
Modification 30 "with no competition").  GCE indicated that it "would expect to have the
opportunity to compete" for financial systems support work and anticipated a competitive
solicitation.  AR 2863.  GCE noted that as the incumbent contractor, it not only competed in full
and open competitions that it won, but it also had "a reasonable expectation that [this work
would have] be[en] re-competed." Id.  It stated that the consequences of the Coast Guard's
intention not to compete this work would cause GCE to lose approximately [. . .], or [. . .] of its
annual revenue.[48] Id.  Furthermore, because GCE was required to assist and train the OSC
contractor, it believed that the Coast Guard "tasked [it] to transition intellectual capital to another
contractor," which would result in giving the contractor "an unfair advantage when a competitive
acquisition occurs." Id. at 2864.  In response, the Coast Guard indicated that the OSC contract
"was competitively awarded and was the Coast Guard['s] mechanism for providing software
development services." Id. at 2854.

Second, in response to the Coast Guard's use of the SETS II task order to task QSS with
audit-supporting federal financial management systems services, GCE stated that it was "unusual
that the scope of a single contract covers the development and maintenance for every line of
business within a federal agency" and that it was "not reasonable to expect that any single

---

[48]   GCE noted that this loss of revenue, which it maintained "would be the result of a
transition process that is a de facto sole source acquisition by the government to another
contractor," was a significant loss for a small business to incur.  AR 2863.

contractor possesses all requisite expertise in every line of business."[49]  Id. at 2864.  Furthermore, GCE indicated that audit-supporting federal financial management systems "have been traditionally regarded as an independent line of business . . . and have been treated as such through contractual vehicles, i.e.[,] awarded independently of other lines of business."  Id.  It also questioned what it believed was an inconsistent application of the transition of audit-supporting federal financial management systems to the OSC–as it related to GCE's contract–by noting that "[t]here are several financial management contracts that are not being transitioned to [the] OSC.  Several aspects of the [Coast Guard] financial systems enterprise software development and hosting are not following this transition methodology."  Id. at 2865.  Additionally, GCE sought clarification about whether the development of key components of the audit-supporting federal financial management systems services were being transitioned to the OSC and where the operations of these systems would occur.  Id.

GCE provided to the Coast Guard a SETS II task order PWS "Section Detailed Analysis" table, which it utilized in support of its position that the SETS II task order PWS "clearly indicate[d] that the [Coast Guard] Enterprise Financial Systems are not in the scope of the SETS II [task order] work.  Id. at 2899; see also id. at 2899-902 (containing the entire table).  For example, GCE noted that the General Scope section of the SETS II task order PWS indicated that "[s]ervice applies to existing and future systems," that Coast Guard "Enterprise Financial Systems existed but are not named," that those systems "would not be considered a 'future' system as it already existed," and, as such, the Coast Guard "could have easily identified those systems and placed them within the scope of this contract."  Id. at 2899.  Additionally, GCE apprised the Coast Guard that the SETS II task order CLINs, in GCE's opinion, did not name any Coast Guard Enterprise Financial Systems or financial system applications and, as such, those systems were outside the scope of the SETS II task order.  Id.; see also id. at 2900-02 (explaining that the SETS II task order System Services, Software Development and Maintenance, Network Administration, System Availability, Scheduled System Downtime, Mean Time to Restore/Repair, and OSC System Requirements sections of the SETS II task order PWS do not list Coast Guard Enterprise Financial Systems as systems covered under the task order).

GCE also provided to the Coast Guard a table of the SETS II task order PWS "Section 8 List of SubCLINs/Systems."  Id. at 2903-07.  According to GCE, Section 8 of the SETS II task order PWS "designates each system covered under this PWS and all of the services to be provided for those named systems."  Id. at 2903; see supra Parts I.D.1.c.i-xvii.  In addition to providing a description of each system, GCE noted that the SETS II task order PWS "does not include CLINs for any component of the [Coast Guard] Enterprise Financial Systems."  AR 2903.

---

[49]  In a November 7, 2007 memorandum to the Coast Guard contracting officer, GCE questioned the Coast Guard's lack of competition and maintained that the Coast Guard's intent to "use a single umbrella contract for all IT services" was contrary to the contracting business model at the OSC, which "employ[ed] multiple prime contracts and prime contractors to perform the mission of [the] OSC."  AR 2913.

Finally, GCE addressed how the transition adversely impacted the Coast Guard.  Id.  It
noted that the Coast Guard's transition plan "duplicate[d] GCE's Software Development
Center," a state of the art software development center and testing facility in which the Coast
Guard invested millions of dollars, and emphasized that the Coast Guard would have spent "an
additional [. . .] to duplicate the infrastructure that [it] has already paid GCE to build and
maintain."  Id.  Additionally, GCE indicated that it

> has been intimately involved in supporting the audit remediation efforts over the
> past two years.  It is risky to transition the software development to a new
> contractor team who has not worked on the [Coast Guard] financial systems in the
> midst of the audit remediation.  GCE is deeply concerned about any interruption
> to the [Coast Guard] audit remediation effort and the operational capability of the
> financial management systems.

Id.  GCE recommended that it "enter into discussions" with the Coast Guard and "hold[] scoping
sessions to convey to [the] OSC the depth and breadth of the [Coast Guard] financial systems."
Id. at 2866.

On October 31, 2007, GCE notified the Coast Guard via electronic mail that it "submitted
a [Freedom of Information Act ("FOIA")] request for the SETS II [task order] PWS and
contract" and "documented [its] concerns with respect to whether or not the [Coast Guard]
Enterprise Financial Systems fit under the current scope."  Id. at 2891.  In an accompanying
memorandum, Mr. Winslow articulated GCE's "position that any change order or task order
issued subsequent to a modification of the SETS II [task order] contract that includes [Coast
Guard] Enterprise Financial Systems software maintenance or support is out of the scope of the
SETS II [task order] contract and the SETS II Performance Work Statement . . . ."  Id. at 2892.
GCE maintained its belief that, among other things, (1) the scope of the SETS II task order "is
very well defined and focused on . . . operational mission systems," id. at 2895; (2) the SETS II
task order PWS "sets out a very clear scope that is not ambiguous," id. at 2896; (3) Coast Guard
financial systems "do not meet the scope criteria and are not named in the PWS," id. at 2895; (4)
if enterprise financial systems at the OSC were intended to fall within the scope of the SETS II
task order, then they could have been easily added within the SETS II task order PWS, id.; and
(5) enterprise financial systems "could be added to the OSC mission," but such a "new
requirement would not fall under any existing contracts of the OSC," id. at 2896.  GCE also
indicated its belief that the Coast Guard "will independently conclude that the SETS II contract is
not an appropriate contracting vehicle to support the transition of the [Coast Guard] Enterprise
Financial Systems to the OSC" and recommended that the Coast Guard pursue a "competitive
acquisition process" for those services.[50]  Id. at 2898.

_____

[50]  In a November 7, 2007 memorandum, GCE explained that the OSC previously
supported multiple prime contracts to fulfill its operational mission, a position that was "contrary
to the view that all OSC initiatives, including financial systems, must be managed under one
umbrella contract, namely the SETS II contract."  AR 2914.  GCE recommended that audit-

The Coast Guard responded to GCE's concerns in a memorandum dated November 8, 2007.  Id. at 2929.  Carmen L. Correa, Chief of the Formal Contracting Division, reiterated that GCE's contract was awarded on a sole-source basis, that the Coast Guard's "Commandant directed the consolidation and responsibility of our financial systems from the current program office," and that the Coast Guard "[was] working on consolidating all financial systems . . . . When this [was] done[,] it [was] likely to be competed among DHS EAGLE contractors."[51]  Id.  Ms. Correa also indicated that although she was "not responsible for the decision to transition the financial systems requirements to [the] OSC or responsible for [its] contracts," a determination was made within the agency that the financial systems requirement fell within the scope of the SETS II task order.[52]  Id.

On November 13, 2007, GCE submitted a memorandum to Ms. Correa questioning the draft PWS of its sole-source bridge contract.  Id. at 2932-34.  GCE stated that a draft PWS modification removed audit remediation tasks and added system transition tasks that included providing the Coast Guard with "documentation, issues in the issue tracking system . . . , and software managed by [the Coast Guard]."  Id. at 2933.  GCE noted that it formed and staffed a prototype and analysis team that "for well over three months ha[d] been executing the audit tasks," id. at 2979, that it worked on remediating "ten material weaknesses" exposed in the Coast Guard's audit for fiscal year 2005, and that the audit tasks it intended to perform "implement[ed] the gap analysis portion of the agency migration plan,"[53] id. at 2933.  It sought clarification as to

---

supporting federal financial management systems and related services "be competed in a full and open manner under the DHS [EAGLE] contract vehicle," which it believed would produce a contract that the OSC could manage "in the same manner as the multiple prime contracts currently managed at [the] OSC."  Id. at 2915.

[51]  Ms. Correa served as the contracting officer for GCE's bridge contract.  Pl.'s App. 25 (Lucas Decl. ¶ 46).

[52]  One day earlier, on November 7, 2007, Linda Dearing, Deputy Office Chief of the Office of Contract Operations, sent an electronic mail communication to Ms. Correa and Kathy Klein, the Coast Guard contracting officer, instructing the latter to "[g]ain counsel's opinion on whether the financial systems are in scope of the existing contract and appropriate action taken in accordance with that opinion."  AR 2931.  But see supra Part I.E.5.a (indicating that the Coast Guard decided to utilize the SETS II task order for including audit-supporting federal financial management systems and related services on September 25, 2007).  Ms. Dearing also instructed that Modification 30 of the SETS II task order "must be modified as soon as possible to remove any reference to GCE."  AR 2931.

[53]  GCE also indicated that the Coast Guard "had ten material weaknesses during [its] FY06 audit and has shown little improvement in the FY07 audit."  AR 2979.  In fact, according to Captain David L. Hill, Chief of the Office of Financial Policy and Systems at Coast Guard Headquarters, the Coast Guard has yet to "support a sustainable 'clean' financial statement audit

the rationale behind the removal of audit tasks from its PWS and questioned the ten-day deadline within which it was required to gather, consolidate, and furnish Enterprise Financial Systems documentation, a time frame it believed was "not sufficient to organize the information in any meaningful way." Id.

Internal communication indicates that the Coast Guard eliminated these audit tasks due to its "desire to concentrate more fully on strategic transition."[54] Id. at 2935. However, on November 13, 2007, Ms. Dearing indicated that "[a]lthough it is our right to change our requirements, we must be sure it is not arbitrary. The reasoning for the change should be documented." Id. GCE believed these changes were "unwise" and perceived them as a reflection of the Coast Guard holding "something personal against GCE." Id. Moreover, GCE stated that it

> does not agree with the removal of these tasks. GCE can only infer from the [Coast Guard's] actions that the [Coast Guard] is penalizing GCE for raising [its] concerns about the bundling of requirements of [its] contract under the SETS II contract. . . . GCE, in good faith, staffed up to support this audit work, purchased additional hardware to support the prototyping effort, and continues to execute for over three months. The removal of these tasks will cause significant harm to GCE.

Id. at 2980.

---

opinion . . . ." Def.'s Opp'n Pl.'s Cross-Mot. J. Administrative R., Pl.'s Mot. Perm. Inj., & Pl.'s Mot. Supplement Administrative R., & Def.'s Reply Pl.'s Opp'n Def.'s Mot. Dismiss or, Alternative, Mot. J. Administrative R. ("Def.'s Opp'n & Reply") Ex. 2 at 3 (Supplemental Decl. David L. Hill ("Hill Supp'l Decl.") ¶ 4(a)).

[54] According to Captain Hill, the Coast Guard chose not to implement GCE's audit remediation plan

> because we have chosen to move away from an IT-centric solution model that GCE proposed[] in favor of a business process centric model where the government (as opposed to the development contractor) is responsible for analyzing the related business processes and defining the necessary functional requirements.

Def.'s Opp'n & Reply Ex. 2 at 6 (Hill Supp'l Decl. ¶ 8).

On October 25, 2007, Mr. Bowen, the SETS II Program Manager for the OSC, expressed displeasure to Mr. Lucas over GCE's apparent "lack of cooperation" with the transition,[55] stating:

> It seems we are at [an] impasse on next Monday's scheduled scoping session.  E-mails and phone messages . . . have gone unanswered. . . .   The continued lack of correspondence between our staffs is of great concern to me as the person who is ultimately responsible for the success of CG Financials after April 1st.

> Let me be very blunt.  I see no future relationship between my contract and GCE if this level of cooperation or lack of cooperation continues . . . .  [M]y company is investing in this effort on [its] own nickel and I expect a similar effort on your part if you wish to have any role whatsoever in CG Financials post 1 April 2008.[56]

Id. at 2867 (footnote added).  Ron Winalski, who was serving as the contracting officer's technical representative ("COTR") for the SETS II task order, see id. at 2959, contacted Ms. Correa and informed her of "the failure of GCE to perform to the standards set in the task

---

[55] Specifically, an issue arose regarding whether GCE was required to provide source code data.  See infra note 57.

[56] In a letter dated December 4, 2007, Ms. Klein notified Mr. Bowen that

> your recent email dated 25 October 2007 to GCE's Mr. David Lucas, another [Coast Guard] contractor, was [. . .].  The email misrepresented the [Coast Guard's] position and was done without authority on your part.  You do not have authorization to address future opportunities with other contractors on behalf of our organization.

> [. . .].

> [. . .].

AR 2982.  Mr. Bowen responded to Ms. Klein on December 10, 2007.  Id. at 3025-26.  Although he "accept[ed] full responsibility for the content of the e-mail" and indicated that he "completely underst[ood] your direction and will comply," Mr. Bowen maintained that "GCE had failed to live up to promises made in a meeting here at OSC on October 15th 2007," id. at 3025, and that "the e-mail [he] sent . . . was appropriate," id. at 3026.  Mr. Lucas indicates that "GCE had no knowledge that the financial systems work was transferred to [the] SETS II [task order]" at the time of Mr. Bowen's October 25, 2007 communication, Pl.'s App. 933-34 (Supplemental Decl. David Lucas ("Lucas Supp'l Decl.") ¶ 14), maintains that "GCE did not refuse to work with [the] OSC prior to this time," id. at 934 (Lucas Supp'l Decl. ¶ 14), and states that GCE "had no knowledge or obligation to work with QSS during this time period," id.

order,"[57] id. at 2938.  GCE, however, indicated that it "cooperate[d] with the [Coast Guard] with

_____

[57] In her November 7, 2007 response to Mr. Winalski, Ms. Correa noted that "GCE is not yet contractually bound to provide any source code to date, therefore, . . . you cannot request any documentation prior to a contractual arrangement." AR 2937; see also id. at 2040 ("[T]he source code will not be available until GCE provides additional documentation to this office and the modification is signed.").  Also on November 7, 2007, Ms. Correa was informed that "the source code [the Coast Guard is] seeking is not related to the transition.  It is source code that is currently in production at the Finance Center and belongs to the Coast Guard and should have been delivered . . . ." Id. at 2960.  On November 8, 2007, Ms. Thompson informed Ms. Dearing that

> [w]hile it may be the case that the source code is not explicitly stated as a deliverable in the contract, it is my understanding that GCE acknowledges that the government owns the source code.  I am asking that we request (not demand) the source code from GCE and see what happens.  If they do not agree to deliver the source code, then we must deal with the response in whatever way is contractually available to result in obtaining the source code. . . .

>      In the interim, GCE may deliver the source code now upon request, but we won't know unless we ask.  In my mind[,] it is not an unreasonable request to ask for what has been acknowledged to be government owned.

Id. at 2966.  Thereafter, Ms. Dearing acknowledged that "the Coast Guard created this situation by not including the deliverable in the work statement.  A contracting officer should not ask for something that is not required by the contract."  Id. at 2970; see also id. at 2971 (stating that because "[t]he 'fact' is that . . . the source code is not clearly defined in the contract work statement, there is no requirement for the contractor to deliver it to the Government").  The Coast Guard subsequently reconsidered Mr. Winalski's appointment as the COTR.  See id. at 2940, 2944.

     According to Mr. Winslow, GCE "delivered the source code to [the] Coast Guard on January 29, 2008" and "was not instructed to give the source code to QSS." Pl.'s App. 970 (Supplemental Decl. David Winslow ("Winslow Supp'l Decl.") ¶ 43).  Mr. Winslow states that GCE played no role in the decision to turn the source code over to QSS in mid-February 2008, which was made solely by the Coast Guard.  Id.; cf. Intervenor QSS's Mot. Admit Harm Decl. William R. Bowen & Strike Improper Lay Opinion Testimony Decls. Supp. Pl.'s Mot. Prelim. Inj. & Application Restraining Order ("Def.-Intervenor's Mot. Strike") Ex. (Decl. William R. Bowen ("Bowen Decl.") ¶ 15 (stating that "GCE has not assisted in any transition planning" and that "despite repeated requests by the Government for the necessary source code and scripts, . . . GCE refused to deliver until mid-February 2008")).

respect to the proposed transition tasks . . . ."[58] Id. at 2981.

## II. PROCEDURAL BACKGROUND

### A. Proceedings Before the GAO

On November 16, 2007, GCE filed with the GAO protest B-310823, wherein it argued that Modification 30 exceeded the scope of the SETS II task order. Id. at 1-102. It then filed "a series of protests after it received a copy of Modification 30, and additional supplemental protests after it learned of the Coast Guard's December 31, 2007 issuance of Modification 32." Pl.'s Mot. Prelim. Inj. & TRO 15. GCE filed a total of five supplemental protests: B-310823.2 on November 29, 2007, AR 123-53; B-310823.3 on November 30, 2007, id. at 167-73; B-310823.4 on January 9, 2008, id. at 4165-201; B-310823.5 on January 25, 2008, id. at 4821-32; and B-310823.6 on January 28, 2008, id. at 4833-49. GCE summarized these actions as follows:

> Taken together, the protests' allegations included that Modifications 30 and 32 were unlawful because they were outside the scope of [the] SETS II [task order] and therefore unlawful under the Competition in Contracting Act, and because in issuing the Modifications the Coast Guard had violated various regulations implemented by the Small Business Administration pursuant to the Small Business Act.

Pl.'s Mot. Prelim. Inj. & TRO 15.

The GAO dismissed protest B-310823.3, in which GCE argued that the Coast Guard improperly failed to stay performance of Modification 30 to the SETS II task order, see AR 167-73, on December 3, 2007:

> Our bid protest jurisdiction is limited by the Competition in Contracting Act to written objections to a solicitation, proposed award, or award of a contract filed with our Office. Whether or not an agency decides to stay performance is an issue that our Office will not consider, because the stay of performance is a procedural matter that does not involve the validity of an award or selection determination (moreover, GAO also has no authority to enjoin an agency's action).

Id. at 176 (citation omitted). On January 31, 2008, the GAO dismissed protests B-310823, B-310823.2, and B-310823.4 because it "is generally precluded from considering protests challenging the issuance of task or delivery orders under ID/IQ contracts." Id. at 4866. Citing the Federal Acquisition Streamlining Act of 1994 ("FASA"), Pub. L. No. 103-355, § 1004, 108

---

[58] GCE noted, however, that its cooperation "should not be construed as concurrence with the [Coast Guard] that the [Coast Guard] Enterprise Financial Systems work fits within the scope of the SETS II contract." AR 2981.

Stat. 3243, 3252-53 (1994) (codified at 10 U.S.C. § 2304c(d) (2006) and 41 U.S.C. § 253j(d) (2006)),[59] the GAO concluded that GCE's protests did "not fit within the exceptions provided in the statute," thereby divesting it of jurisdiction.  AR 4866.

Prior to its January 31, 2008 ruling, the GAO informed the parties that it considered GCE's supplemental protest B-301823.5 "to be a new protest."  Id. at 4855.  Consequently, protest B-301823.5 was "not joined to GCE's other protests" and was assigned a determination date of May 5, 2008.  Id.  On January 30, 2008, the GAO joined protest B-310823.6 with protest B-310823.5, "but not [with] GCE's other protests."[60]  Id. at 4861.  "[A]fter learning that the GAO would not be deciding . . . these protests on the original 100-day schedule" established by its initial protest, GCE, on February 4, 2008, voluntarily withdrew protests B-310823.5 and B-310823.6.  Pl.'s Cross-Mot. & Mot. Perm. Inj. 13; AR 4871; see also Pl.'s Mot. Prelim. Inj. & TRO 16 ("The GAO . . . did not dismiss GCE's final two supplemental protests.").

## B.  Proceedings Before The United States Court of Federal Claims ("Court of Federal Claims")

On March 6, 2008, one month after it withdrew its remaining protests before the GAO, GCE filed its protest in the Court of Federal Claims.[61]  Thereafter, QSS intervened pursuant to Rule 24(a) of the Rules of the United States Court of Federal Claims ("RCFC").  The parties subsequently agreed to an expedited briefing schedule based upon the fact that the transition of support services to QSS, absent court action, was scheduled to take effect on April 1, 2008.  The court heard argument on GCE's motion for a preliminary injunction and temporary restraining order and granted GCE's motion.

Following the court's issuance of a preliminary injunction and temporary restraining order, the parties proposed a schedule for additional briefing and indicated their agreement to

---

[59]  Provisions in the FASA pertaining to ID/IQ contracts are codified identically at 10 U.S.C. §§ 2304a-2304d and at 41 U.S.C. §§ 253h-253k.  See Group Seven Assocs., LLC v. United States, 68 Fed. Cl. 28, 31 n.5 (2005).  The provisions contained in title 10 of the United States Code are the military procurement equivalents to those contained in title 41 of the United States Code.  See A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 133 n.7 (2006).  Thus, the provisions contained in title 10 of the United States Code apply to the Coast Guard.  See 10 U.S.C. § 2303(a)(5).

[60]  The GAO questioned the timeliness of protests B-310823.5 and B-310823.6, and requested briefing on that issue as it pertained to each protest.  AR 4855, 4861.

[61]  Both the government and QSS assert a laches defense based upon GCE's thirty-one day delay between the date it withdrew its supplemental protests from the GAO and the date on which it initiated this action.  The court addresses the equitable defense of laches in Parts IV.C.1-4, infra.

extend the temporary restraining order "during any additional briefing period, from midnight, April 9, 2008, through the date on which the Court resolves GCE's motion for a permanent injunction." J. Status Report 2, Apr. 3, 2008. The parties then conducted additional briefing, and the court heard argument on GCE's motion for permanent injunctive relief. During the permanent injunction hearing, QSS renewed its motion to strike GCE's extra-record evidence, and briefing on QSS's renewed motion to strike followed. The court's concurrent ruling addresses GCE's motion to supplement the administrative record, as well as QSS's motion to strike and renewed motion to strike.

## III.  LEGAL STANDARDS

### A.  Bid Protests

The Court of Federal Claims has "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," 28 U.S.C. § 1491(b)(1) (2006), and may "award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs," id. § 1491(b)(2). Interested parties are those "prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." Am. Fed'n of Gov't Employees, AFL-CIO v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (citing 31 U.S.C. § 3551(2)(A)). Both the government and QSS challenge the court's jurisdiction over GCE's complaint. See Parts IV.A.1-2, infra.

The court reviews the procuring agency's action pursuant to the standards set forth in 5 U.S.C. § 706. 28 U.S.C. § 1491(b)(4). Although section 706 contains several standards, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004). Although "it is well-settled that procurement officials are entitled to broad discretion in the . . . application of procurement regulations," Metcalf Constr. Co. v. United States, 53 Fed. Cl. 617, 622 (2002), the court may set aside a procuring agency's contract "if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure," Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001). The protester must show, by a preponderance of the evidence, that either ground justifies a set aside of the contract award. AmerisourceBergen Drug Corp. v. United States, 60 Fed. Cl. 30, 35 (2004); see also Gulf Group Inc. v. United States, 61 Fed. Cl. 338, 351 (2004) (articulating the preponderance of the evidence standard). Where, as here, "the challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1333 (quoting Kentron Haw., Ltd. v. Warner, 480 F.2d 1166, 1169 (D.C. Cir. 1973)); see also Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (holding that if the

procuring agency's decision was made in violation of the applicable statutes, regulations, or procedures, the court must then "determine, as a factual matter, if the bid protester was prejudiced by that conduct"); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (stating that in addition to showing "a significant error in the procurement process," a protester must show "that the error prejudiced it").  A protester must satisfy both requirements–significant and prejudicial error–in order to prevail.[62]  Bannum, Inc., 404 F.3d at 1351.

        "To establish prejudice . . . , a protester must show that there was a 'substantial chance' it would have received the contract award absent the alleged error."  Banknote Corp. of Am., 365 F.3d at 1350 (quoting Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1086 (Fed. Cir. 2001)); see also Statistica, Inc. v. Christopher, 102 F.3d 1577, 1582 (Fed. Cir. 1996) ("[F]or [a protester] to prevail[,] it must establish not only some significant error in the procurement process, but also that there was a substantial chance it would have received the contract award but for that error."); Data Gen. Corp., 78 F.3d at 1562 ("[T]o establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract.").  The "substantial chance" test creates a "reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances."  Data Gen. Corp, 78 F.3d at 1563.  A protester need not show under the "substantial chance" test that "but for the alleged error, [it] would have been awarded the contract.  Id. at 1562.  Rather, the protester must "demonstrate more than a 'mere possibility that [it] would have received the contract but for the error [in the procurement process].'"  Asia Pac. Airlines v. United States, 68 Fed. Cl. 8, 18 (2005) (quoting Data Gen. Corp., 78 F.3d at 1562); cf. Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d, 1366, 1370-71 (Fed. Cir. 2002) (stating that, where a protester claims that the government was obligated to rebid the contract, as opposed to where the protester claims it should have been awarded the contract during the original bid protest, the protester "need only establish that it 'could compete for the contract' if the bid process were made competitive" (quoting Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1334)).

## B.  Standing

        Standing constitutes a "threshold requirement in every federal action."  Myers Investigative & Sec. Servs., Inc., 275 F.3d at 1369.  As an "indispensable part of the plaintiff's case," Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992), standing is "not a mere pleading requirement," Night Vision Corp. v. United States, 68 Fed. Cl. 368, 391 (2005).  "[T]he question of standing," the United States Supreme Court ("Supreme Court") explained, "is

---

        [62]  "[M]inor errors or irregularities, i.e., harmless errors, committed in the course of the procurement process are not sufficient grounds to warrant judicial intrusion to upset a procurement decision."  Metcalf Constr. Co., 53 Fed. Cl. at 622 (citing Day & Zimmermann Servs., a Div. of Day & Zimmermann, Inc. v. United States, 38 Fed. Cl. 591, 597 (1997)).

whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Seldin, 422 U.S. 490, 498 (1975).  In Lujan, the Supreme Court summarized three elements that comprise standing.  504 U.S. at 560.  First, the plaintiff must have suffered an "'injury in fact'–an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not 'conjectural' or 'hypothetical.'"  Id. (citation & footnote omitted).  Second, "there must be a causal connection between the injury and the conduct complained of."  Id.  In other words, the injury "has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'"  Id. (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41-42 (1976) (alterations in original)).  Third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  Id. at 561 (quoting Simon, 426 U.S. at 38, 43).  The burden of establishing these elements of standing rests with the party invoking federal jurisdiction.  See id.  Standing must be determined "as of the commencement of suit."  Rothe Dev. Corp. v. Dep't of Def., 413 F.3d 1327, 1334 (Fed. Cir. 2005).

"[T]he plaintiff in a bid protest must show that it has standing to bring the suit."  L-3 Global Commc'ns Solutions, Inc. v. United States, 82 Fed. Cl. 604, 608 (2008) (citing Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).  The Tucker Act provides that a bid protest action may be brought by an "interested party objecting to a solicitation by a Federal agency."  28 U.S.C. § 1491(b)(1).  "The pivotal element of standing in a bid protest is whether a protestor qualifies as an 'interested party' under [section] 1491(b)(1)."  RhinoCorps Ltd. v. United States, No. 08-410C, 2009 WL 1362834, at *3 (Fed. Cl. Jan. 28, 2009).  The United States Court of Appeals for the Federal Circuit ("Federal Circuit") has construed the term "interested party" as synonymous with the term "interested party" that is defined by the Competition in Contracting Act of 1984 ("CICA"), Pub. L. No. 98-369, 98 Stat. 494 (codified as amended at 31 U.S.C. §§ 3551-3556 (2006)).[63]  See Am. Fed. of Gov't Employees, AFL-CIO, 258 F.3d at 1302.  In order to have standing as an "interested party," a protester must satisfy a two-part test.  First, the protester must demonstrate that it is an actual or prospective bidder.  Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006); see also id. at 1308 (noting that "one who has not actually submitted an offer must be expecting to submit an offer prior to the closing date of the solicitation" (quoting MCI Telecom. Corp. v. United States, 878 F.2d 362, 365 (Fed. Cir. 1989))).  Second, the protester must demonstrate that it has a direct economic interest in the procurement.  Id. at 1307.

---

[63]  The CICA, which "was designed to create a level playing field, upon which all qualified vendors would have a fair chance to compete for a share of the hundreds of billions of dollars spent by the Federal Government in procurement each year," H.R. Rep. 103-545(I), at 21 (1994), defines the term "interested party" as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract," 31 U.S.C. § 3551(2)(A).

In addition to satisfying the "interested party" requirement under section 1491(b)(1), a protester must show that any alleged errors caused prejudice.  See Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." (quoting Data Gen. Corp., 78 F.3d at 1562)); Textron, Inc. v. United States, 74 Fed. Cl. 277, 283 (2006) ("[A] successful protestor must also establish that the errors complained of caused prejudice.").  Therefore, "prejudice (or injury) is a necessary element of standing." Myers Investigative & Sec. Servs., Inc., 275 F.3d at 1370.

Confusion over the standard of prejudice necessary for establishing standing exists "because, in addition to being an element of standing, a showing of prejudice is required before injunctive relief is granted." Textron, Inc., 74 Fed. Cl. at 284; see also Bannum, 404 F.3d at 1351 (requiring that a protester demonstrate a significant and prejudicial error in order to succeed on the merits); Banknote Corp. of Am., 365 F.3d at 1351 (showing of a "substantial chance" that the protester would have received the contract award necessary to demonstrate prejudice); cf. Rex Serv. Corp., 448 F.3d at 1308 (requiring that a putative, prospective bidder establish that it had a "substantial chance" of receiving the contract as proof of possessing a direct economic interest).  As these cases suggest, the court "looks twice at prejudice, first weighing prejudice as it pertains to standing, and then more thoroughly weighing prejudice to determine whether plaintiff shall be afforded relief." A & D Fire Prot., Inc., 72 Fed. Cl. at 131 n.4.  Thus, addressing questions of standing "presupposes discussion of the merits, which would lead the court in a round-robin through the arguments on the merits in order to resolve a jurisdictional issue.  Such is not a desirable or appropriate procedure." Textron, Inc., 74 Fed. Cl. at 284-85.

A prejudice determination for the purpose of evaluating standing is a "limited review" that seeks "minimum requisite evidence necessary for plaintiff to demonstrate prejudice and therefore standing." Night Vision Corp., 68 Fed. Cl. at 392 & n.23; see also L-3 Global Commc'ns Solutions, Inc., 82 Fed. Cl. at 608 n.4 (explaining that the "first showing of prejudice to the protestor, in order to prove standing, must occur before reaching the merits of the bid protest review").  A merits-based determination of actual prejudice based upon the "substantial chance" test should be separate from the standing inquiry. Textron, Inc., 74 Fed. Cl. at 285.  The court therefore utilizes the approach set forth in Textron, Inc. for assessing standing, which avoids a merits-based determination of actual prejudice and requires

> only that a protestor be (1) either a bidder or proposer that has been prevented from bidding or proposing due to some infraction other than the terms of the solicitation itself; or (2) either a bidder or proposer who would be in contention absent the unreasonable procurement decision or violation of applicable procurement regulations.

Id.  The court addresses QSS's argument that GCE has failed to demonstrate that it is an interested party and, as a result, lacks standing, in Part IV.B, infra.

## C.  Motion to Dismiss for Lack of Jurisdiction

The court's "general power to adjudicate in specific areas of substantive law . . . is properly raised by a [Rule] 12(b)(1) motion." Palmer v. United States, 168 F.3d 1310, 1313 (Fed. Cir. 1999).  When considering an RCFC 12(b)(1) motion, the burden of establishing the court's subject matter jurisdiction resides with the party seeking to invoke it.  See McNutt v. Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 189 (1936).  The plaintiff "bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence." Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).  The court must accept as true the allegations in the plaintiff's complaint and must construe such facts in the light most favorable to the plaintiff.  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 814-19 (1982); Reynolds, 846 F.2d at 747.  If the defendant or the court questions jurisdiction, the plaintiff cannot rely solely on allegations in the complaint but must bring forth relevant, adequate proof to establish jurisdiction.  See McNutt, 298 U.S. at 189.  In deliberating on a motion to dismiss for lack of subject matter jurisdiction, the court may examine relevant evidence in order to decide any factual disputes.  See Moyer v. United States, 190 F.3d 1314, 1318 (Fed. Cir. 1999); Reynolds, 846 F.2d at 747.  If the court finds that it lacks subject matter jurisdiction, then it must dismiss the claim.  Matthews v. United States, 72 Fed. Cl. 274, 278 (2006); see also RCFC 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").

## D.  Judgment on the Administrative Record

In ruling on cross-motions for judgment on the administrative record pursuant to RCFC 52.1 in bid protests, the court will not disturb an agency's decision unless it was "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Bannum, Inc., 404 F.3d at 1351 (quoting 5 U.S.C. § 706(2)(A) (2000)).[64]  Moreover, the court makes "factual findings . . . from the record evidence as if it were conducting a trial on the record." Id. at 1357; see also id. at 1356 ("[J]udgment on the administrative record is properly understood as intending to provide for an expedited trial on the administrative record.").

## E.  Injunctive Relief

Courts "ordinarily refrain from interference with the procurement process . . . ." United States v. John C. Grimberg Co., 702 F.2d 1362, 1372 (Fed. Cir. 1983).  In a bid protest case, the Tucker Act provides that

---

[64]  The decision in Bannum was based upon RCFC 56.1, which was abrogated and replaced by RCFC 52.1.  RCFC 52.1, however, was designed to incorporate the decision in Bannum.  See RCFC 52.1, Rules Committee Note (June 20, 2006).

the court may award any relief that the court considers proper, including
declaratory and injunctive relief[,] except that any monetary relief shall be limited
to bid preparation and proposal costs.

[T]he court shall give due regard to the interests of national defense and national
security and the need for expeditious resolution of the action.

28 U.S.C. § 1491(b)(2)-(3).  Preliminary injunctive relief is an extraordinary and drastic remedy,
Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam), and the decision to grant
injunctive relief falls within the sound discretion of the trial court, FMC Corp. v. United States, 3
F.3d 424, 427 (Fed. Cir. 1993); see also PGBA, LLC v. United States, 389 F.3d 1219, 1225-26
(Fed. Cir. 2004) (determining that the statutory scheme for reviewing procurements "does not
deprive a court of its equitable discretion in deciding whether injunctive relief is appropriate" and
holding that, in a bid protest action, a court is not automatically required to set aside an arbitrary,
capricious, or otherwise unlawful contract award), aff'g 60 Fed. Cl. 196 (2004).

As the Supreme Court acknowledged, a preliminary injunction is designed "merely to
preserve the relative positions of the parties until a trial on the merits can be held."  Univ. of Tex.
v. Camenisch, 451 U.S. 390, 395 (1981).  In order to obtain a preliminary injunction or a
temporary restraining order, the moving party must demonstrate that: (1) it has a likelihood of
success on the merits;[65] (2) it will suffer irreparable harm if preliminary relief is not granted; (3)
the harm it will suffer outweighs the harm to the government and to third parties; and (4) the
grant of relief is not contrary to the public interest.  Four Rivers Invs., Inc. v. United States, 77
Fed. Cl. 592, 594-95 (2007); accord FMC Corp., 3 F.3d at 427; Chrysler Motors Corp. v. Auto
Body Panels of Ohio, Inc., 908 F.2d 951, 952 (Fed. Cir. 1990); Hosp. Klean of Tex., Inc. v.
United States, 65 Fed. Cl. 618, 625 (2005).  "No one factor, taken individually, is necessarily
dispositive . . . . [T]he weakness of the showing regarding one factor may be overborne by the

---

[65]  Although "[t]here is some disagreement on the standard of proof required for
injunctive relief," see Career Training Concepts, Inc. v. United States, 83 Fed. Cl. 215, 218
(2008), the Federal Circuit recently stated that "[n]o other court has held that when the [party
seeking injunctive relief] has presented a 'substantial question' on its side of the dispute–that is,
more than a scintilla but less than a preponderance of evidence in support of its side–no
injunction pendente lite is available."  Abbott Labs. v. Sandoz, Inc., 544 F.3d 1341, 1364 (Fed.
Cir. 2008).  The Abbott Laboratories court emphasized that "the standard is the likelihood of
success of the plaintiff at trial, with recognition of the presumptions and burdens."  Id.; see also
id. at 1365 ("The general criterion of likelihood of success on the merits, in the context of the
equities of the particular case, are uniform throughout the regional circuits. . . . [A]ll refer to the
likelihood of the eventual outcome, not whether a substantial question has been raised."), 1368
("All of the circuits have placed the preliminary injunction in terms of the likelihood of success
on the merits and equitable factors.  No circuit has held that it suffices simply to raise a
'substantial question.'  Raising a substantial question achieves the threshold required of the well-
pleaded complaint; it does not demonstrate a likelihood of prevailing.").

strength of the others." FMC Corp., 3 F.3d at 427.  Moreover, "equitable factors are of particular significance at the preliminary stage, where the question is whether to change the position of the parties during the litigation." Abbott Labs., 544 F.3d at 1364.

A permanent injunction, much like a preliminary injunction, "is extraordinary relief . . . ." Eracent, Inc. v. United States, 79 Fed. Cl. 427, 432 (2007).  The test for a permanent injunction "is almost identical to that for a temporary restraining order or preliminary injunction." Labatt Food Serv., Inc. v. United States, 84 Fed. Cl. 50, 65 (2008); accord Abbott Labs., 544 F.3d at 1364 ("Supreme Court precedent is clear in stating that the same burdens and standards of proof apply in deciding the merits for preliminary injunction purposes, as in deciding the same questions upon full litigation.").  Whereas a preliminary injunction or temporary restraining order requires the likelihood of success on the merits, a permanent injunction requires actual success on the merits.  See Amoco Prod. Co. v. Village of Gambell, Alaska, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.").  If the plaintiff cannot demonstrate actual success on the merits, permanent injunctive relief cannot be granted.  Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., 357 F.3d 1319, 1325 (Fed. Cir. 2004).  Thus, the court must consider the following factors when assessing the viability of issuing a permanent injunction: whether (1) the plaintiff has succeeded on the merits of the case; (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of the hardships to the respective parties favors the grant of injunctive relief; and (4) the grant of injunctive relief is in the public interest.  PGBA, LLC, 389 F.3d at 1228-29 (citing Amoco Prod. Co., 480 U.S. at 546 n.12).

## IV.  DISCUSSION

GCE alleges that the Coast Guard "committed two 'violation[s] of statute or regulation in connection with a procurement' by failing to comply with CICA's competition requirements and the FAR's small-business rules." Pl.'s Cross-Mot. & Mot. Perm. Inj. 2; see also Compl. ¶ 7 (alleging that the Coast Guard "conducted a sole-source award in violation of the CICA" and "failed to set aside the financial systems support work for small business concerns in violation of FAR § 19.502-2").  The government and QSS, however, claim that GCE's action falls outside the court's jurisdictional grant.  See, e.g., Def.'s Mot. & Opp'n 8-12 (maintaining that the Court of Federal Claims is precluded by the FASA to entertain protests in connection with the issuance of task or delivery orders); Def.'s Opp'n & Reply 2-8 (contending, among other things, that GCE's protest is in connection with the issuance of a task order and that GCE does not overcome the FASA's jurisdictional bar); Def.-Intervenor's Mot. & Opp'n 13-20 (arguing that the Court of Federal Claims lacks jurisdiction to entertain protests of task or delivery orders); Def.-Intervenor's Opp'n & Reply 6-12 (contending, among other things, that Modifications 30 and 32 were made in connection with task orders, which, pursuant to the FASA, cannot be subject to protest).  Additionally, QSS challenges GCE's standing because "the [. . .] of GCE's employees were citizens of foreign countries and, therefore, would be ineligible for the security clearances that the Coast Guard requires for anyone to work on its enterprise IT systems." Def.-Intervenor's

Mot. & Opp'n 22; see also Def.-Intervenor's Opp'n & Reply 15 (arguing that GCE is not an interested party because "it could not qualify for this work in a future procurement").

## A. Whether the Court Possesses Subject Matter Jurisdiction

According to GCE, "no party disputes that GCE satisfies the Tucker Act's requirements for jurisdiction[.]" Pl.'s Cross-Mot. & Mot. Perm. Inj. 1; see also Mem. Pl. Global Computer Enterprises, Inc. Filed Pursuant Ct.'s Apr. 7, 2008 Order ("Pl.'s Mem.") 2 ("Neither Defendant disputes GCE's demonstration that its claims fall within the Tucker Act's affirmative grant of jurisdiction."). Instead, GCE notes, the government and QSS "both have argued that a separate statute, the Federal Acquisition Streamlining Act . . . divests the Court of its Tucker Act jurisdiction." Pl.'s Mem. 2. If GCE's protest is, as the government and QSS contend, "jurisdictionally flawed," Def.'s Opp'n & Reply 2, then it must be dismissed, see RCFC 12(h)(3).

The government asserts that the court must dismiss GCE's complaint because the instant protest "conflicts with [the] FASA." Def.'s Mot. & Opp'n 8; see also Def.-Intervenor's Mot. & Opp'n 14 (arguing that "the law prohibits protests of task or delivery orders"). GCE, however, argues that "[b]y its plain terms, . . . [the] FASA's bar does not apply." Pl.'s Mem. 2; accord Pl.'s Cross-Mot. & Mot. Perm. Inj. 2-4. Moreover, even if the FASA bar applies to its protest, GCE argues that its claims fall within one of the statute's exceptions. See Pl.'s Cross-Mot. & Mot. Perm. Inj. 5-9; Pl.'s Mem. 6-8.

### 1. The Purpose of the FASA

The FASA provides: "A protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order except for a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued."[66] 10 U.S.C. § 2304c(d). Introduced in the United States Senate in 1993, the FASA was considered to be a "comprehensive overhaul of the federal acquisition laws," S. Rep. No. 103-258, at 3 (1994); see also 140 Cong. Rec. 23885 (characterizing the FASA as "the most significant procurement reform legislation to be considered by the Senate since the [CICA]"), which were deemed to be "cumbersome" because they "reduce[d] participation," "diminish[ed] competition,"

---

[66] Subpart 16.5 of the FAR, which contains the FASA prohibition on bid protests, provides:

No protest . . . is authorized in connection with the issuance or proposed issuance of an order under a task-order contract or delivery-order contract, except for a protest on the grounds that the order increases the scope, period, or maximum value of the contract (10 U.S.C. [§] 2304c(d) and 41 U.S.C. [§] 253j(d)).

48 C.F.R. § 16.505(a)(9); see supra note 59 and accompanying text.

and "raise[d] Government procurement costs," 140 Cong. Rec. 23885 (1994).  Designed to address the myriad acquisition statutes that, "added together, . . . result [in] a complex and unwieldy system," S. Rep. No. 103-258, at 2, the FASA was intended to

> revise and streamline the acquisition laws of the federal government in order to reduce paperwork burdens, facilitate the acquisition of commercial products, enhance the use of simplified procedures for small purchases, strengthen the industrial base that supports the common defense, and improve the efficiency and effectiveness of the laws governing the manner in which the government obtains goods and services.

S. Rep. No. 103-259, at 1 (1994).  The legislation focused upon "the most critical issue" facing the federal procurement system: "transform[ing] an outmoded system that was designed to regulate defense-dependent industries into a system that will facilitate commercial-military integration and the development of dual-use industries that can meet the defense technology and industrial base requirements for the nineties and beyond."  Id. at 6-7.  In short, Congress enacted the FASA in order to, among other things, (1) make "sweeping reforms to the Federal Procurement System," 140 Cong. Rec. 24865 (1994); (2) provide "accelerated notice of contract awards, contract debriefings, and bid protests"; and (3) "shrink the bureaucracy," id. at 24870.

As the court in A & D Fire Protection, Inc. noted, "[i]n the interest of efficiency, bid protests were targeted by [the] FASA as one of the areas in need of reform[.]"  72 Fed. Cl. at 133.  The FASA "revise[d] and simplif[ied] the bid protest process with a view towards reducing the number of protests that are filed."  S. Rep. No. 103-259, at 7.  For example, Congress recognized that open competition requirements under the CICA resulted in losing bidders filing protests "as a means to discover the propriety of an award decision.  These protests unnecessarily tax[ed] the already burdened procurement system in a manner which could be obviated simply by requiring the appropriate disclosure of such information in the form of a debriefing."  S. Rep. No. 103-258, at 7.

Additionally, the FASA streamlined procurements involving task or delivery order contracts.[67]  In its report, the Senate Committee on Governmental Affairs ("CGA") noted that "indiscriminate use of task order contracts for broad categories of ill-defined services unnecessarily diminishes competition and results in the waste of taxpayer dollars."  S. Rep. No. 103-258, at 15.  The CGA recognized that this "problem can effectively be addressed, without

---

[67]  A "task order contract" is defined as a "contract for services that does not procure or specify a firm quantity of services (other than a minimum or maximum quantity) and that provides for the issuance of orders for the performance of tasks during the period of the contract."  10 U.S.C. § 2304d(1); cf. supra note 21.  A "delivery order contract" is defined as a "contract for property that does not procure or specify a firm quantity of property (other than a minimum or maximum quantity) and that provides for the issuance of orders for the delivery of property during the period of the contract."  10 U.S.C. § 2304d(2).

significantly burdening the procurement system, by awarding multiple task order contracts for the same or similar services and providing reasonable consideration to all such contractors in the award of such task orders under such contracts." Id.  Additionally, the CGA indicated that it "intend[ed] that all federal agencies should move to the use of multiple task order contracts, in lieu of single task order contracts, wherever it is practical to do so."  Id.  The proposed revisions were

> intended to give[] agencies broad discretion in establishing procedures for the evaluation and award of individual task orders under multiple award contracts. They do not establish any specific time frames or procedural requirements for the issuance of task orders, other than that there be a specific statement of work and that all contractors under multiple award contracts be afforded a reasonable opportunity to be considered in the award of each task order (with narrow exceptions).  Accordingly, contracting officials will have wide latitude and will not be constrained by [the] CICA requirements in defining the nature of the procedures that will be used in selecting the contractor to perform a particular task order.  When contracting officials award task orders they will have broad discretion as to the circumstances and ways for considering factors such as past performance, quality of deliverables, cost control, as well as price or cost.

Id. at 16.  By providing "general authorization for the use of task and delivery order contracts to acquire goods and services other than advisory and assistance services," the FASA was

> intended as a codification of existing authority to use such contractual vehicles. All otherwise applicable provisions of law would remain applicable to such acquisitions, except to the extent specifically provided in [10 U.S.C. § 2304a]. For example, the requirements of the [CICA], although they would be inapplicable to the issuance of individual orders under task and delivery order contracts, would continue to apply to the solicitation and award of the contracts themselves.

H.R. Rep. No. 103-712, at 178 (1994) (Conf. Rep.).

## 2.  The Plain Language of the FASA

Statutory analysis begins with the plain language of the act.  McEntee v. Merit Sys. Prot. Bd., 404 F.3d 1320, 1328 (Fed. Cir. 2005); Highmark, Inc. v. United States, 78 Fed. Cl. 146, 148 (2007); see also Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997) ("Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case."); Skillo v. United States, 68 Fed. Cl. 734, 744 (2005) ("The canons of statutory interpretation require the court to consider first the plain language of the statute . . . .").  The Supreme Court noted in Connecticut National Bank v. Germain: "We have stated time and again that courts must presume that a legislature says in a

statute what it means and means in a statute what it says there."  503 U.S. 249, 253-54 (1992).
Thus, in order to ascertain the plain meaning of a statute, the court must look to the statute's text
and structure.  Robinson, 519 U.S. at 341; accord Myore v. Nicholson, 489 F.3d 1207, 1211
(Fed. Cir. 2007).  "If, in a given case, the words of the statute do not provide an answer, then a
court has no choice but to fill in the interstices."  VE Holding Corp. v. Johnson Gas Appliance
Co., 917 F.2d 1574, 1579 (Fed. Cir. 1990).  If, on the other hand, the statutory language is clear
and unambiguous, then the court's inquiry ends with the plain meaning.[68]  Roberto v. Dep't of
the Navy, 440 F.3d 1341, 1350 (Fed. Cir. 2006).

 Based upon the parties' arguments, the court considers the FASA in three parts.  The first
part addresses the scope of the phrase "in connection with" that precedes "the issuance or
proposed issuance of a task or delivery order . . . ."  10 U.S.C. § 2304c(d).  The second part
addresses whether modifications to a task order fall within "the issuance or proposed issuance of
a task . . . order . . . ."  Id.  The third part addresses whether this case implicates the specific
exception authorized by the FASA, viz., permitting a protest "on the ground that the order
increases the scope, period, or maximum value of the contract under which the order is issued."
Id.

### a. An Interpretation of the Scope of a Phrase in One Statute Does Not Control the Interpretation of Identical Language in a Separate Statute

 The parties first dispute the scope of the phrase "in connection with" that immediately
precedes "the issuance or proposed issuance of a task . . . order" in the FASA.  Id.  Both the
government and QSS adopt the position that this phrase should be construed broadly because the
Federal Circuit, in RAMCOR Services Group, Inc. v. United States, 185 F.3d 1286 (Fed. Cir.
1999), aff'g 41 Fed. Cl. 264 (1998), interpreted the same phrase–as it appears in the Tucker
Act–broadly.  See Def.'s Opp'n & Reply 3; Def.-Intervenor's Opp'n & Reply 7; see also
RhinoCorps, Ltd., 2009 WL 1362834, at *4 (noting that the Federal Circuit "explicated" the
phrase "in connection with" in RAMCOR Services Group, Inc.).  GCE does not dispute that the
phrase "in connection with" contained in the FASA is, by itself, broad; however, GCE maintains
that "[s]imply because [the FASA] says 'in connection with' doesn't explain," Prelim. Inj. Hr'g
Tr. 92:3-4, or "doesn't answer the question," id. at 92:7, that GCE believes is before the court,
viz., "'in connection with what?,'" Pl.'s Mem. 3.  Moreover, GCE asserts that the Federal
Circuit's interpretation of the phrase "in connection with" was limited to the Tucker Act and is
therefore an interpretation separate and distinct from the meaning of the same phrase in an
entirely different statute.  Id. at 4.

---

 [68]  When the court determines that statutory language is clear and unambiguous, it need
not seek clarification in the legislative history.  Norfolk Dredging Co. v. United States, 375 F.3d
1106, 1110 (Fed. Cir. 2004).  Indeed, the FASA's legislative history "does not shed meaningful
light on the scope of the task order protest bar."  Labat-Anderson, Inc. v. United States, 50 Fed.
Cl. 99, 105 (2001).

In RAMCOR Services Group, Inc., the appellant contractor performed maintenance and support services for the United States Immigration and Naturalization Service ("INS") at one of its facilities in Charleston, South Carolina.  185 F.3d at 1287.  The INS ultimately initiated a new contract award process, during which it "excluded RAMCOR from the competitive range because of inadequacies in its proposal."  Id.  Consequently, RAMCOR filed a preaward bid protest with the GAO, which "triggered an automatic stay" pursuant to the CICA.  Id.; see also 31 U.S.C. § 3553(c)(1) (providing that with limited exceptions, "a contract may not be awarded in any procurement after the Federal agency has received notice of a protest with respect to such procurement from the Comptroller General and while the protest is pending").  "When faced with a GAO stay, the agency is not without recourse," 41 Fed. Cl. at 265-66, and the INS, pursuant to 31 U.S.C. § 3553(c)(2), issued findings "setting forth purported urgent and compelling circumstances" that enabled it to override the stay,[69] 185 F.3d at 1287.  Thereafter, the INS awarded the contract to another offeror, see id., and RAMCOR moved the Court of Federal Claims to issue a preliminary injunction preventing the INS from making the award until the GAO had issued a decision, see 41 Fed. Cl. at 266.  The court granted the preliminary injunction,[70] which prompted the government to file a combined motion for reconsideration and to dismiss for lack of jurisdiction "based on the override of a GAO stay," id.; accord 185 F.3d at 1288 (stating that the INS "moved to quash the injunction" based upon the argument that the Court of Federal Claims "lack[ed] subject matter jurisdiction to review an agency's override of a CICA stay").

Before the Court of Federal Claims adjudicated defendant's motion, the GAO issued a decision on the merits that was favorable to the government.  41 Fed. Cl. at 266.  As a result of the GAO decision, the Court of Federal Claims lifted the injunction, denied defendant's

---

[69]  Section 3553(c)(2) provides:

> The head of the procuring activity responsible for award of a contract may authorize the award of the contract (notwithstanding a protest of which the Federal agency has notice under this section)–
>
> > (A) upon a written finding that urgent and compelling circumstances which significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General under this subchapter; and
>
> > (B) after the Comptroller General is advised of that finding.

31 U.S.C. § 3553(c)(2)(A)-(B).

[70]  The Court of Federal Claims determined that the INS did not establish an urgent and compelling need to override the automatic stay while the protest was pending before the GAO. See Ramcor Servs. Group, Inc., 185 F.3d at 1287-88.

combined motion as moot, and dismissed the action.  See id.; accord 185 F.3d at 1288 (noting that the court never decided the jurisdictional motion).  RAMCOR subsequently filed an application pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, for attorney fees and expenses associated with its efforts to obtain the injunction.  41 Fed. Cl. at 266.  The Court of Federal Claims denied the application, concluding that it lacked jurisdiction to issue the preliminary injunction.  See id. at 267-70.  Alternatively, it ruled that RAMCOR was not entitled to an EAJA award even if jurisdiction attached.  See id. at 270-72.

Although the Federal Circuit affirmed the trial court's "exercise of discretion in denying an EAJA award on the merits," 185 F.3d at 1287, it vacated the trial court's determination on the jurisdictional issue, id. at 1290.  The issue presented before the Federal Circuit–"whether an objection to a [section] 3553(c)(2) override can serve as a jurisdictional basis under [section] 1491(b)(1)"–required the court to determine whether section 3553(c)(2) was "a statute 'in connection with a procurement,' as required by [section] 1491(b)(1)."[71]  Id. at 1289.  Construing the language of section 1491(b), the Federal Circuit explained that the Tucker Act "does not require an objection to the actual contract procurement, but only to the 'violation of a statute or regulation in connection with a procurement or a proposed procurement.'"  Id. (quoting 28 U.S.C. § 1491(b)(1)).  The phrase "in connection with" in the Tucker Act, the Federal Circuit reasoned, "is very sweeping in scope."  Id.  The Federal Circuit noted that "[a]s long as a statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction" and determined that 31 U.S.C. § 3553(c)(2) was broad enough to fall within the Tucker Act's jurisdictional grant, particularly since the INS override of the automatic stay enabled the INS to immediately award the contract to the successful offeror.  Id.

While waivers of sovereign immunity, such as the Tucker Act, must be construed narrowly, see McMahon v. United States, 342 U.S. 25, 27 (1951) ("[S]tatutes which waive immunity of the United States from suit are to be construed strictly in favor of the sovereign.");

---

[71]  Recently, the Federal Circuit addressed the breadth of the terms "procurement" and "proposed procurement" contained in the Tucker Act.  See Distributed Solutions, Inc. v. United States, 539 F.3d 1340, 1345-46 (Fed. Cir. 2008).  Acknowledging that the Tucker Act does not define either term, the Federal Circuit turned to 41 U.S.C. § 403(2), a subsection of the statutory provision related to the establishment of the Office of Federal Procurement Policy in the OMB, for guidance.  Id. at 1345; see also id. at 1345-46 (noting that the Armed Services Procurement Act ("ASPA") also defined "procurement" by referring to the definition employed at 41 U.S.C. § 403).  The Distributed Solutions, Inc. court determined that it "is appropriate to adopt" the definition of "procurement" contained within the ASPA and concluded that "the phrase, 'in connection with a procurement or proposed procurement,' by definition involves a connection with any stage of the federal contracting acquisition process, including 'the process for determining a need for property or services.'"  Id. at 1346.  Therefore, the court explained, "[t]o establish jurisdiction pursuant to this definition, the contractors must demonstrate that the government at least initiated a procurement, or initiated 'the process for determining a need' for acquisition and assistance solutions . . . ."  Id.

Chancellor Manor v. United States, 331 F.3d 891, 898 (Fed. Cir. 2003) ("Waivers of sovereign immunity are construed narrowly." (citing United States v. Nordic Vill., Inc., 503 U.S. 30, 34 (1992))), the Federal Circuit determined that the phase "in connection with" was sweeping in scope based upon an entire reading of 28 U.S.C. § 1491(b)(1).  This phrase, the Federal Circuit concluded, requires "a connection" with a procurement or proposed procurement, and "[w]here an agency's actions under a statute so clearly affect the award and performance of a contract, . . . that statute has a 'connection with a procurement.'"  RAMCOR Servs. Group, Inc., 185 F.3d at 1289 (emphasis added).  The Federal Circuit reasoned that this interpretation gave effect to all parts of section 1491(b)(1), whereas the trial court's interpretation did not.[72]  Id.

    In RAMCOR Services Group, Inc., the Federal Circuit's broad construction of the phrase "in connection with" as meaning "a connection" to "a procurement or proposed procurement," 28 U.S.C. § 1491(b)(1), was limited to the Tucker Act, a fact that the government acknowledged during oral argument:

        [T]he Federal Circuit has said in the context of this Court's jurisdictional statute that the words "in connection with" are very sweeping in scope.  And that's[,] of course[,] referring to [section] 1491(b)(1) where it says "a violation of statute or regulation in connection with the procurement."  The Federal Circuit's given that a very broad meaning.

Prelim. Inj. Hr'g Tr. 54:9-15 (emphasis added).  The RAMCOR Services Group, Inc. decision, read in conjunction with Distributed Solutions, Inc., confirms that the statutory requirements for jurisdiction under the Tucker Act have been satisfied in this case, see Pl.'s Mem. 4 (stating that "no party disputes" that the court possesses Tucker Act jurisdiction), particularly since it is undisputed that the Coast Guard contemplated various different contract vehicles for a proposed procurement, see 28 U.S.C. § 1491(b)(1) (conferring jurisdiction upon the Court of Federal Claims to render judgment on an action by an interested party objecting to "any alleged violation of statute or regulation in connection with . . . a proposed procurement"); supra Parts I.E.2-4, and GCE alleges that the Coast Guard's failure to compete constituted a violation of the CICA, see Compl. ¶¶ 56-63.

---

[72] According to the Federal Circuit,

[t]he trial court's reading of [section] 1491(b) would . . . render the "violation of statute or regulation" prong of that provision superfluous.  If [section] 1491(b) required a challenge to the merits of the contract award, the contractor would never need to use the "violation" prong but could always rely on other jurisdictional grants in [section] 1491(b)(1).

RAMCOR Servs. Group, Inc., 185 F.3d at 1289.

As noted above, "statutes which waive immunity of the United States from suit are to be construed strictly in favor of the sovereign," McMahon, 342 U.S. at 27, and "withdrawal of Tucker Act jurisdiction by implication is disfavored, which means that a court must find that the statute at issue . . . reflects an unambiguous congressional intent to displace the Tucker Act's waiver of sovereign immunity," Acceptance Ins. Cos. v. United States, 503 F.3d 1328, 1336 (Fed. Cir. 2007). Here, there is no withdrawal by implication since the FASA's terms are explicit. See Labat-Anderson, 50 Fed. Cl. at 104 ("[T]he plain language of the statutory provision clearly bars task order protests . . . ."). Furthermore, the fact that the Tucker Act–and other waivers of sovereign immunity–must be construed narrowly, see Am. Fed'n of Gov't Employees, AFL-CIO, 258 F.3d at 1301, does not warrant the court ascribing as broad a construction of "in connection with" from the Tucker Act to the FASA, particularly since the latter serves as a limitation upon the government's waiver of immunity from suit rather than a waiver itself.

The court disagrees with the government's contention that the term "'in connection with' must be given no less of a 'sweeping scope' in [the] FASA, than in 28 U.S.C. § 1491(b)(1)." Def.'s Opp'n & Reply 3 n.3. The Federal Circuit's interpretations of the phrases "in connection with" and "procurement" in the Tucker Act ultimately offer no guidance concerning the meaning of the phrases "in connection with" and "task order" in the FASA. Although "there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning[,] . . . the presumption is not rigid . . . ." Atl. Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 433 (1932); cf. Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 479 (1992) ("[I]dentical terms within an Act bear the same meaning."). In fact, "[i]t is not unusual for the same word to be used with different meanings in the same act, and there is no rule of statutory construction which precludes the courts from giving to the word the meaning which the Legislature intended it should have in each instance." Atl. Cleaners & Dyers, Inc., 286 U.S. at 433. As the Supreme Court recognized, "[a] given term in the same statute may take on distinct characters from association with distinct statutory objects calling for different implementation strategies," Envtl. Def. v. Duke Energy Corp., 549 U.S. 561, 574 (2007), and

> [w]here the subject-matter to which the words refer is not the same in the several places where they are used, or the conditions are different, or the scope of the legislative power exercised in one case is broader than that exercised in another, the meaning well may vary to meet the purposes of the law, to be arrived at by a consideration of the language in which those purposes are expressed, and of the circumstances under which the language was employed.

Atl. Cleaners & Dyers, Inc., 286 U.S. at 433.

In this case, the court is faced with two completely different statutes that contain a similar term, rather than multiple iterations of the same term within one statute. If, in the latter situation, the same term need not necessarily have the same definition, then it is reasonable to conclude that absent Congressional intent to the contrary, the same term need not have the same definition

in two wholly distinct statutes, let alone the same judicial interpretation.  Therefore, the court declines the government's and QSS's invitation to utilize the Federal Circuit's interpretation of the phrase "in connection with" contained in the Tucker Act to broadly construe the phrase "in connection with" contained in the FASA as barring a protest that has any connection with a task order.

**b. The FASA Only Bars Protests "In Connection With" Either the "Issuance" or "Proposed Issuance" of a Task Order, Not Modifications Thereto**

The parties next dispute whether task order modifications fall within the FASA's bar.  The plain language of the FASA prohibits protests "in connection with" two events: (1) the issuance of a task or delivery order; or (2) the proposed issuance of a task or delivery order.  10 U.S.C. § 2304c(d).  QSS asserts that this language indicates that "the law prohibits protests of task or delivery orders."  Def.-Intervenor's Mot. & Opp'n 14 (emphasis added).  According to GCE, both QSS and the government "recognize that the 'issuance' Congress refers to is the original adoption of that [task or delivery] order . . . ."  Pl.'s Mem. 3.  The government argues that a "modification of the task order modifies the terms of the originally issued task order."  Def.'s Opp'n & Reply 3; see also Def.'s Mot. & Opp'n 8 (stating that "the GAO properly dismissed GCE's protest because GCE was arguing that the modifications were outside the scope of the task order, not outside the scope, period, or maximum value of the ITOP II contract, pursuant to which the task order was issued").  According to the government, "[w]ithout the issuance of a task order, modification of the task order would not be possible.  Thus, a modification to a task order is 'in connection' with the issuance of the task order."  Def.'s Opp'n & Reply 3; see also Prelim. Inj. Hr'g Tr. 54:18-21 ("[A] modification would necessarily be in connection with the issuance of a task order.  It's in connection with the issuance of the SETS II task order.").  The government asserts:

> [T]ask orders aren't always issued pursuant to specific competitive procedures of the task order; yet, protests are barred nonetheless. . . .  [R]egardless of how irrational that particular [agency] justification is, it still can't be protested.  The intent was to bar protesting in connection with task orders here.  So when a task order is issued without competitive procedures, even if the justification for that is irrational, it still can't be protested.

Perm. Inj. Hr'g Tr. 30:21-31:10.  Similarly, QSS argues that the court "consider that modifications of task orders occur 'in connection with' the issuance of those task orders because modifications 'ha[ve] a connection' with the issuance of a task order and, thus, are certainly 'connected' under the RAMCOR [Services Group, Inc.] standard to the task order that they change."  Def.-Intervenor's Opp'n & Reply 9 (first alteration in original).  Indeed, QSS argues that "[i]t is, therefore, impossible for Mod[ifications] 30 and 32 NOT to have a connection with the issuance of the SETS II task order."  Id. at 10.  According to the government, "[b]arring protests of modifications of task orders is in keeping with the language of [the] FASA, as well as

Congressional intent . . . ."[73]  Perm. Inj. Hr'g Tr. 31:15-17.

GCE contends otherwise, claiming that Modifications 30 and 32 "are not themselves
'task or delivery order[s],' nor is the mere modification of a task order the same as the 'issuance
or proposed issuance' of one."[74]  Pl.'s Cross-Mot. & Mot. Perm. Inj. 2 (alteration in original).  It
describes the government's and QSS's "'but for'" argument–that without the original task order
issuance, there could be no modification to the task order–as failing to consider the plain
language of the FASA:

> If anything at any stage of the life cycle of a given task order, or causally linked to
> it, could be deemed to occur "in connection with the issuance" of a task order,
> Congress would have had no need to specify–in the very same phrase–that
> protests "in connection with the . . . proposed issuance of a task order" are barred
> as well.  Simply saying "in connection with the issuance" would have been
> enough.  Defendants' reading improperly turns this other language into
> surplusage.

Pl.'s Mem. 3.  In support of its position that Congress contemplated different life cycle stages of
a particular task order, GCE notes that the terms "contract modification," "task order," and
"delivery order" are separately defined.  Id. at 2-3; see also 48 C.F.R. § 2.101 (providing the
definitions).  GCE asserts that "[t]he issuance of a task order is usually subject to some level of
competition; and even though there are exceptions, as the Government notes, they are still
subject to substitute safeguards to protect against anticompetitive results."  Pl.'s Mem. 5 (citation
omitted).  By contrast, GCE notes that "procurements via task order modifications are by their
nature never subject to competitive procedures, absent the ability of potential bidders to
challenge a procurement's compliance with competition requirements."  Id.; see also Pl.'s Cross-
Mot. & Mot. Perm. Inj. 4 ("Unlike task orders issued under a multiple-award ID/IQ contract,
modifications of those task orders are not subject to competitive procedures; accordingly, they
are also far less visible to other contractors and the public.").

--------

[73]  It is not disputed that the SETS II task order is the applicable task order to which the
FASA refers in this case.  See Def.'s Opp'n & Reply 3 (acknowledging that the "modification of
the task order modifies the terms of the originally issued task order" (emphasis added)); Def.-
Intervenor's Opp'n & Reply 9 (arguing that Modifications 30 and 32 were issued "in connection
with the issuance of the SETS II task order").

[74]  According to QSS, "[t]he veneer of jurisdictional validity that Plaintiff has painted on
its Potemkin village of an argument is that [Modifications] 30 and 32 are not truly modifications
of task or delivery orders . . . ."  Def.-Intervenor's Opp'n & Reply 10.

GCE argued this position before the GAO, which summarily rejected it:

> We recognize that the FASA protest bar does not expressly address the issue of modifications of task and delivery orders issued under ID/IQ contracts.  We think, however, that the restriction on protests of orders placed here under a task order contract as contained in 41 U.S.C. § 253j(d) also applies here.[75]

AR 4867 (footnote added).  The GAO elaborated:

> The protestor essentially argues that although protests regarding an agency's issuance of task orders under ID/IQ contracts are precluded, protests regarding an agency's modification of such task orders are permitted.  We find this position to be inconsistent with both the language of [the] FASA and the underlying congressional intent.  Moreover, we see no logic in holding that an agency's decision to modify an existing task order could be subject to protest when it is clear that an agency's decision to perform the very same action by means of a new task order would not be subject to protest; that is, had the Coast Guard issued a separate task order to QSS for federal financial IT support services rather than modifying the existing SETS II task order, it is undisputed that this action would not be subject to protest.  In our view, accepting GCE's position–which would permit protests regarding task order modifications but not the task orders themselves–would elevate form over substance.  In sum, we conclude that [the] FASA's bar on protests in connection with the issuance or proposed issuance of task orders encompasses protests concerning the issuance or proposed issuance of task order modifications.[76]

---

[75]  QSS states that the GAO "discarded" GCE's interpretation of the FASA, Def.-Intervenor's Opp'n & Reply 9, thereby subjecting GCE to what QSS characterizes as a "jurisdictional Waterloo," id. at 7.  Notwithstanding the GAO's citation to title 41 of the United States Code, the provisions in title 10 of the United States Code apply to this case.  See supra note 59.

[76]  GCE emphasizes that the GAO's determination lacked any reference to applicable decisional law:

> Notably, [the] GAO never cited any authority as to why it was allowed to ignore the plain language of the statute, which it conceded "does not expressly address the issue of modifications of task and delivery orders under ID/IQ contracts."  It simply asserted that there is no reason to treat original task orders and subsequent modifications any differently.

Pl.'s Cross-Mot. & Mot. Perm. Inj. 4 n.2 (citation omitted).  Furthermore, GCE states that the GAO's acknowledgment that the plain language of the FASA does not apply to modifications of

Id. at 4867-68 (footnote added).  The government and QSS embrace the GAO's conclusion.  QSS interprets the GAO's decision as evidencing "common-sense statutory interpretation because it made no sense to exempt task orders from protest, but not their modification, especially in light of the Congressional intent to streamline and simplify Federal procurement activities."  Def.-Intervenor's Opp'n & Reply 9.  The government further states that "there is no logical reason for Congress to have treated modifications to task orders differently from original task orders, so long as they remain within the scope, period, and maximum value of the underlying [ID/IQ] contract."  Def.'s Opp'n & Reply 5.

The court is not bound by the GAO's determination, see Thompson v. Cherokee Nation of Okla., 334 F.3d 1075, 1084 (Fed. Cir. 2003) (stating that the "opinions of the Comptroller General, . . . while not binding, are 'expert opinion[s], which we should prudently consider'" (quoting Delta Data Sys. Corp. v. Webster, 744 F.2d 197, 201 (D.C. Cir. 1984))); Career Training Concepts, Inc., 83 Fed. Cl. at 232 ("Although not binding on this court, GAO opinions are properly used for information and guidance, given the GAO's experience and expertise."); Tel-Instrument Elecs. Corp. v. United States, 56 Fed. Cl. 174, 177 n.2 (2003) ("GAO decisions are not binding on this court, but we normally accord them deference in recognition of [the] GAO's expertise in resolving contested procurement decisions."), particularly since the GAO did not rely upon any case law or authority in support of its conclusion that the FASA bar encompasses GCE's protest of task order modifications.  Moreover, the court is not persuaded that a modification to a task order is, as the government and QSS contend, "in connection with" either the "issuance" or "proposed issuance" of that task order.  With respect to terminology, a modification is defined as an "alteration, adjustment, or limitation."  American Heritage Dictionary 894 (4th ed. 2004).  The term "issuance" is defined as "[t]he act of issuing," and "issue" is defined as "[t]he act of circulating, distributing, or publishing by an office or official group" or "[s]omething produced, published, or offered."  Id. at 736.  The term "propose" means "[t]o put forward for consideration, discussion, or adoption; suggest" or "[t]o make known as one's intention; purpose or intend."  Id. at 1118.  Certainly a modification to an item cannot occur absent the existence of the item itself.  Thus, Modifications 30 and 32 cannot exist in a vacuum.  Absent the issuance of the SETS II task order, no modifications thereto can occur.  See LBM, Inc., B-290682, 2002 WL 31086989, at *3 (Comp. Gen. Sept. 18, 2002) (stating that the FASA precludes protests "in connection with the actual or proposed issuance" of a task order (emphasis added)).  As such, the court cannot conclude that a task order modification, which, by definition, must occur subsequent to the circulation, publication, or distribution–i.e., issuance–of the task order itself, bears any connection with the original issuance that brought the task order into existence.

"It is the duty of the court to give effect, if possible, to every clause and word of a statute, avoiding, if it may be, any construction which implies that the legislature was ignorant of the meaning of the language it employed."  Inhabitants of Montclair, County of Essex v. Ramsdell,

---

task orders, see Pl.'s Mem. 2, "should be the beginning and the end" of the court's jurisdictional inquiry, Perm. Inj. Hr'g Tr. 6:12-19.

107 U.S. 147, 152 (1883).  The government's and QSS's broad reading of the FASA bar–"[w]ithout the issuance of a task order, modification of the task order would not be possible.  Thus, a modification to a task order is 'in connection with' the issuance of the task order," Def.'s Opp'n & Reply 3–does not account for the term "proposed issuance" contained in the FASA, 10 U.S.C. § 2304c(d) (emphasis added).  As discussed above, a modification to a task order cannot exist by itself; the modification must relate to the task order that it modifies.  The government and QSS contend that Modifications 30 and 32 are "in connection with" the actual issuance of the SETS II task order; accordingly, they fail to address the term "proposed issuance" contained in the statute.  Indeed, neither the government nor QSS explains how a modification to a task order can be "in connection with" the "proposed issuance" of a task order, and it is apparent that they cannot demonstrate such a connection.  As defined above, the term "proposed" contemplates that final action (i.e., actual issuance of the task order) has yet to occur.  If a modification to a task order cannot occur absent the existence of the task order itself, then such a modification certainly cannot be "in connection with" a task order that has not come into existence.  Thus, Modifications 30 and 32, which were issued in 2007, cannot be considered "in connection with" the proposed issuance of the SETS II task order, which occurred before June 2005.  Were the court to adopt the government's and QSS's reading of the FASA, the court would be obligated to ignore completely the phrase "proposed issuance" and render that statutory language mere surplusage.

To summarize, neither the government nor QSS demonstrates how Modifications 30 and 32 of the SETS II task order have a connection with the original issuance of the SETS II task order.  Even if the government and QSS are correct that Modifications 30 and 32 of the SETS II task order do, in some manner, have a connection with the original issuance of the SETS II task order, this interpretation cannot be reconciled with the FASA's reference to the "proposed issuance" of a task order, especially since Modifications 30 and 32 cannot exist absent the actual issuance of the SETS II task order that they modify.  As such, the court concludes that the FASA does not divest the Court of Federal Claims of jurisdiction to entertain GCE's protest in this case.

Although the court determines that the FASA's language is clear and need not rely upon the legislative history, see Norfolk Dredging Co., 375 F.3d at 1110, it nevertheless emphasizes that the purpose underlying enactment of the FASA supports its conclusion.  As discussed above, the FASA was enacted by Congress as part of a "comprehensive overhaul of the federal acquisition laws . . . ."  S. Rep. No. 103-258, at 3.  Although the FASA was intended to "revise and simplify the bid protest process with a view towards reducing the number of protests that are filed," S. Rep. No. 103-259, at 7, Congress explicitly tailored the legislation to ensure that those "objectives would be accomplished without undermining the key features of the current procurement statutes, such as full and open competition and an effective bid protest process, that have been established over the years to safeguard the acquisition system and prevent abuse."  S. Rep. No. 103-258, at 3 (emphasis added).  Thus, while Congress extended to contracting officers "wide latitude" so that they "will not be constrained by CICA requirements in defining the nature of the procedures that will be used in selecting the contractor to perform a particular task order," id. at 16, it simultaneously cautioned that task order contracts "must be structured carefully to

ensure that <u>they are not abused to avoid competition and funnel money to favored contractors</u>,"
140 Cong. Rec. 23877 (1994) (emphasis added).

   The FASA establishes that "when a procurement envisioned a multiple award [ID/IQ]
contract, creating, through competition, a pool of contractors for certain work projects, the
issuance of individual task orders to these contractors would not be subject to protests." <u>A & D</u>
<u>Fire Prot., Inc.</u>, 72 Fed. Cl. at 133.  Thus, "when an agency makes an order pursuant to a task . . .
order contract, the agency is not required to publish a notice of solicitation[,] nor is it required to
hold a 'competition . . . that is separate from that used for entering into the contract.'" <u>Corel</u>
<u>Corp. v. United States</u>, 165 F. Supp. 2d 12, 20 (D.D.C. 2001) (quoting 41 U.S.C. § 253j(a)(2)
(alteration in original)).  While the FASA establishes that "once the task or delivery order
contract itself has been obtained through full and open competition, orders made pursuant to that
contract are immune from [the] CICA's full and open competition requirement," <u>Corel Corp.</u>,
165 F. Supp. 2d at 16, this case challenges, in part, whether the addition of audit-supporting
federal financial management system services to the SETS II task order via Modifications 30 and
32 was, in fact, lawful in light of the scope of the SETS II task order at the time the task order
was competed.[77]  GCE alleges that the Coast Guard improperly shifted "new work as
modifications," without open competition, to the task order issued to QSS and that the shifted
work "was well outside the scope of QSS's original task order."[78]  Compl. ¶ 1.  Thus, GCE's

---

   [77]  QSS argues:

        No matter how Plaintiff parses things, its protest is now, and has been from the
        start of the GAO litigation, a protest regarding the scope of the SETS II task order,
        not the scope of the ITOP II contract. . . .  Plaintiff's GAO protests never alleged
        that either disputed modification, or the SETS II task order itself, exceeded the
        scope of the ITOP II contract until the fifth supplemental protest, filed last, and
        filed after the parties briefed the issue of the FASA jurisdictional bar.

Def.-Intervenor's Opp'n & Reply 10 (footnote & citations omitted); <u>see also</u> Def.'s Mot. &
Opp'n 14 ("GCE's complaint is really that the modifications exceed the scope of the SETS II
task order.").

   [78]  GCE does not bring a protest in connection with the issuance of the SETS II task order,
which was competitively awarded to QSS in 2005.  Rather, it alleges that in July 2007, the Coast
Guard "considered adding its financial systems to an ITOP II task order [(the SETS II task
order)] that it had issued to QSS in June 2005 . . . ."  Compl. ¶ 23.  With respect to the SETS II
task order competitive bidding process in 2005, GCE alleges that "the Coast Guard never
suggested to GCE that [the] SETS II [task order] might encompass the financial systems work
GCE had been performing for the Coast Guard."  <u>Id.</u> ¶ 26.  GCE challenges the Coast Guard's
2007 issuance, without competition, of Modifications 30 and 32, which GCE contends violated
the CICA and governing regulations, <u>see id.</u> ¶¶ 50-63, because the modifications materially
departed from and exceeded the scope of the SETS II task order, <u>id.</u> ¶ 52, and "exceed[ed] the

complaint implicates the concerns expressed by Congress, which did not intend for the FASA to undermine the CICA and a federal procurement system that was designed to encourage and ensure open competition.[79]

The court can neither discount nor ignore the principles that underscored Congress's enactment of the FASA, and it cannot read into the statute what is absent therefrom.  See, e.g., Artuz v. Bennett, 531 U.S. 4, 10 (2000) ("[W]hatever merits these and other policy arguments may have, it is not the province of this Court to rewrite the statute to accommodate them."); Badaracco v. Comm'r, 464 U.S. 386, 398 (1984) ("Courts are not authorized to rewrite a statute because they might deem its effects susceptible of improvement.");  Bailey v. United States, 52 Fed. Cl. 105, 110 (2002) ("It is not the task of the court to rewrite the statute . . . .").  If Congress intended to prohibit protests stemming from any action related to a task order contract, then it could have explicitly drafted a statute that barred any protest in connection with a task order.  It did not do so.  Instead, Congress prohibited bid protests in connection with either the issuance or proposed issuance of a task order.  As the court explained above, the modification to an already-issued task order is not "in connection with" the task order's original "issuance," and if it is not in connection with the task order's issuance, then it certainly is not in connection with its "proposed issuance."  The GAO's observation–that "had the Coast Guard issued a separate task order to QSS for federal financial IT support services rather than modifying the existing SETS II

_____

ordering period of the underlying ITOP II contract," id. ¶ 54.

[79]  As explained in Part IV.A.1, supra, Congress intended that the FASA codify existing authority and that "[a]ll otherwise applicable provisions of law would remain applicable . . . ." H.R. Rep. No. 103-712, at 178 (Conf. Rep.).  Even before the FASA was enacted, the GAO exercised jurisdiction over protests alleging that contract modifications exceeded the scope of the original contract.  See, e.g., Neil R. Gross & Co., B-237434, 1990 WL 269546 (Comp. Gen. Feb. 23, 1990) (sustaining a protest alleging that the DOL modified an existing contract without solicitation where the modification was beyond the scope of the original contract, noting as significant that the "DOL has procured the . . . services under separate contracts, awarded on the basis of different statements of work" and that "the agency itself has viewed the services as separable and essentially different in nature," and concluding that the DOL was required to procure the new services in accordance with the CICA), aff'd on reconsideration, B-237434.2, 90-1 CPD ¶ 491 (1990).  In that case, the GAO clarified its jurisdiction:

> As a general rule, our Office will not consider protests against contract modifications, as they involve matters of contract administration that are the responsibility of the contracting agency.  We will, however, consider a protest that a modification is beyond the scope of the original contract, and that the subject of the modification thus should be competitively procured absent a sole-source justification.

Id. at *2 (emphasis added) (citation omitted).

task order, it is undisputed that this action would not be subject to protest," AR 4868–is hypothetical and therefore inapplicable here.  Cf. Compl. ¶ 1 (alleging that "because the underlying [ITOP II] contract had expired, the Coast Guard was barred from issuing a new task order").  Upon consideration of the plain language of the FASA, as well as the parties' arguments, the court concludes that under the circumstances presented in this case, GCE's protest is not "in connection with the issuance or proposed issuance of a task . . . order,"[80] 10 U.S.C. § 2304c(d), a conclusion that comports with the legislative objectives behind the FASA's enactment.

### c.   Alternatively, Even if the FASA Bar Applies, GCE's Protest Falls Within the Statutory Exception Contained Therein

GCE argues in the alternative that even if the FASA bar applies to its protest, the "FASA expressly permits protest of a task order that 'increases the scope, period, or maximum value of the contract under which the order is issued.'"  Pl.'s Mem. 6 (quoting 10 U.S.C. § 2304c(d)); accord Pl.'s Cross-Mot. & Mot. Perm. Inj. 5.  It asserts that Modifications 30 and 32 "were acquisitions of new work that was never encompassed by [the] SETS II [task order]," and, as such, "they constituted a brand-new stand-alone procurement under the ITOP II contract–but one that was conducted nearly two years after [the] ITOP II's ordering period had expired."  Pl.'s Mem. 6; see also Pl.'s Cross-Mot. & Perm. Inj. 5 (arguing that Modifications 30 and 32 "constituted a brand-new stand-alone procurement under [the] ITOP II nearly two years after ITOP II's ordering period expired" and that the "issuance of these 'task orders' was . . . outside of the ordering period of the ID/IQ contract").  Because, GCE contends, Modifications 30 and 32 fall outside the scope of the SETS II task order, these modifications "increased the period of [the] ITOP II, and the Court has jurisdiction to hear GCE's protest to them."[81]  Pl.'s Cross-Mot. &

_____

[80]  Because the court determines that the FASA bar does not apply to GCE's protest, then, a fortiori, the exception to the FASA bar authorizing a "protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued," 10 U.S.C. § 2304c(d), also does not apply to GCE's protest.

[81]  GCE states:

If the modifications at issue here are not issuances of new task orders, then the FASA provision doesn't apply at all . . . because if the modifications aren't new orders, then this isn't a protest 'in connection with the issuance of a new task order,' and that's the end of the inquiry.  On the other hand, if the modifications are new orders, then we are under the provision.  It potentially applies.  But then the exception to the bar applies, and that's because these new orders, if we're going to consider them task orders, . . . were issued two years past the period for placing new orders under [the] ITOP II, the underlying contract.

Prelim. Inj. Hr'g Tr. 10:7-21.  QSS characterizes GCE's argument as proposing "a two-step

Mot. Perm. Inj. Hr'g Tr. 5; see also Compl. ¶ 8 (alleging that "the work given to QSS by the Modifications exceeded the scope of the SETS II task order and the period of the ITOP II contract").

GCE emphasizes that neither the government nor QSS "contest[s] that a modification of a task order that exceeds the scope of the original procurement is a new acquisition." Pl.'s Mem. 7; see also Def.'s Mot. & Opp'n 28 (citing regulations that provide that "'[m]odifications that increase the scope of a contract or order would . . . be reviewed since these are considered to be acquisitions'" (quoting Final Rule, Defense Acquisition Regulations System, Department of Defense, 71 Fed. Reg. 44,926-02 (Aug. 8, 2006))); Pl.'s Cross-Mot. & Mot. Perm. Inj. 5 ("It is beyond dispute that a modification to a contract or task order that exceeds the scope of the original procurement constitutes a new acquisition."). It also asserts that neither the government nor QSS "contest[s] that [the] ITOP II's ordering period expired on January 13, 2006, and that the Modifications were issued nearly two years after that."[82] Pl.'s Mem. 7; see also Def.'s Opp'n & Reply 6 ("The Government was precluded from issuing new task orders pursuant to the ITOP II contract after January 13, 2006."); Pl.'s Cross-Mot. & Mot. Perm. Inj. 6 (arguing that "[t]here can also be no dispute that the period for conducting new procurements under [the] ITOP II has expired.").

Without assessing whether Modifications 30 and 32 do, in fact, fall outside the scope of the SETS II task order and, as a result, exceed the period of the ITOP II contract, a merits inquiry that the court addresses in Parts IV.D.2-4, infra, the court determines that GCE has brought a protest that falls within the FASA's exception. The FASA, as discussed above, permits "a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the [task] order is issued." 10 U.S.C. § 2304c(d) (emphasis added). In its complaint, GCE "alleges that the work given to QSS by . . . Modifications [30 and 32] exceeded

---

review process by which the Court must first examine whether the modified work exceeds the scope of the SETS II task order and, if it does, whether that allegedly out-of-scope work would improperly extend the ordering period of the ITOP II contract." Def.-Intervenor's Opp'n & Reply 11. Instead, QSS suggests that

> [t]he more appropriate reading of the FASA bar–the one most loyal to the plain text–would be that a protest of a task order is permitted under the "period" exception only when the task order extends the performance period envisioned in the underlying contract, or when a new task order is issued after the expiration period of the underlying contract.

Def.-Intervenor's Opp'n & Reply 11-12.

[82]   The government contends that it "never issued a new task order pursuant to the ITOP II contract after January 13, 2006. Rather, the [Coast Guard] modified the existing SETS II task order." Def.'s Opp'n & Reply 6; accord Def.'s Mot. & Opp'n 10 n.7.

the scope of the SETS II task order and the period of the ITOP II contract."[83]  Compl. ¶ 8 (emphasis added).  Accordingly, even if GCE's protest is in connection with the issuance or proposed issuance of the SETS II task order, the court nevertheless possesses jurisdiction to entertain the protest because GCE alleges that the SETS II task order, as modified by Modifications 30 and 32, exceeded or increased the period of the ITOP II contract.

## B.  Whether GCE Possesses Standing

The court, having established that it possesses jurisdiction, next examines whether GCE has standing to maintain this protest.  In its complaint, GCE alleges:

GCE is an "interested party" with standing to sue under the Tucker Act.  GCE is the incumbent contractor currently performing the financial systems work awarded to QSS in Modifications 30 and 32, and has a history of successfully performing this work for the Coast Guard as a small business.  Thus, GCE could compete for an award if a competitive procurement is conducted, and would participate in any such procurement.  GCE therefore has an economic interest in this procurement and has been prejudiced by the Coast Guard's decision to award the work to QSS without a competition.

Compl. ¶ 9.  It notes that only QSS questions its standing to pursue this action.  See Pl.'s Mem. 9 ("The Government does not challenge GCE's standing.").

QSS claims that GCE "would not properly be able to compete for the federal IT work in the future if it were to be re-competed," Def.-Intervenor's Mot. & Opp'n 20, because "[. . .] of GCE's employees were citizens of foreign countries and, therefore, would be ineligible for the security clearances that the Coast Guard requires for anyone to work on its enterprise IT systems," id. at 22.  It asserts that the SETS II task order incorporates DHS acquisition regulation clauses regarding the qualifications of contractor employees, id. at 21; see also AR 1205 (incorporating by reference various DHS acquisition regulations), and that GCE cannot satisfy the qualification clause contained in the relevant regulation, which requires that "[e]ach employee of the Contractor shall be a citizen of the United States of America, or an alien who has been lawfully admitted for permanent residence as evidenced by an Alien Registration Receipt Card Form I-151."  Def.-Intervenor's Mot. & Opp'n 22.  QSS states:

Unfortunately for Plaintiff, . . . [Mr. Bowen] discussed with David Lucas of GCE the possibility of using GCE employees after March 31, 2008[,] as subcontractors on a time-and-materials contract basis to perform part of the [Coast Guard] Financials work.  Mr. Lucas told him at that time that he did not think such a plan

---

[83]  GCE's complaint complies with the requirements of RCFC 8, viz., it contains "a short and plain statement of the grounds for the court's jurisdiction" and "a short and plain statement of the claim showing that [GCE] is entitled to relief," RCFC 8(a)(1)-(2).

would be possible since [. . .] of GCE's employees were citizens of foreign
countries and, therefore, would be ineligible for the security clearances that the
Coast Guard requires for anyone to work on its enterprise systems.

Id. (citation & footnote omitted); see also Def.-Intervenor's Mot. Strike Ex. (Bowen Decl. ¶ 13
(stating that Mr. Lucas advised him that [. . .] "of [GCE] employees were citizens of foreign
countries" and would be ineligible for security clearances needed to perform enterprise IT
systems work, and noting that Mr. Lucas "did not explain how GCE has been able to perform the
work it had done up to that time for the Coast Guard in light of that fact")).  But see Pl.'s App.
933 (Lucas Supp'l Decl. ¶ 13 (explaining that based upon his experience, "missions IT work
often requires security clearances but . . . financial management systems work does not . . .
because classified information is not involved in financial management systems IT work," stating
that he "did not inform [Mr. Bowen] that [. . .] of GCE's employees were non-U.S. citizens," and
denying that he discussed GCE's eligibility "to meet any hypothetical Coast Guard requirements
for security clearances or otherwise")), 980 (Decl. Kieran C. McHargue ("McHargue Decl.") ¶ 4
(explaining that GCE has complied with security procedures and performed background checks
on all employees in accordance with policy and procedures, and that the Coast Guard has
"accepted these procedures and offered no direction to GCE to amend these practices")), 980A
(McHargue Decl. ¶ 17 (stating that the "Coast Guard Financials Systems data has been provided
to GCE in [a] secure manner for 38 months without incident")).

    GCE maintains that QSS's "citizenship issue is a red herring." Pl.'s Cross-Mot. & Mot.
Perm. Inj. 10.  First, it notes that the regulations upon which QSS relies and cites in its brief
"have been repealed."  Prelim. Inj. Hr'g Tr. 12:8; see also id. 12:15-17 (explaining that the new
DHS regulations do not contain the same restrictions); Revision of DHS Acquisition Regulation,
71 Fed. Reg. 25,775 (May 2, 2006) (indicating the removal of section 3052.237-70); cf. Def.-
Intervenor's Opp'n & Reply 13 (stating that "it is true that QSS . . . incorrectly cited the
applicable regulation," but contending that "the revised regulation does not help Plaintiff's
position").  GCE explains that "[t]he new rules that the Department of Homeland Security has
put into their place do not contain the same restrictions."[84]  Prelim. Inj. Hr'g Tr. 12:15-17; see

---

[84]  GCE states that the new rules "explicitly state that for a project like we'd be talking
about here involving sensitive but not classified information, the citizenship requirements apply
only to the individuals working on the projects and not all employees of the contractor."  Prelim.
Inj. Hr'g Tr. 12:17-22.  In fact, where the contract requires contractor employees to have access
to IT resources, "[n]on-U.S. citizens shall not be authorized to access or assist in the
development, operation, management or maintenance of Department IT systems under the
contract, unless a waiver has been granted . . . with the concurrence of both the Department's
Chief Security Officer (CSO) and the Chief Information Officer (CIO) or their designees."  48
C.F.R. § 3052.204-71(k); see also id. § 3052.204-71(k)(1)-(3) (indicating that within DHS
headquarters, such a waiver may be granted for individuals who are legal, permanent residents of
the United States or a citizen of Ireland, Israel, the Republic of the Philippines, or any nation on
the Allied Nations List maintained by the United States Department of State ("State

also Revision of DHS Acquisition Regulation, 71 Fed. Reg. 25,760 (May 2, 2006) (indicating that 48 C.F.R. § 3052.237-70 was redesignated as 48 C.F.R. § 3052.204-71, which "revise[d] the content of the . . . clause with regard to access to sensitive information and to [IT] resources"). Second, GCE argues that it "need not demonstrate eligibility under a solicitation not yet written, and, unsurprisingly, QSS points to no authority suggesting a bid protestor must hit such a moving target." Pl.'s Cross-Mot. & Mot. Perm. Inj. 9-10 (emphasis added).  Even if citizenship did become an issue, GCE explains, waivers are available.  Prelim. Inj. Hr'g Tr. 13:3-7; supra note 84.

        Third, GCE emphasizes that it, in fact, employs United States citizens.  For example, GCE notes that it "has over [. . .] U.S. citizens working on a financial management systems contract for the [. . .]," Pl.'s Cross-Mot. & Mot. Perm. Inj. 10; see also Pl.'s App. 925 (Supplemental Decl. Raed Muslimani ("Muslimani Supp'l Decl.") ¶ 10 (explaining that since 2006, GCE has "supplied an entire team of qualified U.S. citizens" to staff a [. . .] finance, procurement, and travel systems IT support project that "contains all of the same major software applications (Oracle Financials, PRISM[,] and Sunflower) as the Coast Guard's financial management systems")), and represents that it "would have no difficulty in making a team of qualified U.S. citizens available for the Coast Guard effort if required," Pl.'s App. 925 (Muslimani Supp'l Decl. ¶ 10); see also id. at 926 (Muslimani Supp'l Decl. ¶ 13 ("GCE can provide a team of U.S. citizen employees if the Coast Guard determines that waivers are no longer acceptable now or as part of a new contract, just as GCE does under its contract with the [. . .].  Each of those employees has undergone a background check by the Secret Service.")); id. (Muslimani Supp'l Decl. ¶ 14 (indicating that for Coast Guard contracts, "GCE has available approximately [. . .] employees who are U.S. citizens to work on the contracts")).  Thus, asserts GCE, it "'could compete' for the work in a forthcoming solicitation and plainly has standing." Pl.'s Cross-Mot. & Mot. Perm. Inj. 10 (quoting Int'l Mgmt. Servs., Inc. v. United States, 80 Fed. Cl. 1, 5 (2008)) (citation omitted).

        Additionally, while QSS asserts that GCE never advised Mr. Bowen as to how it has been able to staff prior work for the Coast Guard, Def.-Intervenor's Mot. & Opp'n 22-23, GCE explains that the August 2007 bridge contract was the first in its contracting history with the Coast Guard to contain a United States citizenship provision.  Pl.'s App. 925-26 (Muslimani Supp'l Decl. ¶ 11); see also id. at 925 (Muslimani Supp'l Decl. ¶ 9 ("Prior to the bridge contract, GCE's contracts with the Coast Guard [and other federal agencies] have not previously required U.S. citizenship of all contractor personnel working on financial system efforts.")).  GCE states that "the Coast Guard has never raised any concerns about GCE employees until now," id. at 926 (Muslimani Supp'l Decl. ¶ 14), and notes that it discussed obtaining the appropriate waivers with

_____

Department"), where there is a compelling reason for using such an individual as opposed to a United States citizen, and where the waiver is in the best interest of the government).  GCE asserts that "as long as a contractor can have enough U.S. citizens staffing the project, this particular project and the pieces of this project that actually meet the restrictions, they're okay. They're allowed to compete for it."  Prelim. Inj. Hr'g Tr. 12:23-13:2.

Coast Guard personnel with regard to the bridge contract,[85] see id. (Muslimani Supp'l Decl. ¶ 12).

Given its previous contracting history with the Coast Guard, "[t]here is substantial reason to believe that GCE as the incumbent of the last eight years could compete for the financial management systems work if a competition was conducted." Pl.'s Cross-Mot. & Mot. Perm. Inj. 10. Moreover, GCE is in a position not unlike CCL, Inc., which alleged that the government violated the CICA by failing to engage in a competitive procurement for work that was ultimately found to fall outside the scope of an existing contract between the government and the contractor. CCL, Inc. v. United States, 39 Fed. Cl. 780, 788-89 (1997). In that case, the Court of Federal Claims noted that the protester

> was not a bidder on the original . . . contract, and because [the Defense Information Systems Agency ("DISA") ] did not proceed through a competitive procurement but rather through a modification to the . . . contract, it follows that CCL could not be a bidder for the . . . work. What CCL claims is that the future work . . . , as well as the work to be performed in the other facilities brought in by [the] modification . . . , should have been the subject of a solicitation. If it had been, CCL would have competed for some or all of that work.

Id. at 789. CCL, Inc., the court concluded, had standing. Id. Although it acknowledged that "CCL did not have a connection with the procurement," the court recognized that "[t]he work that [CCL] contends should have been competed was work that it wanted to do." Id. at 790. Moreover, the court noted that the protester "would likely have submitted a proposal[ because] it was performing the very work that it alleges [the] DISA illegally diverted . . . ." Id. Concluding that CCL, Inc. "potentially lost a contract" due to its inability to compete, the court held that "where a claim is made that the government violated [the] CICA by refusing to engage in a competitive procurement, it is sufficient for standing purposes if the plaintiff shows that it likely would have competed for the contract had the government publicly invited bids or requested proposals." Id.

QSS's challenge to GCE's standing is grounded, in large part, in the application of a regulation that has since been repealed and replaced by a new regulation, see Def.-Intervenor's Mot. & Opp'n 23 ("By regulation, Plaintiff would not be considered a 'qualified' contractor and would not be able to compete for the disputed work. As a result, it is not an interested party and lacks standing."), and the court finds QSS's arguments unpersuasive. The court determines that CCL, Inc. supports its conclusion that GCE has standing in this case. Furthermore, GCE has demonstrated that it is an interested party–it would have submitted an offer for audit-supporting federal financial management system services if a solicitation had issued, see Compl. ¶ 9–and, in

---

[85]   However, according to GCE, it has "not heard back from the Coast Guard" since Kevin Schiesl, who was the COTR at the time and the person with whom GCE was discussing an appropriate waiver, departed the agency. Pl.'s App. 925-26 (Muslimani Supp'l Decl. ¶¶ 11-12).

fact, expressed interest in participating in future competitions, see supra Part I.E.4. Additionally, in light of its previous contracting history with the Coast Guard, GCE has a direct economic interest in such a procurement. See Rex Serv. Corp., 448 F.3d at 1307. GCE has demonstrated that it "would be in contention" for an audit-supporting federal financial management system services contract "absent the . . . violation of applicable procurement regulations." Textron, Inc., 74 Fed. Cl. at 285; see also Compl. ¶ 9 (alleging that it has been prejudiced by the Coast Guard's decision to award audit-supporting federal financial management system services to QSS without competition). Accordingly, GCE has standing to bring its protest.

## C. Whether the Equitable Doctrine of Laches Applies

Next, the court addresses whether the government and QSS may invoke the equitable doctrine of laches as a defense to bar GCE from obtaining relief. GCE argues that "the harm [it] faces is extremely urgent" because QSS is scheduled to take over audit-supporting federal financial management system services the day after GCE's contract expires. Pl.'s Mot. Prelim. Inj. & TRO 2; see also Compl. ¶ 3 ("Time is of the essence . . . ."). On March 31, 2008, the court issued a temporary restraining order. The government, however, argues that GCE's claims that it would suffer irreparable harm should be "discounted because of GCE's delay in filing this suit." Prelim. Inj. Hr'g 62:7-8. Similarly, QSS asserts that GCE engaged in "unreasonable delay." Def.-Intervenor's Mot. & Opp'n 23.

### 1. Standards for a Laches Defense

Laches is an affirmative defense, Sucesion J. Serralles, Inc. v. United States, 46 Fed. Cl. 773, 783-84 (2000); RCFC 8(c)(1), that requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense, Costello v. United States, 365 U.S. 265, 282 (1961); see also JANA, Inc. v. United States, 936 F.2d 1265, 1269 (Fed. Cir. 1991) (stating that the defense of laches "requires a showing of two things: (1) unreasonable and unexcused delay by the claimant, and (2) prejudice to the other party"); Athey v. United States, 78 Fed. Cl. 157, 160 (2007) ("To prevail on a claim of laches, the burden lies with the [party asserting the defense] to show an 'unreasonable' delay in filing suit which causes 'prejudice or injury to the defendant.'" (quoting Poett v. Merit Sys. Prot. Bd., 360 F.3d 1377, 1384 (Fed. Cir. 2004))); cf. A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1033 (Fed. Cir. 1992) (en banc) (stating that "[m]aterial prejudice . . . resulting from the . . . delay is essential to the laches defense"). The doctrine of laches recognizes the necessity for "speedy vindication or enforcement of rights," and "is based upon considerations of public policy, which require for the peace of society the discouragement of stale demands." Alligood v. United States, 14 Cl. Ct. 11, 15 (1987).

As an equitable doctrine, laches "differs from the statute of limitations in that it offers the courts more flexibility, eschewing mechanical rules." Waddell v. Small Tube Prods., Inc., 799 F.2d 69, 79 (3d Cir. 1986); see also Pepper v. United States, 794 F.2d 1571, 1573 (Fed. Cir. 1986) (stating that the doctrine of laches "can apply 'apart and irrespective of' the court's statute

of limitations" (quoting <u>Brundage v. United States</u>, 504 F.2d 1382, 1384 (Ct. Cl. 1974))).  As the court in <u>CW Government Travel, Inc. v. United States</u> recognized,

> [w]hen a limitation on the period for bringing suit has been set by statute, laches will generally not be invoked to shorten the statutory period.  Jurisdiction . . . is based on 28 U.S.C. § 1491(b), which does not limit the time in which a bid protest action may be brought.  Had Congress wanted to set a statute of limitations on bid protest actions, it would have done so[; however,] Congress did not so limit the jurisdiction of this Court to hear such actions . . . .

61 Fed. Cl. 559, 569 (2004).  Unlike a statute of limitations defense, laches is "personal to the particular party[,] . . . must have flexibility in its application[, and a] court must look at all of the particular facts and circumstances . . . and weigh the equities of the parties."  <u>A.C. Aukerman Co.</u>, 960 F.2d at 1032; <u>see also</u> <u>Cornetta v. United States</u>, 851 F.2d 1372, 1379 (Fed. Cir. 1988) ("The general rule is that laches . . . must be considered in light of the facts of each case.").  Therefore, there "are no predetermined exact boundaries to the length of time that are considered unreasonable by the courts and sufficient to support a laches defense."  <u>Mexican Intermodal Equip., S.A. de C.V. v. United States</u>, 61 Fed. Cl. 55, 71 (2004); <u>see also</u> <u>A.C. Aukerman Co.</u>, 960 F.2d at 1032 ("The length of time which may be deemed unreasonable has no fixed boundaries but rather depends on the circumstances.").  Indeed, the court must "consider and weigh any justification offered by the [party against whom the laches defense is asserted] for its delay."  <u>A.C. Aukerman Co.</u>, 960 F.2d at 1033.  Ultimately, application of laches "is committed to the sound discretion of the district court."  <u>Id.</u> at 1032.

## 2.  GCE's Argument That Laches Does Not Apply

GCE emphasizes that laches "only applies in situations of extraordinary delay."  Pl.'s Cross-Mot. & Mot. Perm. Inj. 11; <u>accord</u> Pl.'s Mem. 9 ("Laches only applies in 'extraordinary circumstances.'" (quoting <u>CW Gov't Travel, Inc.</u>, 61 Fed. Cl. at 569)).  According to GCE, "there is no basis for the laches doctrine to apply in this case," Pl.'s Cross-Mot. & Mot. Perm. Inj. 10, because "[f]ar from engaging in <u>any</u> delay, GCE has made every effort to assert its claims in a timely manner," <u>id.</u> at 12.  GCE states that although Modification 30 went into effect on September 25, 2007, the Coast Guard did not inform it about Modification 30 until November 8, 2008.  <u>Id.</u>; <u>see also</u> Compl. ¶¶ 32, 36 (indicating that Modification 30 took effect on September 26, 2007, but that GCE learned about its issuance for the first time from the Coast Guard on November 8, 2007).  Once it became aware of Modification 30, GCE asserts that it sought relief from the GAO within eight days.[86]  Compl. ¶ 37.

---

[86]  According to GCE, it sought relief from the GAO "without even a copy of Modification 30," which it received on November 20, 2007, and only "in response to a request under the [FOIA]."  Pl.'s Cross-Mot. & Mot. Perm. Inj. 12 & n.12; <u>see also</u> AR 4866 n.8 ("[W]hile the Coast Guard issued Modification [30] to QSS on September 25, it did not inform GCE of its decision until November 8, and did not provide GCE with a copy of the modification

GCE claims that its diligence is evidenced by the fact that it was "forced" to file supplemental protests before the GAO as facts became available and came "into clearer focus," Pl.'s Cross-Mot. & Mot. Perm. Inj. 12; see also Pl.'s Mem. 9 ("GCE acted with a diligence appropriate to the information then available to it and to the complexity of the matters to be litigated."), actions that it maintains "are not characteristic of a party sleeping on its rights–rather, they show that GCE's efforts to enforce its rights outpaced its access to information," Pl.'s Cross-Mot. & Mot. Perm. Inj. 12.  For example, GCE notes that it voluntarily withdrew two supplemental protests before the GAO on February 4, 2008, "after learning that the GAO would not be deciding . . . these protests on the original 100-day schedule."[87] Id. at 13.  As a result, GCE states that it was "left with no avenue of relief available," secured counsel, and "commenced vigorous analysis and preparations for the extensive set of pleadings that GCE filed with this Court on March 6, 2008."  Id.  It argues that the thirty-one days between its withdrawal of the supplemental protests at the GAO and its filing of the instant complaint were reasonable and, in fact, necessary: "The 31 days . . . were spent ensuring that the complex materials presented to this Court were sufficiently clear, succinct, and accurate to assist in this Court's understanding of the issues in this case.  That effort represents not delay but diligence."  Id. During oral argument, GCE elaborated:

> [Y]ou wouldn't buy legal services before you commit to writing a pleading and actually spending the money on having your lawyers write it.  That's a pretty good time to reevaluate whether you're pursuing the right cause of action. . . .  I would argue that this has not been an atypical [time frame] for one of these cases, a one-month delay between withdrawing the filings at the GAO. . . .  I would say a one-month delay, one month to actually prepare the huge stack of filings that you need to immediately file a complaint and move for a TRO and preliminary injunctive relief is not unreasonable.

Prelim. Inj. Hr'g Tr. 88:13-89:2.  GCE notes that this court previously rejected a laches defense "in a case with a timeline quite similar to the one here, eight weeks of proceedings before the

---

until November 20, after receipt of a Freedom of Information Act request.").

[87] GCE also emphasizes that its

subsequent protests were not successive bites at the apple, but rather supplemental protests under the same original protest, as GCE obtained new information about what the Coast Guard had done or failed to do.  Supplemental protests are permitted under the GAO rules, and the GAO attempts to resolve all supplemental protests within the 100-day period for resolving the original protest.  Unfortunately, [the] GAO was unable to do so in this case, and GCE elected to pursue its action in this Court.

Pl.'s Cross-Mot. & Mot. Perm. Inj. 11 n.9 (citation omitted).

GAO followed by a month break before filing in this Court," Pl.'s Mem. 9 (citing Heritage of Am., LLC v. United States, 77 Fed. Cl. 66, 73, reconsideration denied, 77 Fed. Cl. 81 (2007)), and that the cases upon which QSS relies are inapposite, see Pl.'s Cross-Mot. & Mot. Perm. Inj. 12 n.11. Moreover, GCE argues that QSS cannot–and ultimately "does not even attempt to"–demonstrate any prejudice, which is a required showing in order for the court to apply laches. Pl.'s Mem. 9.

### 3. The Government's and QSS's Arguments That GCE's Delay Was Unreasonable

While GCE contends that it utilized the thirty-one days to act affirmatively by preparing its case and filings before initiating this action, the government offers a contrasting interpretation of this time frame: "almost half of that time period is just taken up by inaction basically." Prelim. Inj. Hr'g 63:13-14 (emphasis added). It asserts that the thirty-one day gap between the dates on which GCE withdrew its supplemental protests before the GAO and filed its complaint in the Court of Federal Claims was unreasonable, particularly given GCE's own assertions that it would allegedly suffer "catastrophic" harm. Id. 63:13. Nevertheless, the government could not, when questioned by the court, provide a time frame that it believes would have been reasonable under the circumstances presented here:

> In this case, I would think probably closer to a week considering that we have less than two months before this supposed irreparable harm is going to come and you wait over half of that time period before filing a suit in the Court of Federal Claims, that seems unreasonable . . . .

Id. 64:5-10. The government maintains that GCE "shouldn't have waited a month after [it] voluntarily dismissed [its] GAO protest to come to this Court." Id. 65:3-5. Although it, like QSS, acknowledges that there is no bright line for determining what is a reasonable amount of delay, see id. 65:14-16, the government nonetheless asserts that "each week that you add on [to GCE's delay] would get more and more unreasonable," id. 65:9-10, and that "waiting over a month is too long," id. 65:16-17.

QSS asserts that "in a case where a party waits too long between the dismissal of its GAO protest and the filing of its complaint, there is a strong argument in favor of applying the doctrine of laches." Def.-Intervenor's Mot. & Opp'n 24 (citing Software Testing Solutions, Inc. v. United States, 58 Fed. Cl. 533, 536 (2003)). Here, QSS maintains that GCE's complaint "was filed unreasonably late . . . ." Id. at 2. It claims that the "short [time frame] Plaintiff now faces is one of its own making because it has slept on its rights to the detriment of both the Agency and QSS." Id. at 23; accord id. at 25 ("The emergency about which Plaintiff complains is self-induced . . . ."). It notes that GCE "had more than a month to file a complaint at the Court, yet chose not to," id. at 25, and characterizes GCE's delay as "inexcusable" based upon "the fact that it took Plaintiff's counsel thirty-one days to draft a complaint and memorandum in support of its motion for preliminary injunction when those pleadings are based almost entirely on the prior GAO pleadings," Def.-Intervenor's Opp'n & Reply 16.

QSS believes that "equity argues against the Court permitting Plaintiff's forum-shopping under the particular facts of this case."  Id.  It notes that the CICA, as well as the GAO's bid protest regulations, "give[] protestors a choice of fora in which to bring their complaints" and that these fora "offer a variety of potential tactical advantages and risks."[88]  Def.-Intervenor's Mot. & Opp'n 25; see generally Michael J. Schaengold, T. Michael Guiffré & Elizabeth M. Gill, Choice of Forum For Bid Protests, Briefing Papers (Thompson Reuters/West, St. Paul, Minn.), Oct. 2008 (discussing options, along with their advantages and disadvantages, a disappointed offeror may pursue for contesting a contract award).  According to QSS, GCE elected to proceed before the GAO and "lost on two out of three of its protests and chose on its own not to pursue the remainder in its forum of choice."  Def.-Intervenor's Mot. & Opp'n 25; see also id. ("Plaintiff finally arrived at the Court to try for a seventh time to stop the implementation of [Modifications] 30 and 32.").  It argues that GCE's thirty-one day delay to seek relief "on claims that are essentially the same as the original losing ones is disingenuous at best, and vexatious at worst." Id. at 25.

Although QSS acknowledges that no case sets forth a bright line delineating the precise amount of delay that constitutes an untimely delay, see Def.-Intervenor's Opp'n & Reply 16, it rejects the contention that GCE's delayed filing of supplemental protests before the GAO was justified due to GCE's lack of necessary information.  For example, while GCE states that it did not receive a copy of the ITOP II contract until January 17, 2008, QSS notes that GCE nevertheless "was aware of the existence of [the] ITOP II [contract] as early as November 20, 2007, when it received the response to its FOIA request, including the SETS II [task order] RFP documentation, which refers to [the] ITOP II [contract]."  Id. at 15.  Moreover, QSS asserts that GCE had constructive notice of the ITOP II contract, particularly since "it has been posted online for over a year, if not more."[89]  Id. at 15-16.

---

[88]  GCE offers the following response to QSS's forum-selection argument:

The GAO and Court of Federal Claims fora options do not create a disjunctive choice of tracks for bid protests: as the CICA provides, 'nothing contained in this subchapter [governing bid protests] shall affect the right of any interested party to file a protest with the contracting agency or to file an action' in this Court.

Pl.'s Cross-Mot. & Mot. Perm. Inj. 11.  GCE believes that it "should not be penalized for proceeding initially at the GAO and subsequently seeking relief from this Court."  Id.

[89]  While GCE states that the Coast Guard "only reluctantly disgorged" material in response to a FOIA request, Pl.'s Cross-Mot. & Mot. Perm. Inj. 12 n.12, QSS suggests that any delay GCE experienced while awaiting processing of its FOIA request was negligible: "[T]he Agency actually responded promptly to the request, providing documents within twenty-two days, which is near light-speed in the FOIA world, as any knowledgeable practitioner knows." Def.-Intervenor's Opp'n & Reply 15 n.8.

### 4.  Neither the Government nor QSS Demonstrates That the Application of Laches Is Appropriate Under the Circumstances Presented in This Case

As noted above, GCE explains that its delay in instituting this action was due, in part, to logistical considerations.  See supra Part IV.C.2.  The burden of proof lies with the government and QSS to prove that GCE's delay was unreasonable and prejudicial.  CW Gov't Travel, Inc., 61 Fed. Cl. at 568-69.  In challenging GCE's position, QSS relies upon Software Testing Solutions, Inc., wherein the court noted that the government had "not yet formally pled any affirmative defenses . . . ."  58 Fed. Cl. at 536.  Nevertheless, it observed that laches "may well be appropriately invoked," id., given that the plaintiff waited two months to file a postaward protest before the Court of Federal Claims after the GAO denied its second request for reconsideration, id. at 535.  The court determined that there was a "strong presumption in favor of applying laches" because the plaintiff's "only explanation for its delay in filing suit is that it was weighing the cost of litigating this matter."  Id. at 536 (emphasis added).  The court observed:  "[A]t this point, this assertion has a decidedly hollow ring as plaintiff has failed to explain why it took months to make that decision knowing full well that this contract at issue would quickly be performed."  Id.  Despite this assessment, the court ultimately declined to reach a determination on a possible laches defense:  "When all is said and done, . . . the court believes that the pending application must be measured under the typical factors for deciding whether to issue a temporary restraining order."  Id.  Thus, Software Testing Solutions, Inc. offers QSS little assistance and, in fact, suggests that the court should not foreclose GCE's action.

In order to avail themselves of a laches defense here, the government and QSS must prove that GCE lacked diligence by unreasonably delaying filing suit in this court and that they were prejudiced by GCE's conduct.  See Costello, 365 U.S. at 282; Athey, 78 Fed. Cl. at 160.  These elements are conjunctive.  EEOC v. Great Atl. & Pac. Tea Co., 735 F.2d 69, 80 (3d Cir. 1984).  Neither the government nor QSS has made the requisite showing that GCE unreasonably delayed filing suit.  QSS suggests that GCE's delay was unreasonable and unjustified because its pleadings before the court "are based almost entirely on the prior GAO pleadings," Def.-Intervenor's Opp'n & Reply 16, but this argument is beside the point.  The GAO pleadings comprise part of the administrative record and are materials upon which all of the parties in this case can rely in preparing their respective cases before this court.  More importantly, the court finds no support for the government's contention that GCE simply engaged in "inaction" for one month.  Prelim. Inj. Hr'g Tr. 63:14.  The court agrees with GCE that a sufficient amount of time was necessary to "actually prepare the huge stack of filings."  Id. at 88:24-25.  GCE ultimately filed its complaint, together with a thirty-six page motion for preliminary injunctive relief and an appendix of materials exceeding 900 pages.  Such voluminous filings cannot be drafted and assembled overnight, and the "[m]ere passage of time does not constitute laches."  CW Gov't Travel, Inc., 61 Fed. Cl. at 568 (citing Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc., 988 F.2d 1157, 1161 (Fed. Cir. 1993)).  Thus, the court rejects any claim that GCE was not diligent during the thirty-one day period immediately preceding its filing of this action.

The question then becomes whether GCE's thirty-one day delay was reasonable. The government asserts that it "can't pinpoint the exact date" upon which GCE should have filed its complaint, but settles upon the time frame of one week. Prelim. Inj. Hr'g Tr. 65:17-18, 20-21. QSS does not bind itself to a specific date after which it believes GCE's delay became unreasonable. See Def.-Intervenor's Opp'n & Reply 16. Yet, neither party demonstrates why thirty-one days was unreasonable, let alone "extraordinary," in this case. See CW Gov't Travel, Inc., 61 Fed. Cl. at 569. Because the government offers no concrete support as to why a one-week period was appropriate, the court is unwilling to adopt this arbitrary "fixed boundar[y]," A.C. Aukerman Co., 960 F.2d at 1032, and concludes that GCE did not unreasonably delay commencement of this action in the Court of Federal Claims.

Even assuming, arguendo, that GCE's thirty-one delay was, in fact, unreasonable, neither the government nor QSS explains how it was prejudiced by GCE's conduct. See State Contracting & Eng'g Corp. v. Condette Am., Inc., 346 F.3d 1057, 1067 (2003) (requiring "sufficient evidence of material prejudice to support a finding of laches"). QSS claims prejudice because GCE has failed to assist "with the transition and only recently turn[ed] over computer program code to the Agency." Def.-Intervenor's Mot. & Opp'n 25. Yet, that harm is wholly unrelated to any harm stemming from GCE's alleged delay in filing this action.[90] QSS also claims that it "would have to reassign or lay off several dozen workers" if the court enjoins its work on Modifications 30 and 32. Id. This harm relates to the merits of the case, rather than to GCE's alleged delay in filing this action.

The government intimates that GCE's inaction caused harm to both it and QSS because "we're forced to litigate . . . over the course of three weeks when it could have been litigated over a longer period of time." Prelim. Inj. Hr'g Tr. 63:15-17. Without more, this contention is insufficient, particularly since the government and QSS participated in prior proceedings before the GAO and were certainly familiar with the issues presented in that forum. Indeed, QSS suggests that this action is merely another iteration of GCE's previous protests before the GAO. See, e.g., Def.-Intervenor's Mot. & Opp'n 25 (characterizing GCE's instant claims as "essentially the same as the original losing ones" before the GAO); Def.-Intervenor's Opp'n & Reply 16 (arguing that GCE's pleadings in this case "are based almost entirely on the prior GAO pleadings"). Therefore, counsel who are well-versed in the issues would not be significantly burdened on account of an expedited briefing schedule.

---

[90]  QSS relies upon Mr. Bowen's declaration in support of its laches argument and to assert that it would suffer in the event that the court enjoins its performance on the work encompassed by Modifications 30 and 32. See Def.-Intevenor's Mot. & Opp'n 25. According to Mr. Bowen, GCE has refused to cooperate with a transitioning plan since mid-October 2007. Def.-Intervenor's Mot. Strike Ex. (Bowen Decl. ¶¶ 13-14). Assuming that Mr. Bowen's assertion is true, any prejudice QSS experienced as a direct result of GCE's lack of cooperation predated GCE's protests before the GAO, let alone the filing of GCE's complaint in the Court of Federal Claims. Thus, QSS's prejudice claim is wholly unrelated to the timing of GCE's protests before the GAO and the Court of Federal Claims.

Neither the government nor QSS makes the requisite showing for an application of laches in this case.  Given the parties' extensive filings both before the GAO and the Court of Federal Claims, the court is satisfied that GCE did not unreasonably delay instituting this action. Accordingly, the court rejects the government's and QSS's laches defense.

### D.  GCE's Claim That the Coast Guard Violated the CICA

GCE's "first claim is that the Coast Guard violated [the] CICA by failing to bid out the financial management systems IT support work it sole-sourced to QSS in Modifications 30 and 32 to the SETS II task order."  Pl.'s Cross-Mot. & Mot. Perm. Inj. 14; see also Compl. ¶¶ 52-54 (alleging that Modifications 30 and 32 to the SETS II task order should have been subject to a competitive award process pursuant to the CICA because these modifications exceeded both the scope of the SETS II task order and the ordering period of the underlying ITOP II contract).  In support of this claim, GCE asserts that "[t]he community of prospective bidders would never have read a generic IT solicitation like [the] SETS II [task order] . . . and thought this was a procurement that could be expanded to pull in audit supporting financial systems work."  Perm. Inj. Hr'g Tr. 14:2-11.  Both the government and QSS contend otherwise, arguing that the solicitation was broad enough to encompass financial systems, see Def.'s Mot. & Opp'n 15-22; Def.-Intervenor's Mot. & Opp'n 28-30, and that the court should "avoid the rabbit-hole down which Plaintiff would here attempt to lead it by having the Court read such a distinction between financial IT and other IT services into the record where none exists," Def.-Intervenor's Mot. & Opp'n 30-31 (citation omitted).

### 1.  The Court Engages in a Two-Part Inquiry to Determine Whether Modifications 30 and 32 Exceeded the Scope of the SETS II Task Order

The government argues that "GCE has not proven that Modifications 30 and 32 exceed the scope of the SETS II task order, which, under GCE's theory, is a prerequisite to finding that the modifications exceeded the ITOP II contract's period."  Def.'s Opp'n & Reply 9; see also Def.'s Mot. & Opp'n 14 (contending that GCE "cannot prove that Modifications 30 and 32 exceeded the scope of the SETS II task order").  QSS asserts that Modifications 30 and 32 "are within the scope of the SETS II task order, they are not subject to competition, and Plaintiff has suffered no harm by the Government's decision not to compete the modified work."  Def.-Intervenor's Opp'n & Reply 17.  GCE, however, contends that it has made "key showings" demonstrating that the audit-supporting federal financial management systems and related services encompassed by Modification 30 are materially different from the systems and services described in the SETS II task order PWS.  Pl.'s Mem. 10.

The parties acknowledge that the Federal Circuit's decision in AT&T Communications, Inc. v. Wiltel, Inc., 1 F.3d 1201 (Fed. Cir. 1993), sets forth the test for determining whether a modification materially departs from the scope of the original procurement.  In AT&T Communications, Inc., the Federal Circuit addressed whether the government was required to initiate a separate procurement for a modification to a comprehensive telecommunications

contract.[91]  Id. at 1202-03.  Ultimately determining that the government was not required to initiate a separate procurement, see id. at 1203 ("[T]he [CICA] does not require a separate competitive procurement for this modification . . . ."), the Federal Circuit reversed the General Services Administration Board of Contract Appeals ("GSABCA"), which had initially sustained the protest, id. at 1203, 1208.

As an initial matter, the Federal Circuit noted that "Congress did not intend to prevent contract modification."  Id. at 1205 n.1.  Indeed, the Federal Circuit observed, the CICA "does not prevent modification of a contract by requiring a new bid procedure for every change."  Id. at 1205.  Rather, "only modifications outside the scope of the original competed contract fall under the statutory competition requirement."  Id.  Nevertheless, the Federal Circuit acknowledged that the CICA "sets forth no standard for determining when modification of an existing contract requires a new competition or falls within the scope of the original competitive procurement."[92]

---

[91]  In 1986, the GSA solicited bids for the telecommunications contract at issue in AT&T Communications, Inc., 1 F.3d at 1203.  The contract indicated that the government intended to procure six telecommunications services: (1) switched voice service; (2) switched data service; (3) switched digital integrated service; (4) packet switched service; (5) video transmission service; and (6) dedicated transmission service.  Id.  Congress required the GSA to award the contract to two providers in a sixty-to-forty percent division.  Id. at 1204.  After four and seven years of contract performance, the contract permitted the two providers to compete for a larger share of the services.  Id.  In 1988, the GSA awarded the sixty-percent share to AT&T Communications, Inc. ("AT&T"), which, in 1992, submitted a proposal under the Service Improvements clause of the contract to modify the contract by adding T3 circuits–circuits that provided digital data transmission at a rate that was twenty-eight times faster than T1 circuits and were "the fastest pre-modification dedicated transmission service circuit"–as a fourth type of dedicated transmission service.  Id.  After the GSA concluded that AT&T's proposal fell within the scope of the contract, the parties entered into a bilateral modification of the contract.  Id.  Wiltel, Inc.–and later MCI Telecommunications Corp.–protested the modification, asserting that it exceeded the scope of the underlying contract.  Id. at 1202-03.

[92]  The Federal Circuit recognized that its predecessor court, the United States Court of Claims, articulated the cardinal change doctrine, "a standard for determining whether a contract modification is within the scope of the underlying contract," in Allied Materials & Equipment Co. v. United States:

> Under established case law, a cardinal change is a breach.  It occurs when the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for.  By definition, then a cardinal change is so profound that it is not redressable under the contract, and thus renders the government in breach.

569 F.2d 562, 563-64 (Ct. Cl. 1978), cited in AT&T Commc'ns, Inc., 1 F.3d at 1205.  The

Id.

The Federal Circuit explained that a modification "generally falls within the scope of the original procurement if potential bidders would have expected it to fall within the contract's changes clause." Id. (citing Am. Air Filter Co., 57 Comp. Gen. 567, 573 (1978)). In order to determine whether a modification falls within the CICA's competition requirement, the court must examine "whether the contract as modified materially departs from the scope of the original procurement." Id. (citing Neil R. Gross & Co., 1990 WL 269546, at *2). The court's analysis "focuses on the scope of the entire original procurement in comparison to the scope of the contract as modified. Thus[,] a broad original competition may validate a broader range of later modifications without further bid procedures." Id.

Having enunciated these principles, the Federal Circuit first examined the scope of the telecommunications contract at issue, which it determined was broad. Id. at 1205-06. It noted that the contract encompassed "'a comprehensive set of telecommunications services' for the entire Federal Government," its terms "cover[ed] a broad range of telecommunications services," and that one contract objective included forecasting telecommunications costs over a ten-year period.[93] Id. The Federal Circuit also noted that the contract included a service improvements clause, see supra note 91, which "expressly encourage[d] contractors 'to propose independently improvements to the services, features, or other requirements of the contract'" and "provide[d] a mechanism for contractors to suggest new . . . telecommunications services,"[94] AT&T

_____

AT&T Communications, Inc. court indicated that the question presented before it was slightly different that the question presented in the cases that developed the cardinal change doctrine. 1 F.3d at 1205. Whereas cases involving the cardinal change doctrine decided whether government modifications breached a contract, the issue before the AT&T Communications, Inc. court was "whether Government modifications changed the contract enough to circumvent the statutory requirement of competition," rather than breach. Id.; see also Mark G. Jackson, G. Matthew Koehl & Derek D. Crick, Recognizing & Challeging Out-of-Scope Changes, Briefing Papers (Thompson Reuters/West, St. Paul, Minn.), Dec. 2003, available at 03-13 BRPAPERS 1, at *8 (Westlaw) (recognizing that "the issue presented by a protest alleging that a modification violates [the] CICA is somewhat different from the issue presented by a [Contract Disputes Act] claim alleging breach of contract based upon a cardinal change"). Despite these differences, the Federal Circuit indicated that "[i]n application, these questions overlap." AT&T Commc'ns, Inc., 1 F.3d at 1205.

[93] The ten-year period, the Federal Circuit reasoned, enabled potential bidders to "certainly contemplate[] extensive modifications to meet changing needs of the entire Federal Government." AT&T Commc'ns, Inc., 1 F.3d at 1205.

[94] The Federal Circuit determined that the GSABCA erred in its interpretation of the service improvements clause because that interpretation "limited the clause to improvements in the existing services" and "overlook[ed] the contractor's obligations to improve Dedicated

Commc'ns, Inc., 1 F.3d at 1206.  Additionally, the Federal Circuit determined that the contract's express references to "transition[ing] to more advanced technology as it becomes available commercially" gave "potential bidders . . . full notice that the . . . contract would require extensive alterations to meet the Government's changing needs and the changing technology of telecommunications."  Id.  Furthermore, the Federal Circuit observed that the telecommunications contract utilized the term "service" in "many distinct ways."  Id. at 1207.  These indicia, the Federal Circuit concluded, "suggest[ed that] a broad range of modifications would fall within the scope of [the contract's] changes clause."[95]  Id. at 1206.

Next, the Federal Circuit assessed "[a]n important factor in determining the scope of the original competition," id. at 1207, namely, "'whether the solicitation for the original contract adequately advised offerors of the potential for the type of changes during the course of the contract that in fact occurred, or whether the modification is of a nature which potential offerors would reasonably have anticipated,'" id. (quoting Neil R. Gross & Co., 1990 WL 269546, at *2).  It determined that "offerors at the time of the competition would reasonably have believed T3 to be within the scope of the contract," id. at 1207; supra note 91, because "the breadth of the stated objectives" contained in the contract, as well as "the meaning of the Service Improvements clause, the express language about commercially available technology, and the requirement for an annual forecast of new technologies, would suggest to potential offerors that the next generation of Dedicated Transmission Service would reasonably fall within the scope of the contract,"[96]  AT&T Commc'ns, Inc., 1 F.3d at 1207.  Accordingly, the Federal Circuit determined as a matter of law that the modification fell within the scope of the contract and that the

_____

Transmission Service as a whole."  AT&T Commc'ns, Inc., 1 F.3d at 1206.  This clause, the Federal Circuit observed, contained "sweeping language" and expressly indicated that "acceptable improvements 'will be processed as modifications.'"  Id. at 1207.

[95]  In other words, "adding work to an existing contract that is clearly within the scope of the contract does not raise a viable protest under [section] 1491(b)(1)."  Distributed Solutions, Inc., 539 F.3d at 1346.

[96]  The Federal Circuit supported its conclusion by looking to other GSABCA cases, namely MCI Telecommunications Corp., No. 11963-P, 1992 BPD ¶ 287, wherein the GSABCA interpreted the scope of the same contract at issue in AT&T Communications, Inc. and determined that

> "[t]he record . . . establishes beyond doubt that all of the offerors for the . . . contract, and the Government, believed that the successful vendors would provide virtually all commercially available intercity telecommunications services to the user agencies, and that the losing vendor would be essentially shut out of that business for a ten-year period."

1 F.3d at 1207 (quoting MCI Telecomms. Corp., 1992 BPD ¶ 287) (emphasis added).

GSABCA committed error by focusing upon the differences between the types of circuits at issue rather than upon the modification in the broader context of the contract as a whole.  Id. at 1207-08.

> As the Court of Federal Claims summarized, <u>AT&T Communications, Inc.</u>
>
> stands for the proposition that, to sustain a bid protest stemming from a change or modification to a contract, the protestor must allege facts that establish that the modification falls outside the scope of the original contract, thereby triggering the statutory competition requirement.  If any change made to a procurement is within the scope of work originally contemplated, no competition is required, and jurisdiction is not present.

<u>RhinoCorps, Ltd.</u>, 2009 WL 1362834, at *9.  The <u>AT&T Communications, Inc.</u> decision underscores the notion that "[t]here is no exact formula . . . for determining if ordered work is outside the scope of the contract–each case must be analyzed 'on its own facts and in light of its own circumstances.'"  <u>WBC, Inc.</u>, No. GPOBCA 17-98, 1999 GPOBCA LEXIS 12, at *6 (U.S. Gov't Printing Office Bd. Contract Appeals Sept. 22, 1999) (quoting <u>Wunderlich Contracting Co. v. United States</u>, 351 F.2d 956, 966 (Ct. Cl. 1965)).  Accordingly, the court first looks to Modification 30 in the context of the SETS II task order as a whole.  <u>See</u> <u>AT&T Commc'ns, Inc.</u>, 1 F.3d at 1207; <u>see also</u> <u>MCI Telecomms. Corp.</u>, B-276659.2, 1997 WL 602194, at *6 (Comp. Gen. Sept. 29, 1997) (explaining that "[e]vidence of a material difference between the modification and the original contract is found by examining any changes in the type of work, performance period, and costs between the contract as awarded and as modified").  It then addresses whether potential offerors would have reasonably anticipated that audit-supporting federal financial management systems and related services would fall within the scope of the SETS II task order.

**2.  Modification 30 Added Systems and Services That Materially Changed the Scope of the SETS II Task Order**

QSS maintains that the SETS II task order was drafted in broad terms to cover a broad scope of services and that GCE fails to demonstrate how the audit-supporting federal financial management system services encompassed by Modification 30 is outside the scope of either the SETS II task order or the ITOP II contract.  <u>See</u> Def.-Intervenor's Mot. & Opp'n 28-31.  According to the government,

> [t]he language of the original SETS II task order and [RFP] show[s] that SETS II was a broad procurement for IT systems support that, although not originally including the financial management system GCE is administering, accounted for the possibility that additional systems, including financial management systems, may be added to the task order.

Def.'s Mot. & Opp'n 16; see also Def.'s Opp'n & Reply 9 (stating that the "SETS II task order was a 'broad original procurement' for 'software engineering and technical services' for computer systems supported by" the OSC). The government also asserts that the SETS II task order "explicitly accounted for the possibility that additional systems could be added without limitation as to the type of system." Def.'s Opp'n & Reply 9; see also Def.'s Mot. & Opp'n 17 (maintaining that (1) the SETS II task order was "designed to provide a broad range of IT support services to systems supported by the OSC," (2) "these systems were not limited to systems supported by the OSC at the time the task order was issued, but rather, included 'existing and future systems,'" (3) the contractor "was expected to adapt as the Coast Guard added new systems to respond to its changing 'regulatory and mission requirements,'" and (4) "[n]othing in the scope of work . . . or in the original task order[] suggests any limits to the types of systems that might ultimately be included in the SETS II task order").

QSS notes that the SETS II task order (1) "was designed for growth," Def.-Intervenor's Opp'n & Reply 19; see also Def.-Intervenor's Mot. & Opp'n 28 ("The Coast Guard's SETS II Acquisition Plan imagined an overarching IT support contract for the Coast Guard and DHS that would grow as needs changed."), and (2) "advised potential offerors of the room for growth by predicting that twenty-five additional systems of varying sizes and degrees of complexity were expected to be added over the contract performance period," Def.-Intervenor's Mot. & Opp'n 29; see also Def.-Intervenor's Opp'n & Reply 19 (stating that this "growth was consistent with the notice to potential offers contained in . . . the RFP, where the addition of twenty-five new systems was contemplated, systems not identified by function, but simply by size, reflecting the broad nature of the scope"). QSS quotes the ITOP II contract SOW, which indicated both that the "contract is intended to cover the gamut of IT efforts," AR 4711, and that "[i]t would be impossible to identify all requirements and/or anticipate how technology will evolve over the life of the contract," id. at 4720, and opines that "[o]ne strains to imagine broader criteria," Def.-Intervenor's Mot. & Opp'n 30; see also Def.-Intervenor's Opp'n & Reply 20 (arguing that it is "undisputed that financial management systems could be procured under the ITOP II contract, which was even more broadly written than the SETS II task order").

**a. The SETS II Task Order Did Not Contemplate an Unlimited Expansion of Computer Systems**

The SETS II task order PWS informed offerors that the contractor "shall provide software engineering and technical services that apply to existing and future computer systems and communications networks designated by the OSC for SETS II support under this Task Order." AR 532 (emphasis added); see also id. at 540 (discussing the "smooth transition of IT systems engineering and technical services" (emphasis added)). The general scope section also informed the contractor that it "shall respond to changing regulatory and mission requirements of the Coast Guard that may result in new computer systems and communications networks that [the] OSC hosts." Id. at 532 (emphasis added). Additionally, the general scope section enumerated twenty-eight contractor-provided IT services, AR 532; supra Part I.D.1.b, that could be classified within fourteen broad categories, see AR 544 (noting that the "contractor shall provide a broad

range of services" (emphasis added)); <u>supra</u> Parts I.D.1.b.i-v.  It is therefore apparent that the general scope section of the SETS II task order PWS was drafted in broad terms that permitted, as well as forecasted, expansion with respect to the number of systems supported by the OSC.[97] <u>See</u> Def.-Intervenor's Mot. & Opp'n 28 (noting that the SETS II task order PWS "imagined an overarching IT support contract . . . that would grow as needs changed); Def.'s Mot. & Opp'n 17 (stating that the SETS II task order PWS was "not limited to systems supported by the OSC at the time the task order was issued . . . .").

The government maintains that the general scope section contains the "key language for the SETS II task order," Perm. Inj. Hr'g Tr. 33:4-9, and that "[t]here is nothing in the General Scope section, or the rest of the solicitation for that matter, that indicates that the type of the systems that can be added is limited in any way," Def.'s Opp'n & Reply 13; <u>see also</u> Def.'s Mot. & Opp'n 17 ("Nothing in the scope of work . . . or in the original task order[] suggests any limits to the types of systems that might ultimately be included in the SETS II task order.").  The court disagrees that the general scope section is open-ended to the degree the government suggests. While the court recognizes, as did the <u>CLL, Inc.</u> court, that "there may be a need for flexibility when the government contracts for computer and related equipment [or services], particularly when those contracts will be performed over a number of years," 39 Fed. Cl. at 794, it notes that the general scope section was not drafted to contemplate an unlimited type of system.[98]  Indeed, the Coast Guard could not draft the SETS II task order as "an empty vessel into which it [could] pour all its future needs."  <u>Id.</u>

Certainly the general scope section was framed in broad terms and left open the possibility for the OSC's continued expansion.  <u>See</u> Def.-Intervenor's Mot. & Opp'n 29.  <u>Cf.</u> <u>supra</u> note 97.  Nevertheless, the general scope section indicated that contractor-performed

---

[97]  Nevertheless, despite these broad terms, the Coast Guard initially planned to recompete audit-supporting federal financial management systems through the EAGLE vehicle, conduct that suggests that the Coast Guard itself did not deem the SETS II task order PWS broad enough to encompass those systems and related services.  <u>See</u> <u>supra</u> Part I.E.2.

[98]  The government suggests that nothing in the SETS II task order PWS distinguishes or classifies systems by type–mission, administrative, or logistical.  Perm. Inj. Hr'g Tr. 35:3-12. The definition of "computer system" offers no guidance into a particular computer system's underlying characteristics.  <u>See</u> AR 632 (defining a computer system as consisting of "a functional unit of one or more computers and associated hardware and software components including system software, application, communication and database software systems, databases, and files"); <u>cf.</u> Perm. Inj. Hr'g Tr. 52:2-4 (stating the government's position that "the very definition of the term, computer system, . . . does nothing to exclude financial management systems").  Nevertheless, it is apparent that not all computer systems are the same.  If this were the case, then there would be no need for the Coast Guard to enumerate the unique features of each system throughout the SETS II task order, let alone specify what contractor-provided services were required or not required for a particular system.

software engineering and technical services applied only to "existing and future" computer systems and communications networks.  AR 532.  Were the SETS II task order virtually limitless in terms of the type of systems encompassed therein, as the government and QSS suggest, then the general scope section need not have included the phrase "existing and future."  Rather, it could have informed offerors that the contractor would perform services for "any" computer system and communications network designated by the OSC for SETS II support.  Under that circumstance, there would have been no need for the SETS II task order PWS to enumerate in-depth the systems discussed in Parts I.D.1.c.i-xvii, supra, because the underlying nature of the existing systems designated by the OSC would, in fact, be irrelevant.  Indeed, "any" system or network would include both "existing" and "future" systems and networks without a need to distinguish between the two.

The general scope section was not drafted in such a manner.  The phrase "existing and future" described the type of computer systems and communications networks the contractor was expected to encounter during the course of its performance.  The SETS II task order PWS contained detailed descriptions of the "existing" systems designated by the OSC for a reason: it provided offerors with insight into the types of systems and computer networks then-designated by the OSC and implied that any "future" systems and networks that could be designated by the OSC for SETS II support would be of a similar nature.  Tellingly, nowhere are enterprise financial systems named.  See AR 2899 (containing GCE's position that these systems are outside the scope of the SETS II task order); supra Part I.E.6.  With respect to "future" systems, the general scope section noted the OSC's past expansion, but it also indicated that any new systems would not be added arbitrarily.  Rather, the general scope section explicitly indicated that any new systems might result only from "changing regulatory and mission requirements of the Coast Guard . . . ."[99]  AR 532.

---

[99]  The government notes that this provision informed offerors that the "contractor was expected to adapt as the Coast Guard added new systems . . . ."  Def.'s Mot. & Opp'n 17.  The court does not read this provision as requiring the contractor to adapt.  Rather, the general scope section notes that the contractor shall "respond" to changing Coast Guard regulatory and mission requirements.  AR 532.  At no point does the SETS II task order PWS indicate that the contractor must adapt to any changes by performing tasks or providing services not already described in the solicitation.  The government does not dispute this fact.  See Def.'s Mot. & Opp'n 17 ("[T]he task order was limited by the type of work that could be done, i.e., software engineering and technical services, and where the work could primarily be performed, i.e., the OSC.").  In fact, QSS concedes that contractor services were not expected to change over the performance period of the SETS II task order when it argues that "[f]inancial IT services are no different than any other IT services . . . ."  Def.-Intervenor's Mot. & Opp'n 37.  The court construes this provision as merely indicating that changes to the Coast Guard's regulatory and mission requirements might result in the designation of new or additional systems at the OSC, which was consistent with the pattern of expansion that occurred at the OSC between 1991 and 2004.

The government maintains that the general scope section, rather than the background section, established the SETS II task order's scope.  Def.'s Opp'n & Reply 13.  Again, the court disagrees.  The background section, which immediately followed the general scope section, informed offerors that the OSC provided "full life-cycle support for operationally-focused Coast Guard Automated Information Systems" that supported the Coast Guard's five strategic missions, id.; see supra notes 13 & 14 (describing what was encompassed by full life cycle support for systems hosted at the OSC and enumerating the Coast Guard's five missions, respectively).  While it certainly gave offerors "an idea of what the OSC does," Def.'s Opp'n & Reply 13, the background section provided additional information, namely, a context for the type of systems and networks mentioned in the general scope section.  Read together, the general scope and background sections indicated that the contractor was required to provide an array of services to existing and future systems and networks designated by a contractor-operated unit (i.e., the OSC) whose primary function was to provide full lifecycle support for operationally focused Coast Guard systems.  AR 532.  Thus, while the range of general contract services defined within the SETS II task order PWS might have varied among systems depending upon the particular system or network, see supra Part I.D.1.a, it is apparent that these two sections contemplated that any new systems and networks would be of a similar nature as those supported by the OSC at the time of the solicitation.[100]

Indeed, this conclusion is supported by Appendix 5 of the SETS II task order PWS, which, as GCE observes, "impliedly excluded from SETS II's scope any systems that would represent a fundamental qualitative change in the types of systems."  Pl.'s Mem. 13.  The court therefore agrees with GCE that the government's and QSS's reading of the SETS II task order general scope section is overly broad and is little more than a "post-hoc rationale to allow the Government to pour whatever IT support work it desires into the SETS II task order scope, regardless of the nature of the work."  Pl.'s Cross-Mot. & Mot. Perm. Inj. 22.  GCE is correct that the SETS II task order "PWS's references to work on 'future computer systems' had to refer to systems of the same basic kind as the . . . systems already listed."  Id. at 18.  More importantly, the SETS II task order PWS enumerated clearly the totality of "[c]ontractor-provided IT services," AR 532, and simply could not contemplate the future incorporation of "IT-related financial services," id. at 2575, because the Coast Guard itself characterized these services, along with future development requirements for audit-supporting federal financial management systems, as "undefined," id.

---

[100]  Appendix 5 of the SETS II task order PWS, as discussed in Part I.D.1.b, supra, outlined general assumptions that could be made concerning future services and systems, see AR 839-43.  It indicated that no general contract services would be removed and that no changes were anticipated in the outgoing year, though future systems might require "an additional general contract service level or effort."  Id. at 839.  The general contract services contemplated by the SETS II task order were finite and specifically enumerated therein.  See id. at 550-60.  The remainder of Appendix 5 described system sizes, see id. at 840-42, and, according to GCE, "tells bidders . . . that the changes that are expected are limited to changes in staffing levels as new systems are added," Perm. Inj. Hr'g Tr. 15:14-18.

**b.  Modification 30 Added Audit-Supporting Federal Financial Management Systems, Which Differ Substantially From Those Computer Systems Described in the SETS II Task Order**

The parties quibble over the differences between the systems that GCE argues were improperly added to the SETS II task order via Modification 30 and the already-existing systems hosted by the OSC that were described in the SETS II task order PWS.  GCE maintains that the systems described in the SETS II task order are "mission- and operations-related," Pl.'s Mot. Prelim. Inj. & TRO 21, which are fundamentally different from audit-supporting federal financial management systems, Pl.'s Cross-Mot. & Mot. Perm. Inj. 16.  According to GCE, audit-supporting federal financial management systems "are governed by extensive regulatory and statutory requirements, which require support contractors to have experience with FSIO-certified software, knowledge of the regulatory environment in which audited financial systems operate, and subject matter expertise in accounting, budgeting, and procurement."  Id.  The government, however, argues that GCE's contention "finds no support in the task order's language."  Def.'s Opp'n & Reply 10.

The SETS II task order did not define a computer system based upon any specific attribute, programmatic feature, or function, see supra note 98, though the government acknowledges that audit-supporting federal financial management systems were not originally included in the SETS II task order PWS, see Def.'s Mot. & Opp'n 16.  Certainly the SETS II task order could have explicitly included audit-supporting federal financial management systems. Indeed, the Coast Guard's FSTWG began initial planning for the consolidation of information systems, specifically financial information systems, in 2004, a year before the SETS II task order was competitively awarded to QSS.  See supra Parts I.D.2, E.1.  Nothing, therefore, prevented the Coast Guard from explicitly indicating within the SETS II task order PWS that audit-supporting financial information systems might constitute one of the "future" systems to which the SETS II task order PWS obliquely referred.[101]

Regardless, both the government and QSS maintain that the SETS II task order does not distinguish among the types of systems that the OSC hosted.  See, e.g., Def.'s Mot. & Opp'n 18

_____

[101]  Additionally, nothing prevented the Coast Guard from explicitly indicating within the SETS II task order PWS that any future transfer of audit-supporting federal financial management systems to the OSC, which the Coast Guard was apparently investigating as early as 2004, see supra Part I.E.1, might constitute a changing regulatory or mission requirement to which the contractor would respond.  The fact that the SETS II task order PWS was silent comports with (1) GCE's contention that IT services for audit-supporting federal financial management systems was bid separately from other types of IT work both prior to and following the SETS II task order solicitation, see Pl.'s Cross-Mot. & Mot. Perm. Inj. 16-17; supra Part I.A.3.a, and (2) the Coast Guard's own practices and decision to settle upon use of the SETS II task order vehicle to procure financial management systems IT services only after efforts to issue separate solicitations were unsuccessful, see supra Parts I.A.3.b, E.2, E.5.

(maintaining that the SETS II task order "encompasses all types of enterprise-wide mission, administrative, logistical, and financial systems throughout the Coast Guard"); Def.'s Opp'n & Reply 12 ("[T]he SETS II [task order] contained no language limiting the type of 'future computer systems' that may be supported by the task order."); Def.-Intervenor's Opp'n & Reply ("Plaintiff cites no authority for the premise that financial IT systems must be procured by Federal Government agencies separately from all other IT services."); see also Def.-Intervenor's Mot. & Opp'n 30 (indicating that with respect to the broader ITOP II contract, "[n]owhere within the text . . . is there a distinction between financial IT services and all other IT services").  GCE characterizes the government's and QSS's position as follows:

> Now the Defendants want to boil down [the] SETS II [task order] into just two words.  They really just want you to focus on two words in the task order, computer systems, and they say that there's nothing in those two words by themselves that would exclude Federal financial systems[.]

Perm. Inj. Hr'g Tr. 14:12-17.  The government maintains that while GCE

> argues that the only types of systems that could be added to the SETS II task order are "mission, logistical, and administrative systems[,]" . . . GCE fails to define "mission, logistical and administrative systems."  Rather, GCE simply contends that IT support services for an "administrative" system could be added to the SETS II task order, but IT support services for a "financial management system" are outside the scope of the SETS II task order.  It is unclear, however, why a financial management system is not an "administrative" system.[102]

---

[102]   The government suggests that some guidance concerning the distinction between "mission" or "production" work and "administrative" work may be derived from within the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219 (2006), even though it acknowledges that this is not an FLSA case.  See Def.'s Opp'n & Reply 10 ("[T]he FLSA context[] is instructive to provide the Court with at least some guidance as to the definition of a 'mission' and 'administrative' system.").  Utilizing this analogy, the government explains that a "production" or "mission" employee "directly support[s] the mission of the employer . . . , such as working on a manufacturing production line in a plant, or selling a product in a retail establishment."  Id. at 11 (citing 29 C.F.R. § 541.201(a)).  By contrast, the government states, an "administrative" employee "support[s] the management or business functions of an employer, rather than the production function of an employer, through functions such as budgeting, auditing, quality control, procurement, human resources, and accounting."  Id. (citing 29 C.F.R. § 541.201(b)).  Applying this analogy to the Coast Guard, the government contends that

> employees operating search and rescue stations, boat crews performing drug interdiction, employees tending buoys, etc., are mission or production-type workers, while employees such as contracting officers, human resources personnel, accountants, and other employees that prepare the Coast Guard's

Def.'s Opp'n & Reply 10 (footnote added).  Furthermore, the government states that GCE failed to provide any examples of computer systems that would, in fact, fall outside the scope of the SETS II task order:  "According to GCE, the SETS II was a broad contract vehicle that allowed for the addition of IT support services for all types of systems . . . except the system for which GCE had been performing IT support services."  Id. at 10 n.10 (omission in original).  On the other hand, Mr. Bowen, the OSC's SETS II Program Manager, indicated that the "fifty applications that [the] OSC manages are all critical IT applications supporting the daily operations of the Coast Guard in its strategic missions of national defense, maritime safety, and protecting natural resources."  Def.-Intervenor's Mot. Strike Ex. (Bowen Decl. ¶ 5 (emphasis added)).  Yet, neither the government nor QSS explain how audit-supporting federal financial management systems support the Coast Guard's strategic missions of national defense, maritime safety, and protecting natural resources.

Regardless of the term–"operations-focused," "mission-focused," "logistical," or "administrative-supporting"–employed to describe the systems enumerated in the SETS II task order PWS, it is clear, based upon the descriptions contained within the SETS II task order PWS, that these systems advanced the Coast Guard's strategic missions and had no correlation with advancing audit-supporting federal financial management objectives.  The SETS II task order computer systems can be classified based upon their underlying purposes or functions as follows:

•   Logistics data generation or analysis.  AAPS, ATONIS, and I-ATONIS, among other things, generated global positioning information for and to manage aids to navigation data.  See supra Part I.D.1.c.i.  AMVER was a reporting system utilized to assist search and rescue, see supra Part I.D.1.c.ii, and CASP generated probability data used to locate objects adrift at sea and developed to aid search plans, see supra Part I.D.1.c.iv.  GIS provided geospatial data, map services, and images, see supra Part I.D.1.c.xi, and SAN collected, stored, and disseminated information concerning vessels arriving and departing from American ports, see supra Part I.D.1.c.xvi.  SLDMB tracked buoys deployed by surface vessels and aircraft to aid in search and rescue, see supra Part I.D.1.c.xvi, and FLS, among other things, supported logistical needs, see supra Part I.D.1.c.xi.

audited financial statements are administrative-type workers.

Therefore, . . . it follows that mission-type computer systems would be those systems directly supporting the Coast Guard's mission-based activities . . . .  Administrative systems . . . are those types of systems that provide support to the Coast Guard's administrative functions.

Id. at 11-12.  According to the government, "GCE has presented no reason why a financial management system should not be considered an 'administrative system,' which GCE admits that the Coast Guard may add."  Id. at 12.

- Resource management.  AOPS recorded and analyzed resource hours expended by cutters during missions, see supra Part I.D.1.c.iii, and AUXDATA tracked auxiliary activities, performance, and resource management, see supra Part I.D.1.c.iv.

- Compliance facilitation.  C & A ensured that all applications and support systems were certified and accredited in accordance with federal and agency guidelines.  See supra Part I.D.1.c.iv.  BelManage ASM Support, among other things, ensured software-licensing compliance, see supra Part I.D.1.c.v, CM required document and requirement reviews to ensure that all published materials were consistent with agency configuration management policy, see supra Part I.D.1.c.vii, and data center support included, among other things, maintaining performance logs and establishing management procedures, see supra Part I.D.1.c.viii.  MMLD automated maritime licensing and documentation processes.  See supra Part I.D.1.c.xiii.

- Information compilation or data centralization.  BI-EDW served as a central repository for enterprise information captured by several systems.  See supra Part I.D.1.c.v.  EPMO replicated information between production and backup services, see supra Part I.D.1.c.xi, and FLS, among other things, provided an integrated, automated system to support vessel logistical needs, see supra Part I.D.1.c.xi.  LOIS supported various data entry, calculations, functions, graphing, and reporting capabilities, see supra Part I.D.1.c.xiii, and BI-RM monitored, assessed, and managed agency readiness to mine data and report, see supra Part I.D.1.c.xv.

- Technical support or management.  ASG provided technical support for IT infrastructure at the OSC, see supra Part I.D.1.c.iii, and CGHELP comprised an automated help desk available for assistance, see supra Part I.D.1.c.vi.  DRBC support services included developing disaster recovery plans for each system, see supra Part I.D.1.c.ix, while FLS, among other things, incorporated configuration management activities, see supra Part I.D.1.c.xi.  MSN provided management information systems that supported various Coast Guard programs, only one of which was finance.  See supra Part I.D.1.c.xiv.  PB-Views enabled the Office of the Chief of Staff to evaluate COTS packages for feasibility and usefulness, see supra Part I.D.1.c.xiv, and the LAN team provided data communications technical support throughout the OSC, see supra Part I.D.1.c.xii.  EMS provided technical support for IT infrastructure and enterprise business services at the OSC, see supra Part I.D.1.c.xiv, and BI-RM monitored, assessed, and managed agency readiness to mine data and report, see supra Part I.D.1.c.xv.  SAM provided information about the Coast Guard

facilities and civil engineering, and assisted in management of engineering programs.  See supra Part I.D.1.c.xv.  SPERTT, among other things, performed troubleshooting and analyzed system performance, see supra Part I.D.1.c.xvii, and the SRM team built, tested, and managed applications for system backups, monitoring, and storage, see supra Part I.D.1.c.xvii.

- Technological assessment.  The ETTT researched, prototyped, integrated, and developed new technologies and assisted the Coast Guard in keeping abreast of the most recent technologies.  See supra Part I.D.1.c.x.

- Personnel information processing.  TMT assisted units with planning, tracking, and reporting personnel and unit level training activities, see supra Part I.D.1.c.iii, and HMI served the Coast Guard's housing community and, among other things, tracked occupancy and provided information for ease of transfers for personnel, see supra Part I.D.1.c.xii. MMLD automated records and employment information for each United States mariner.  See supra Part I.D.1.c.xiii.

- Communications.  CGLS served as a mailing list manager to facilitate electronic mail messaging.  See supra Part I.D.1.c.vi.  CGRC, among other things, provided access to Coast Guard recruiting centers across the United States and facilitated messaging and other electronic mail communications.  See supra Part I.D.1.c.vii.  DIRSERV provided critical electronic mail relay and directory services to the DHS, see supra Part I.D.1.c.ix, POP managed connectivity to the Internet, see supra Part I.D.1.c.xv, and WEB Services provided intranet and internet web content information, see supra Part I.D.1.c.xvii.

- Maintenance.  Data center support included, among other things, monitoring and adjusting computer room air handling equipment to maintain temperature and humidity specifications.  See supra Part I.D.1.c.viii.  CITRIX provided services for system management and data center support for the CITRIX system, and CMPLUS, among other things, enabled cutters and shore units to manage configuration, maintenance, and supply information.  See supra Part I.D.1.c.viii.

- Requisitioning and inventorying.  BelManage ASM Support, among other things, provided real-time data for hardware and software assets, supra Part I.D.1.c.v, and VDS captured documentation information for United States-owned vessels, see supra Part I.D.1.c.xvii.  FLS incorporated procurement and supply activities and their associated financial transactions.  See supra Part

-113-

> I.D.1.c.xi.  ARMS received, processed, and forwarded requisitions
> for filing, and generated obligation accounting data for transmittal
> to the Coast Guard's Oracle Federal Financials accounting system.
> See supra Part I.D.1.c.iii.

The SETS II task order PWS gave no indication that any of these systems functioned in a manner that produced information subject to statutory and regulatory requirements or contributed to the generation of any type of audited financial material.[103]  Cf. Pl.'s App. 331-35 (containing the PBGC's 2005 solicitation and statement of work, which required, among other things, use of Oracle Federal Financials (an FSIO-certified financial software suite, as discussed above), as well as financial reporting that complied with generally accepted accounting principles and federal government accounting guidelines), 366 (containing the EPA's 2006 solicitation that sought, among other things, to "[p]roduce reliable reports on the Agency's reported financial condition"), 437-50 (containing the FCC's 2007 solicitation, which sought, among other things, "[a]n integrated core financial management system that meets FSIO and FCC-specific requirements as well as the financial management system requirements set forth in Section 7 of OMB Circular A-127"), 731-32 (containing the Coast Guard's 2004 solicitation for financial management systems work, which required that the offeror demonstrate work experience with Oracle Federal Financials), 765 (containing the Coast Guard's 2005 RFP for FPD/CIMS, which described audit remediation tasks designed to "correct faults or deficiencies in FPD or CIMS as a result of audits conducted by the [GAO], [DHS,] or other organizations with oversight responsibility").

       In fact, only a few of the SETS II task order system descriptions included references to a financial component.  Mr. Bowen identified three such systems: HMI, MSN, and NESSS.  Def.-Intervenor's Mot. Strike Ex. (Bowen Decl. ¶ 6).  In addition to those three, the court notes that FLS and ARMS also appear to incorporate some type of financial component.  At best, then, only five of the systems described in the SETS II task order PWS incorporated any type of financial component.  Furthermore, none of these systems exclusively processed financial information.  For example, "finance" was only one element–indeed, it was the last program listed among a total of six–of MSN.  AR 600.  ARMS tracked requisition transactions sent by other systems and generated data that ultimately was sent to separate financial systems for processing.  Id. at 568.  FLS captured financial transactions to the extent that they were associated with procurement and supply activities.  Id. at 592.  While the court does not question Mr. Bowen's knowledge of the OSC's systems, the SETS II task order PWS did not explicitly indicate that either HMI or

---

[103]  GCE asserts: "[T]he SETS II solicitation did not refer to any [of] the regulations governing federal financial management systems, or require specialized expertise with these systems, for the simple reason that none of the forty-plus systems listed in [the] SETS II [task order] is an audit-supporting FSIO-certified financial management system."  Pl.'s Mot. Prelim. Inj. & TRO 21.

NESSS incorporated any financial material.[104]  See id. at 594-95, 602-04.  Mr. Winslow acknowledges that "[a] few systems have secondary financial type components," but notes that he

> do[es] not believe that any of the systems hosted by [the] OSC, including those that perform secondary financial functions, use Oracle Federal Financials or any other FSIO-certified financial software, require[] configuration in accordance with the regulatory and statutory requirements applicable to core financial management systems, or is a financial management system of record that produces financial statements that are annually audited pursuant to law.

Pl.'s App. 43 (Winslow Decl. ¶ 48).  Thus, "[a]lthough a few of these systems may feed financial data into the Coast Guard's core financial system (i.e.[,] CAS), none of the SETS II systems produce audit-ready financial statements."  Pl.'s Mot. Prelim. Inj. & TRO 21.

In this regard, the SETS II task order PWS is not unlike the contract for word processing and related equipment considered by the GAO in CPT Corp., B-211464, 1984 WL 46202 (Comp. Gen. June 7, 1984).  In that protest, CPT Corp. alleged that the State Department improperly modified a contract via amendments that were outside the scope of the original procurement.  Id. at *1-2.  The GAO sustained the protest, in part, because the State Department "significantly altered the conditions under which the work was to be performed by including domestic as well as overseas installations . . . ."  Id. at *3.  The GAO's analysis of the original procurement–and a telegraphic amendment that advised offerors to consider "North American and Greenland posts as falling within" one of the option areas that divided the State Department's overseas facilities–indicated that the State Department identified only overseas facilities: "[t]he facilities . . . were all outside the United States, and the RFP clearly stated that the intent of the procurement was to provide word processing to meet the requirements of overseas foreign service posts."  Id.  Thus, the GAO concluded that "[w]hile it would seem reasonable in view of the amendment to construe 'overseas' as including neighboring foreign countries, we cannot see how offerors could have been expected to characterize [the] State [Department's] Washington, D.C. offices as either foreign or overseas."  Id.; see also id. (noting that the RFP did not contain any estimated requirements for domestic installations).  As such, the GAO determined that the solicitation contemplated only the inclusion of Canadian and Mexican installations, and not any domestic installations.  Id.

Here, the systems that were listed in, as well as future systems contemplated by, the SETS II task order PWS are, in fact, similar to the State Department's enumeration of installations in the procurement at issue in CPT Corp.  The State Department's solicitation identified and

---

[104]  Mr. Bowen previously served in the Coast Guard, Def.-Intervenor's Mot. Strike Ex. (Bowen Decl. ¶ 4), and has, since September 1996, been program manager for various Coast Guard IT contract vehicles at the OSC, beginning with the O & M II contract in 1996, and continuing through the SETS I and SETS II task orders, id. (Bowen Decl. ¶ 2).  Mr. Bowen currently manages a team of approximately [. . .] IT professionals.  Id. (Bowen Decl. ¶ 4).

addressed only its overseas facilities, which did not include services for any of its domestic facilities, much like the SETS II task order PWS only identified and addressed systems that incorporated no type of financial component or contributed to the (1) processing of audit-supporting federal financial management system data or (2) generation of a related deliverable. In short, to the extent that the SETS II task order PWS described systems that incorporated financial components, such components were incidental to the systems' other, primary functions and were not related to the generation or maintenance of financial or accounting data that was subject to federal accounting or financial audit standards. Significantly, nowhere did the SETS II task order PWS characterize any of these systems as "highly complex," a term that was employed in Modification 30 to describe CAS. See AR 2312, 4139.

Although to the government and QSS "it would appear 'to be perfectly clear and unambiguous' that the ordinary meaning of 'computer systems' includes 'financial management systems,'" Def.'s Opp'n & Reply 18, the Coast Guard itself avoided utilizing the EAGLE vehicle to procure audit-supporting federal financial management systems and related work, in part, because "the EAGLE contract vehicle requires issuance of new task orders for any new requirements that are out of scope of an existing PWS." AR 2575. The Coast Guard's needs related to audit-supporting federal financial management systems were "undefined," id., and it is clear that the SETS II task order specifically defined the systems encompassed therein. Regardless of the moniker that the parties wish to attach to the systems described within the SETS II task order PWS, each system is qualitatively similar in that it has little or no connection with a system that performs or advances audit-supporting federal financial management services. The court concludes, as a matter of law, that Modification 30 added systems that were not contemplated by the SETS II task order and fall outside the scope of those systems either hosted by or forecasted to be added to the OSC.

The question remains whether Modification 30 affected the scope of the contractor-provided IT support services encompassed by the SETS II task order PWS. The government and QSS argue that these services were identical. See, e.g., Def.-Intervenor's Opp'n & Reply 18 (arguing that a conclusion that audit-supporting federal financial management systems differ from other computer systems "would avail Plaintiff nothing since, even though the system might be different[,] . . . the services are the same"). Thus, the court addresses whether Modification 30 substantially changed the type of work to be performed under the original SETS II task order. See HDM Corp. v. United States, 69 Fed. Cl. 243, 254 (2005).

**c. Modification 30 Substantially Changed the Type of Services to Be Performed Under the SETS II Task Order by Adding Audit-Supporting Federal Financial Management Systems**

Both the government and QSS maintain that Modification 30 effected no change to the nature of contractor-provided services for any computer system described in the SETS II task order PWS. See, e.g., Def.'s Mot. & Opp'n 21 ("The types of services provided for in Modifications 30 and 32 were the same types of services provided for in the SETS II task order, but servicing a different system."); Def.-Intervenor's Mot. & Opp'n 12 ("Numerous

Mod[ification] 30 labor categories match the PWS work elements in the SETS II task order."); Def.-Intervenor's Opp'n & Reply 18 ("The work added to the SETS II task order by Mod[ification] 30 was the same type of work that the SETS II task order RFP anticipated . . . ."). Furthermore, QSS asserts that GCE "has advanced <u>no argument concerning any statutory or regulatory prohibition on including financial IT services with other IT services.</u>"  Def.-Intervenor's Mot. & Opp'n 30.  The government notes that Modification 30 linked "types of services regarding the financial management system to the types of services called for by the task order."  Def.'s Mot. & Opp'n 22.  <u>Compare</u> AR 543-60, <u>with id.</u> at 4141 (indicating that financial management systems, like other SETS II task order systems, required that the contractor provide general contract services, functional area management, software development and maintenance, hardware maintenance, system administration, database administration, network administration, data management, system downtime, system documentation, system transition, computer system fielding, application system training, and technical field support).  Thus, according to the government, "[t]he financial management systems section . . . lists duties . . . [that] are the same types of general duties listed in the General Scope section and services sections of the original performance work statement."  Def.'s Opp'n & Reply 14.

QSS proffers a chart, reproduced here as Table 1, to support its and the government's position that the services encompassed by Modification 30 were identical to those contained in the original SETS II task order PWS:

**Table 1**

| SETS II RFP Performance Work Statement | Mod[ification] 30 Performance Work Statement |
|---|---|
| •       Project management | •       Project management |
| •       Software development | •       Software development |
| •       Application system training | •       Training |
| •       Configuration management | •       Configuration management |
| •       Software upgrade & maintenance | •       Software bugs correction |
| •       System & network administration | •       Incidental administration |
| •       Hardware upgrade & maintenance | •       Technical maintenance |
| •       System transitions | •       Migration |

| | | | |
|---|---|---|---|
| • | Database administration | • | Database administration support |
| • | Quality assurance | • | Trouble-shooting |
| • | Application technical field support | • | Technical analysis/assistance |
| • | Customer hotline support | • | User support |

Def.-Intervenor's Opp'n & Reply 18-19 (comparing AR 532 with AR 2312).  QSS offers no explanation as to how the underlying services are identical and instead merely correlates broad headings based upon similar language ("configuration management") or terms that appear to possess similarities ("transitions" with "migration" or "upgrade & maintenance" with "bugs correction").  This alone, of course, tells little about what those services actually entailed for each system.[105]

QSS does not account for all contractor-provided services that were required by Modification 30.  The contractor was required to provide "complete Software Development Life Cycle . . . services[, which] include[d], but [we]re not limited, to" planning, requirements, analysis, design, development, integration, testing, delivery, and complete documentation.  AR 4140 (containing the SETS II task order PWS, as modified through Modification 31) (emphasis added).  It is unclear under which of QSS's umbrella categories these services (i.e., "delivery") might fall.

More significantly, neither the government nor QSS accounts for differences between the contractor-provided services enumerated in Modification 30 and those contained in the original SETS II task order PWS.  The SETS II task order PWS contained an exhaustive list of twenty-eight services, see id. at 532; supra Part I.D.1.b, which included:

> SETS II project management, system life cycle management, software
> engineering, software development, software upgrade and maintenance, quality
> assurance, configuration management, security, hardware upgrade and
> maintenance, hardware/software integration, database administration, system
> administration, network administration, data management, computer operations,
> technical writing services, customer hotline support, computer system fielding

---

[105] An example that illustrates how a broad description fails to capture the specific tasks required to be performed thereunder is exemplified by "legal" services.  Legal services for one client might involve drafting a will or estate plan, whereas legal services for another client might require instituting or defending litigation.  In both cases, counsel perform "legal services," though the nature of those services is diverse and requires both different skills and levels of expertise.

services, application system training, application technical field support, data center environmental monitoring and control, data center analysis and capacity planning, data center infrastructure reconfiguration, disaster recovery business continuity support, technical reference library support, property management, magnetic media support, and system transitions.

AR 532.  Modification 30 listed, as noted in Part I.E.5.a, supra, twelve services: "a wide-range of Federal Financial Information Technology (IT) system development, software development, technical maintenance, project management, audit remediation, technical assistance, administration, software maintenance, configuration management, migration, user support, and database administration support."  AR 4140.  Although several services are present in both lists, see Def.'s Opp'n & Reply 14, the government and QSS ignore significant differences.  The original SETS II task order PWS did not include "a wide-range of Federal Financial Information Technology (IT) system development" services, "technical maintenance" services, "audit remediation" services, "technical assistance" services, "migration" services, "user support" services, and "database administration support" services.  Compare AR 532 (describing services encompassed by the original SETS II task order PWS), with id. at 4140 (describing services encompassed by Modification 30).  If some of these services overlapped with or were, in fact, identical to those described in the original SETS II task order PWS, then the Coast Guard could have–and, indeed, would have–maintained consistency and utilized the same terminology to describe similar services.  That it did not do so indicates some type of variance between the services.  Even assuming that the majority of the Modification 30 services overlapped with or was identical to the original SETS II task order PWS services, neither the government nor QSS explains the conspicuous absence of federal financial IT system development and audit remediation services from the latter description.  Cf. Def.'s Opp'n & Reply 20 ("We do not claim that the SETS II task order expressly included the financial management system.").  It is therefore apparent that these services were specific to audit-supporting federal financial management systems, and the original SETS II task order PWS, however broadly drafted, never contemplated the inclusion of these systems and their related services.

Instead, the government focuses upon general similarities in labor categories, summarized in Table 2 below.[106]  Neither it nor QSS offers specifics to indicate that the underlying, substantive work was identical:

_____

[106] The court notes that the government's chart, which is included in its motion and opposition, see Def.'s Mot. & Opp'n 21-22, is a reproduction of a chart contained in the Coast Guard's legal memorandum and request for denial that was submitted before the GAO.  See AR 280-84.  Neither the government's chart nor its previous iteration in the original legal memorandum explains how these labor categories are similar.  Rather, the Coast Guard's legal memorandum argues conclusively that a comparison "demonstrate[s] that Modification 30 is clearly within scope[.]"  Id. at 284.

**Table 2**

| Modification 30 Labor Categories (AR 2711) | SETS II [Task Order PWS] Elements (AR 532) |
| --- | --- |
| Applications Programmer | Applications Systems Training Applications Technical Field Support |
| Communications Network Specialist | Network Administration |
| Configuration Management Specialist | Configuration Management |
| Data Analyst | Data Management |
| Database Analyst | Database Administration |
| Document Management Specialist | Data Center Environmental Monitoring and Control Magnetic Media Support Technical Reference Library Support |
| FAM (Functional Area Manager) | Project Management |
| Software Systems Specialist | Software Engineering Software Development Software Upgrade and Maintenance Hardware/Software Integration System Transitions |
| Systems Analyst | System Transitions |
| Systems Administator/Operator | System Administration Computer Operations |
| Word Processor | Technical Writing Services |

Def.'s Mot. & Opp'n 21-22 (arguing that the original SETS II task order PWS labor categories were the same as those enumerated in Modification 30); see also Def.-Intervenor's Mot. & Opp'n 12 (containing a similar comparison of labor categories). Yet, the SETS II task order PWS did not require that the contractor possess or utilize any special expertise. Instead, the contractor was required to submit a proposal consisting of (1) a "technical approach for satisfying the requirements of this solicitation," AR 792, (2) position descriptions for each labor category (including minimum qualifications), id. at 793, and (3) past performance information that

"should be as close as possible to a type of work and size comparable to the requirements" in the SETS II task order PWS, id. at 794.  By contrast, Modification 30 required that the contractor "provide software development and technical expertise for the maintenance and support" of numerous financial systems, including but not limited to, Oracle Federal Financials, FPD, FPD-to-go, CIMS, Sunflower, and Informatica.  Id. at 4141-42 (emphasis added).  Although the government notes that "some of the contractor's employees may need to have specialized knowledge of the system upon which they were working," Def.'s Opp'n & Reply 15, the example it cites–functional area managers who must be "'technically qualified to manage and supervise the day-to-day operation and coordination of their respective specialties, services[,] and staffs,'" id. (quoting AR 550)–falls short of demonstrating the similarities between an individual who was "technically qualified" for management-related tasks and a contractor employee who demonstrated "technical expertise" with financial systems work.[107]  Moreover, the Coast Guard's August 2007 solicitation explicitly sought a contractor with "extensive knowledge" of Oracle software and a "comprehensive understanding of best practices for accounting and financial reporting," AR 2820; supra Part I.E.4, thereby suggesting that audit-supporting federal financial management systems services do require some type of specialized knowledge.

Indeed, it is clear from the administrative record in this case that audit remediation services are "significantly different in many respects," Neil R. Gross & Co., 1990 WL 269546, at *2, from the broad categories of services contained in the original SETS II task order PWS.  First, as noted above, the language utilized in Modification 30 differed from the language utilized in the original SETS II task order PWS.  This, alone, is significant and reflects differences in the services originally contemplated and those added later.  Second, Mr. Muslimani indicates that audit remediation services "work is generally centered around correctly configuring a COTS application like Oracle Federal Financials to meet financial management system requirements and regulations, while mission systems support of Coast Guard legacy software applications is more software development focused and is centered upon government owned and developed software." Pl.'s App. 924 (Muslimani Supp'l Decl. ¶ 7).  According to Mr. Winslow, financial management system audits "involve[] assessing the compliance of these systems against the laws and regulations applicable to federal financial systems,"[108] id. at 938 (Winslow Supp'l Decl. ¶ 5),

---

[107]  Although QSS proffers one of GCE's contracts awarded under GSA Schedule 70 to illustrate its position that the services at issue in this case are not special or unique and therefore fall within the scope of the SETS II task order, see Prelim. Inj. Hr'g Tr. 82:7-83:8, the labor categories do contemplate expertise in financial systems, see Def.-Intervenor's Opp'n & Reply App. Ex. D (describing the position of Oracle Federal Financials Database Administrator II as providing "technical expertise and guidance in the logical and physical database configuration, operations, and maintenance of Oracle Financial systems" (emphasis added)).

[108]  According to GCE, "there are over fifty government-wide accounting standards, laws, regulations, and other guidance applicable to 'Core financial system requirements.'" Pl.'s Mem. 18.  These laws and regulations include the: (1) Chief Financial Officers Act of 1990; (2) Clinger-Cohen Act of 1996; (3) Federal Managers' Financial Integrity Act of 1982; (4) FSIO and

and therefore require "subject matter expertise in federal accounting, budgeting, finance, procurement, and related fields[, which is] necessary to carry out the functional and technical requirements of FSIO-certified financial management systems, including the basic maintenance of the applications that [comprise] the Coast Guard's audit-supporting financial management system," id. at 41 (Winslow Decl. ¶ 40); see also Pl.'s Mem. 10 (asserting that "audit-supporting financial management systems . . . demand[] that contractors have experience with FSIO-certified software, knowledge of the regulatory environment in which audited financial systems operate, and subject matter expertise in accounting, budgeting, and procurement"). Third, GCE maintains that solicitations for audit-supporting federal financial management systems IT work "regularly include[]" requirements related to FSIO-certified software products, subject-matter expertise, and technical expertise.[109] Pl.'s App. 42 (Winslow Decl. ¶ 45). But see Def.-Intervenor's Mot. Strike Ex. (Bowen Decl. ¶ 7 (asserting that his team members "have never been required to be masters of a particular subject matter of the IT applications that they manage, but rather must understand and manage the technical aspects . . . for those applications")).[110]

---

OMB Common Government-wide Accounting Classification Structure; (5) Government Management Reform Act of 1994; (6) Treasury Financial Manual; (7) OMB Circular A-123, Management Accountability and Control; (8) OBM Circular A-127, Financial Management Systems; and (9) OMB Circular A-130. Pl.'s App. 40 (Winslow Decl. ¶ 34); see also id. (Winslow Decl. ¶ 33 (indicating additional applicable federal accounting standards, including those issued by the Federal Accounting Standards Board, and the United States Government Standard General Ledger)). Modification 30 provided: "This support is required to implement, maintain[,] and comply with: federal financial management systems requirements; applicable federal accounting standards; and the United States (US) Government Standard General Ledger at the transactional level for the [Coast Guard] as well as the [DHS] component agency entity's financial and mixed IT systems." AR 4140 (emphasis added).

[109] For example, GCE notes that QSS, after the Coast Guard issued Modification 30, advertised positions on the Internet seeking individuals who possessed expertise with audit-supporting federal financial management systems. See, e.g., Pl.'s App. 866 (containing QSS's advertisement for a "Technical Lead" position and a specific preference for candidates with Oracle Federal Financials experience), 867-68 (containing QSS's advertisement for a "Systems Accountant" position and a specific preference for candidates with "Oracle Financials, financial system experience"), 869-70 (containing QSS's advertisement for an "Applications Programmer" position with requirements that candidates, among other things, "[m]ust have functional experience with Oracle/Oracle Federal Financials" and "[e]xcellent technical and functional knowledge of Oracle Federal Financial modules," and stating that "[f]ederal accounting/financial Management systems would be a plus").

[110] In support of this statement, Mr. Bowen offers an example concerning the Coast Guard's Dining Facilities Automated Management System ("DFAMS"), which "focuses [on] inventory management and food ordering for Coast Guard dining facilities worldwide." Def.-Intervenor's Mot. Strike Ex. (Bowen Decl. ¶ 8); see also AR 4135-36 (indicating that DFAMS

The government and QSS have neither refuted GCE's claims that the services associated with audit-supporting federal financial management systems are distinct from the numerous other services included in the SETS II task order PWS nor explained why these differences did not substantially change the type of work performed under the contract.  Indeed, QSS's own advertisements for personnel support GCE's argument that "[i]f an 'applications programmer' could, as the government's theory would posit, be expected to perform any kind of programming, it would not have been necessary to target those applications with (FSIO-certified) Oracle Financials and the associated financial management systems expertise."  Pl.'s Cross-Mot. & Mot. Perm. Inj. 24; see supra note 109.  In short, the government and QSS have failed to refute GCE's argument, which finds support in the administrative record, that an audit-supporting federal financial management system differs from the type of computer system described in and covered by the SETS II task order PWS.

After careful examination of the SETS II task order PWS and the terms utilized therein, the court concludes, as a matter of law, that the addition of audit-supporting federal financial management systems to the SETS II task order via Modification 30 substantially changed the type of services that the contractor was required to perform under the original SETS II task order.[111]  The "OSC was not supporting a financial management system when the SETS II task order was issued," Def.'s Opp'n & Reply 20, and nowhere did the SETS II task order PWS contemplate the addition of a "complex set" of products that comprised the Coast Guard's financial management systems, AR 4139.  Although these systems may have required the contractor to perform many of the services identified in the original SETS II task order PWS, see id. at 4140-41, they also required that the contractor perform additional services, namely wide-range federal financial IT system development and audit remediation, that were outside the scope of those services identified in the original SETS II task order PWS.

---

was added to the SETS II task order).  Mr. Bowen states:

> Although the Coast Guard veterans on our team have eaten at Coast Guard dining facilities during their careers, management of DFAMS, in my experience, has never required any personal understanding of the operations of such facilities, and my team has relied on dining facility experts in the Coast Guard to manage the application.

Def.-Intervenor's Mot. Strike Ex. (Bowen Decl. ¶ 8).  According to Mr. Winslow, Mr. Bowen's statement highlights the difference between the work completed at the OSC and the work performed by GCE for the Coast Guard because GCE staff, unlike Mr. Bowen's staff, "must know the invoicing business process and the financial impact of the invoicing business processes, including the . . . transaction codes and general ledger accounts" when working with the Coast Guard's CAS."  Pl.'s App. 939 (Winslow Supp'l Decl. ¶ 7).

[111]  As discussed in Part I.E.5.b, supra, the Coast Guard, via Modification 32, exercised option period 3 for the period spanning January 1, 2008, through December 31, 2008.  AR 3963.

**3.  A Reasonable Offeror Would Not Have Anticipated That Audit-Supporting Federal Financial Management Systems Under Modification 30 Would Fall Within the SETS II Task Order's Changes Clause**

As the <u>HDM Corp.</u> court explained, "[a] modification generally falls within the scope of the original procurement if potential bidders would have expected it to fall within the contract's changes clause."  69 Fed. Cl. at 257.  Thus, the question remains whether "a potential contractor bidding on the original [SETS II task order] contract . . . would not have anticipated that it could also be called upon under the changes clause to provide" audit-supporting federal financial management system services.  <u>CW Gov't Travel, Inc.</u>, 61 Fed. Cl. at 574.  The government and QSS contend that a reasonable bidder, based upon the plain language of the SETS II task order PWS, "should have anticipated that financial management systems could be added to the types of systems supported by the SETS II task order."  Def.'s Mot. & Opp'n 22; <u>see also</u> Def.-Intervenor's Mot. & Opp'n 29 (emphasizing that the Coast Guard "advised potential offerors of the room for growth").  GCE argues to the contrary, asserting that "[t]here is nothing in the language of [the] SETS II [task order] that would put a bidder on notice that its engagement could reasonably be modified to include the financial systems work heretofore universally bid out in separate procurements."  Pl.'s Mot. Prelim. Inj. & TRO 25; <u>see also</u> Pl.'s Cross-Mot. & Mot. Perm. Inj. 16 (arguing that "no potential bidder would have thought that a mission- and administrative- systems procurement like [the] SETS II [task order] might silently encompass audit-supporting financial systems work as well").  Indeed, GCE contends that aspects of the SETS II task order, when read as a whole, "indicated to the sophisticated community of potential bidders that future modifications to [the] SETS II [task order] would not encompass IT work for audit-supporting financial management systems."  Pl.'s Mem. 12-13.

It is undisputed that the SETS II task order PWS alerted prospective offerors to the possibility that additional systems might be hosted by the OSC during the life of the contract.  Thus, the court agrees with the government's assessment that the SETS II task order PWS "accounted for the possibility that the contractor <u>could</u> be required to provide software engineering and technical services for <u>any computer system that the Coast Guard designated to be supported by the OSC</u>."  Def.'s Opp'n & Reply 20 (second emphasis added).  Yet, the government emphasizes that "the plain language of the SETS II task order" placed "no limit upon the types of the systems that may be added," Def.'s Mot. & Opp'n 22, even as it departs from that plain language by substituting the term "any" for "existing and future," <u>see</u> Def.'s Opp'n & Reply 20.  Notwithstanding the government's and QSS's arguments to the contrary, the SETS II task order PWS did not alert offerors of a virtually limitless expansion, so while the contractor could be required to perform particular services for any computer system designated by the OSC, the SETS II task order PWS did not indicate to offerors that all computer systems, whether enumerated in the SETS II task order PWS or otherwise, could, in fact, be designated.

First, as the court explained in Part IV.D.2.a-b, <u>supra</u>, the changes clause contained in Appendix 5 did not alert offerors to the fact that future systems could be of a different nature than those already hosted by the OSC.  Appendix 5 was limited in scope, a fact that GCE states

"makes this case very different from the typical one in which a modification is upheld on the changes clause." Pl.'s Mem. 13.  Here, Appendix 5 addressed changes–the addition of future systems–on the basis of size.  AR 839.  Indeed, QSS concedes that future systems were referenced "simply by size."  Def.-Intervenor's Opp'n & Reply 19.  Rather than simply informing prospective bidders that small, medium, and large systems might be added to the OSC, Appendix 5 went further by explicitly likening future systems to then-existing systems hosted by the OSC: "For purposes of estimating, a small system can be <u>assumed to be most like CASP or SLDMB</u>. A medium system can be <u>assumed to be most like ASG or MMLD</u>.  A large system can be <u>assumed to be most like FLS</u>."  AR 841 (emphasis added).  These comparisons demonstrate that the SETS II task order PWS contemplated the addition of systems that were similar to the systems already hosted by the OSC in both size and nature.  <u>See also</u> <u>id.</u> at 839-41 (containing a chart of SETS II task order PWS systems and their sizes).  If the Coast Guard contemplated that the nature of future systems would vary from those the OSC hosted, then offering these comparisons would have been unnecessary.  The court therefore rejects the government's interpretation of this provision and agrees with GCE that the changes clause "would have suggested to potential SETS II bidders that future systems would be limited to systems of a different size," Pl.'s Mem. 13, and did not leave open the possibility for the addition of other system types.

Additionally, Appendix 5 informed offerors that "future systems may require <u>an additional general contract service level or effort</u>."  AR 839 (emphasis added).  All general contract services were defined in the SETS II task order PWS, <u>see</u> <u>id.</u> at 543-50, and Appendix 5 anticipated all of the services–functional area management, customer hotline support, software development and maintenance, hardware maintenance, system administration, database administration, network administration, data management, system downtime, technical writing, system transition, computer system fielding, application system training, and technical field support–that any new systems would require, <u>id.</u> at 842-43.  Significantly, neither "audit remediation" nor any other service the court identified in Modification 30 as not corresponding to the services contained in the original SETS II task order PWS, <u>see</u> <u>supra</u> Part IV.D.2.c, was listed in Appendix 5.  As such, potential offerors would not have anticipated that these additional services could have been added through future modifications.

Second, other portions of the SETS II task order PWS confirm that potential offerors would not have anticipated that audit-supporting federal financial management systems and related services might be incorporated into the SETS II task order.  As the court explained in Part IV.D.2.a, <u>supra</u>, the general scope and background sections provided offerors with a context for the type of systems the OSC hosted and would continue to host in the future.  Neither section left the possibilities for future types of systems open-ended to the degree that the government and QSS suggest.  The various system descriptions themselves alerted potential offerors to the type of systems hosted by the OSC, <u>see</u> <u>supra</u> Parts I.D.1.c.i-xvii, and the SETS II task order PWS did not reference any system that served a function or purpose other than to advance the Coast Guard's strategic missions.  Furthermore, the Coast Guard itself did not know with certainty what its requirements for audit-supporting federal financial management systems would be, <u>see</u>

supra note 43, so it follows that offerors certainly would not have known and would not have been able to anticipate that the SETS II task order PWS would incorporate these systems and related services.  In short, upon consideration of the plain language of the SETS II task order PWS, the court agrees with GCE that audit-supporting federal financial management systems "do not fit [the] profile," Pl.'s Mem. 15, of systems contemplated by the SETS II task order PWS and concludes, as a matter of law, that potential offerors would not have anticipated the addition of these systems and their related services.

Third, the evidence proffered by GCE related to "the universal practice among federal agencies around the time of the SETS II solicitation . . . to bid financial management systems IT work separately from other kinds of IT work in separate procurements," Pl.'s Cross-Mot. & Mot. Perm. Inj. 16-17, further supports the court's conclusion.  The court may rely upon this evidence to ascertain how potential bidders on the SETS II task order would have viewed the scope of the solicitation.  Indeed, as the CW Government Travel, Inc. court observed with respect to the addition of "traditional travel services" to contracts for travel management services using an automated travel management system known as the Common User Interface ("CUI"),

> [n]ot only does the contract language show that Northrop Grumman and the Government intended at the time of contract formation that traditional travel services would not be required under the . . . contract, the course of dealings during performance confirms this interpretation. . . .
>
> . . . .
>
> . . . [A] potential contractor bidding on the original contract to deploy and provide travel services using a CUI would not have anticipated that it could also be called upon . . . to provide traditional travel services.  This is especially true because at the time of contract formation there were already contracts in place for traditional travel services.  Furthermore, no provider of traditional travel services bid on the original contract.  The industry view, therefore, was that such services were not within the scope of the original procurement.  The addition of traditional travel services significantly altered the type of work to be performed under the contract.

61 Fed. Cl. at 572-74 (emphasis added).  The same is true in this case.  Here, the SETS II task order PWS language indicates, as discussed above, that audit-supporting federal financial management systems and services fall outside the scope of that solicitation.  This conclusion is supported by both the Coast Guard's and other agencies' previous procurement practices.  While the government and QSS contend that GCE's industry view evidence is irrelevant, the government nevertheless acknowledges that it "merely prove[s] that the Coast Guard sometimes procured IT support for financial management systems separately from IT support for other systems." Def.'s Opp'n & Reply 19.  Yet, GCE has not argued, contrary to QSS's assertion, that financial systems "must be procured by Federal Government agencies separately from all other

IT services."[112]  Def.-Intervenor's Opp'n & Reply 23 (emphasis added).  Instead, GCE proffered
examples of "solicitations solely for IT support for financial management systems," Def.'s Opp'n
& Reply 19, to illustrate what it argues was an industry practice of procuring services
separately.[113]  This evidence is therefore relevant and highly probative–it "shows a consistent
government practice, both before and after SETS II, of acquiring audit-supporting financial
management IT systems separate from IT services for other computer systems," Pl.'s Mem. 16
(emphasis added)–and does not, contrary to QSS's argument, "'create an ambiguity where none
exists,'" Def.-Intervenor's Opp'n & Reply 23 (quoting Pete Vicar Ge. Constr., Inc. v. United
States, 51 Fed. Cl. 161, 167 (2001)).  Instead, it merely confirms what the plain language of the
SETS II task order PWS reflected: that a prospective bidder would not have read the SETS II task
order PWS, which described the various systems hosted by the OSC, to include within the scope
of the solicitation services for audit-supporting federal financial management systems.  See Pl.'s
Mem. 17 (indicating that GCE's evidence "illustrates the Government's understanding of [the
SETS II task order], and further confirms that a reasonable bidder would, given [the] SETS II
[task order's] silence on the matter, have seen the task order[] as not contemplating financial
management systems work").

_____

[112]  QSS notes that "the Government can vary the norm in the trade when contracting for
goods and services–even if we were to accept that a niche market for financial IT services
existed . . . ."  Def.-Intervenor's Opp'n & Reply 24; see also id. at 23-24 (discussing Federal
Circuit precedent, namely Jowett, Inc. v. United States, 234 F.3d 1365 (Fed. Cir. 2000), in
support of this argument).  However, as the court previously noted, the Coast Guard apparently
did not vary from this norm.  See supra note 101; see also Compl. ¶ 52(e) (alleging that the Coast
Guard "itself has consistently procured financial system services through competitions conducted
in parallel with–and separate from–SETS II . . . without ever giving any indication that the two
might one day be combined"); Prelim. Inj. Hr'g Tr. 6:23-7:4 (stating that (1) the Coast Guard
"for years had never bid these kinds of IT work together in one solicitation," (2) audit-supporting
federal financial management systems services "had been on parallel and separate tracks," and
(3) "more broadly than the Coast Guard, this was a universal practice among virtually all federal
agencies").

[113]  The Coast Guard's conduct was consistent with this practice since it distinguished
between companies that provided audit-supporting federal financial management services, see
AR 2576-77; supra note 7 and accompanying text, and those that provided general IT services,
see AR 512; supra note 27 and accompanying text.

**4. The Coast Guard's Issuance of Modifications 30 and 32 to the SETS II Task Order Extended the Ordering Period of the ITOP II Contract**[114]

GCE has demonstrated that audit-supporting federal financial management systems were substantially different from the systems described–as well as forecasted to be hosted by the OSC–in the SETS II task order PWS.  See supra Part IV.D.2.b.  GCE has also demonstrated that audit-supporting federal financial management services differed substantially from those services described in the SETS II task order PWS, see supra Part IV.D.2.c, and that prospective bidders would have understood the SETS II task order PWS as not encompassing those services, see supra Part IV.D.3.  Furthermore, GCE has shown the existence of a procurement practice among agencies, including the Coast Guard, in which solicitations for audit-supporting federal financial management systems and related services have been issued independently from other IT systems services both pre- and post-dating the SETS II task order solicitation.  See supra Parts I.A.3.a-b.

GCE asserts that "[t]he fact that the Modifications are beyond the scope of the SETS II task order is relevant to proving that they are brand-new procurements," Pl.'s Cross-Mot. & Mot. Perm. Inj. 7, which where issued outside of the ITOP II contract's ordering period, Pl.'s Mot. Prelim. Inj. & TRO 17-18; see also Compl. ¶¶ 53-54 (alleging that Modifications 30 and 32 exceeded the scope of the SETS II task order and therefore exceeded the ordering period of the underlying ITOP II contract).  GCE qualifies its argument that it "is not suggesting that no modification to [the] SETS II [task order] of any kind could be issued after the ITOP II [contract] ordering period expired.  Pl.'s Cross-Mot. & Mot. Perm. Inj. 8 n.5.  Rather, GCE states:

> [t]he problem with the protested Modifications is that they are beyond the scope of [the] SETS II [task order] and therefore constitute new procurements. Modifications consistent with the scope, period, and value of [the] SETS II [task order] may be issued through the performance period, as such modifications would not be new acquisitions.

Id.  Thus, according to GCE, Modification 30 effectuated a "brand new stand-alone acquisition under the ITOP II contract . . . that was made after the ordering period for new procurements under [the] ITOP [II contract] expired."  Prelim. Inj. Hr'g Tr. 9:16-19.

---

[114] The ITOP II contract was "intended to cover the gamut of IT efforts," AR 4711, though no reference was made in the ITOP II contract SOW to tasks related to audit-supporting federal financial management systems.  See, e.g., id. at 4713 (describing tasks incorporated under the first functional support area, ISE), 4720 (describing tasks incorporated under the second functional support area, SOM), 503 (announcing the SETS II task order solicitation for functional support areas one and two, ISE and SOM, respectively, under the ITOP II contract); cf. id. at 4711 (indicating that other IT efforts could be obtained in addition to the three functional support areas).  Nevertheless, as explained above, GCE challenges the period, rather than the scope, of the ITOP II contract.  See supra Parts IV.A.2.a-c.

The ITOP II contract SOW provided that all CLINs must be ordered within seven years from the date of contract execution. AR 4771. Since the ITOP II contract was awarded in 1999, id. at 4864, no new CLIN could be ordered thereunder after 2006. As demonstrated above, the Coast Guard's issuance of Modifications 30 and 32 in 2007 transferred audit-supporting federal financial management systems and services to QSS via the SETS II task order and exercised option period 3 for 2008, despite the fact that these systems and services fell outside the scope of the SETS II task order. As such, the Coast Guard effectively issued a new, standalone procurement under the ITOP II contract in 2007, over a year after the ITOP II contract ordering period expired. As a result, GCE has demonstrated by a preponderance of the evidence that the Coast Guard's actions violated the CICA.

### E.  GCE's Claim That the Coast Guard Violated the "Rule of Two"

GCE claims that the Coast Guard's issuance of Modifications 30 and 32 violated FAR § 19.502-2. See Compl. ¶¶ 56-63. Regulations for awarding contracts to small businesses are set forth in Subpart 19.5 of the FAR and implement the requirements of the Small Business Act, Pub. L. No. 85-536, 72 Stat. 384 (1958) (codified as amended in scattered sections of 15 U.S.C.). FAR § 19.502-2, referred to as the "Rule of Two," Benchmade Knife Co. v. United States, 79 Fed. Cl. 731, 737 (2007), is "part of the standard of competitiveness required before an acquisition may be set aside for small business," FAR "Rule of Two"; Requirements for Setting Aside Acquisitions for Small Business, 49 Fed. Reg. 40,135 (Oct. 12, 1984). It provides, in part:

> The contracting officer shall set aside any acquisition over $100,000 for small business participation when there is a reasonable expectation that (1) offers will be obtained from at least two responsible small business concerns offering the products of different small business concerns . . . and (2) award will be made at fair market prices.

48 C.F.R. § 19.502-2(b). "In other words, the evaluation of competition adequacy for a small business set aside is prospective." Greenleaf Constr. Co. v. United States, 67 Fed. Cl. 350, 355 (2005). A contracting officer's determination under FAR § 19.502-2 "concerns a matter of business judgment within the contracting officer's discretion that . . . will not [be] disturb[ed] absent a showing that it was unreasonable." Quality Hotel Westshore; Quality Inn Busch Gardens, N-290046, 2002 WL 1162918, at *2 (Comp. Gen. May 31, 2002) (citing Neil R. Gross & Co., 1990 WL 269546, at *2). FAR § 19.502-2 "does not require the use of any particular method for assessing the availability of small business . . . ." MCS Mgmt., Inc. v. United States, 48 Fed. Cl. 506, 511 (2000); see also Am. Artisan Prods., Inc., B-292380, 2003 WL 21755984, at *4 (Comp. Gen. July 30, 2003) ("The use of any particular method of assessing the availability of small businesses is not required, and measures such as prior procurement history, market surveys, and advice from the [Small Business Administration ("SBA")] may all constitute adequate grounds for a contracting officer's decision not to set aside a procurement."). Nevertheless, the contracting officer "must undertake reasonable efforts to determine whether it is likely that offers will be received from at least two responsible small businesses at fair market prices for each . . .

contract." MCS Mgmt., Inc., 48 Fed. Cl. at 511; see also Am. Artisan Prods., Inc., 2003 WL 21755984, at *4 (stating that "a contracting officer must make reasonable efforts to ascertain whether it is likely that offers will be received from at least two responsible small businesses at fair market prices, and [the GAO] will review a protest of a contracting officer's decision in that regard to determine whether the contracting officer made such efforts").

According to GCE, the Coast Guard's "acquisition of financial management systems services constitutes an acquisition above $100,000, as Modifications 30 and 32 are valued at over $1 million and $5 million[,] respectively."  Compl. ¶ 58; accord Pl.'s Mot. Prelim. Inj. & TRO 28.  GCE alleges that because (1) at least two small businesses could perform the work encompassed by Modifications 30 and 32,[115] Compl. ¶ 59, and (2) "small business/federal financial systems IT providing services do so at market rates," id. ¶ 60, the Coast Guard "was required to conduct a 'Rule of Two' analysis before utilizing modifications to [the] SETS II [task order] to award financial systems work," id. ¶ 61; see also Pl.'s Mem. 22 (arguing that FAR § 19.502-2(b) "required [the Coast Guard] to determine whether [audit-supporting federal financial management systems] work should have been set aside for small businesses").  GCE alleges that the Coast Guard conducted no such analysis, Compl. ¶ 61; see also Perm. Inj. Hr'g Tr. 11:7-10 ("[I]t's significant that the government doesn't ever suggest in this case[] that it conducted an inquiry into whether the financial system's work should be set aside for small businesses[.]"), and suggests that an analysis would have yielded a conclusion that the "Rule of Two" requirements were satisfied, thereby compelling the Coast Guard to set aside the work encompassed by Modifications 30 and 32 for a small business, Compl. ¶¶ 62-63; see also Pl.'s Mot. Prelim. Inj. & TRO 29 (stating that "had the Coast Guard made the required inquiries assessing the interest and capabilities of small businesses to perform this work, it appears likely that there would have been strong grounds for the Coast Guard to conclude that the 'rule of two' requirements were met").

The government's response to GCE's "Rule of Two" claim is intertwined with its argument that the FASA divests this court of jurisdiction:

> GCE is arguing that Modifications 30 and 32 are outside the scope of the SETS II task order, not the underlying ITOP II contract. . . .  [T]he record is clear that the modifications did not exceed the period of the ITOP II contract, and GCE is not arguing that the modifications exceeded the scope or maximum value of the ITOP II contract, therefore, this Court does not possess jurisdiction to entertain GCE's complaint.

---

[115]  Mr. Lucas, GCE's Chief Strategy Officer, indicates that "GCE knows of two or more small businesses that recently competed for Oracle Federal Financial management systems work similar to that GCE performs for the Coast Guard."  Pl.'s App. 15 (Lucas Decl. ¶ 9); see also id. at 28 (Lucas Decl. ¶ 58 (identifying [. . .] and [. . .] as two small businesses qualified to compete for this work)).

Def.'s Mot. & Opp'n 11-12. The government contends that if GCE "can overcome the jurisdictional bar simply by alleging that a regulation was violated, then that just eviscerates the jurisdictional bar." Prelim Inj. Hr'g Tr. 56:16-19.

QSS advances a similar argument, stating first that the "Rule of Two" "is inapplicable here and, in any case, the FASA bar on protests of task orders applies here to the same degree that it does with Plaintiff's CICA claims." Def.-Intervenor's Mot. & Opp'n 31. According to QSS, "if plaintiffs could elude the FASA jurisdictional hurdle by alleging small business regulation violations, then every protest would include such claims, making the statute a hollow shell." Def.-Intervenor's Opp'n & Reply 13. Nevertheless, QSS concedes that "the 'rule of two' would only apply[] if modifications were held to be out-of-scope of the contract such that a distinct contract were required." Def.-Intervenor's Mot. & Opp'n 32; cf. supra Parts IV.D.2.b-c, 3 (determining that Modification 30 did constitute an out-of-scope modification of the SETS II task order).

Second, QSS asserts that the "Rule of Two" does not apply to task order modifications. Def.-Intervenor's Opp'n & Reply 12. QSS suggests that the GAO's decisions in LBM, Inc. and N&N Travel & Tours, Inc., B-285164.2, 2000 WL 1254158 (Comp. Gen. Aug. 31, 2000), upon which GCE relies, support its position that "the 'rule of two' is concerned with solicitations and invitations for bids and not modifications of task orders issued under GWACs."[116] Def.-Intervenor's Mot. & Opp'n 33. In LMB, Inc., the protester challenged a decision by the United States Department of the Army ("Army") to acquire services under Logistical Joint Administrative Management Support Services ("LOGJAMSS") contracts when those services were previously provided exclusively by small businesses.[117] 2002 WL 31086989, at *1. After the Army decided to transfer these services to the LOGJAMSS contracts, it solicited proposals from LOGJAMSS contractors and "did not coordinate with, or notify, the SBA of its intent to

---

[116] When GCE lodged its protest with the GAO, the GAO determined that LBM, Inc. was "inapposite to the circumstances here" because LBM, Inc. "challenged the propriety of the agency's decision to transfer certain requirements to the multiple award ID/IQ contracts," whereas GCE "challenge[d] only the agency's decision to combine federal financial IT support services with other work originally required under the SETS II task order." AR 4868-69 (emphasis added). According to the GAO, GCE "has not shown or even alleged that these services represent work not already encompassed by the ITOP II ID/IQ contract." Id. at 4869 (footnote omitted); see also Perm. Inj. Hr'g Tr. 60:1-3 (containing the government's assertion that LBM, Inc. is inapposite).

[117] The LOGJAMSS contracts were multiple-award, indefinite-delivery, ID/IQ task order contracts. LBM, Inc., 2002 WL 31086989, at *1. LBM, Inc. argued that the Army "should have continued to set aside the . . . services . . . exclusively for small businesses, and that the Army improperly failed to coordinate with the SBA in deciding to withdraw these services from exclusive small business participation and instead to transfer the services to the LOGJAMSS contracts." Id. at *3.

withdraw . . . services from exclusive small business competition and to transfer these services to LOGJAMSS contracts." Id. at *3.  The GAO sustained the protest.  Id. at *8.

In its decision, the GAO rejected the Army's argument that LBM, Inc. challenged the proposed award of a task order under a LOGJAMSS contract–thereby divesting the GAO of jurisdiction pursuant to the FASA–by explaining that

> LBM is not challenging the proposed issuance of a task order for these services, but is raising the question of whether work that had been previously set aside exclusively for small businesses could be transferred to LOGJAMSS . . . .  This is a challenge to the terms of the underlying LOGJAMSS solicitation and is within our bid protest jurisdiction.

Id. at *3.  It added that the FASA "was not intended to, and does not, preclude protests that timely challenge the transfer and inclusion of work in ID/IQ contracts without complying with applicable laws or regulations," id. and explained that Small Business Act requirements "were applicable to acquisitions prior to the enactment of [the] FASA, and nothing in that statute authorizes the transfer of acquisitions to ID/IQ contracts in violation of those laws and regulations," id. at *4.

The GAO further noted that "the increasing use of ID/IQ contracts with very broad and often vague statements of work may place an unreasonable burden upon potential offerors, who may be required to guess as to whether particular work, for which they are interested in competing, will be acquired under a particular ID/IQ contract."  Id.  With respect to the LOGJAMSS contracts, the GAO indicated that the scope of work was both expansive and vague because it "encompassed a 'wide range of logistical functions and supporting tasks' and was undefinitized at the time the LOGJAMSS contracts were solicited."  Id.; see also id. at *5 (determining that because of the "breadth and vagueness of the LOGJAMSS scope of work," as well as the fact that the services at issue were exclusively set-aside for small businesses in the past, "LBM cannot reasonably be viewed as on notice that the Army would transfer this work to LOGJAMSS without consideration of FAR §19.502-2(b)").  The GAO indicated that the "Rule of Two" applied "to 'any acquisition over $100,000,'" id. at *7 (quoting 48 C.F.R. § 19.502-2(b)), and that the Army's purchasing of the services at issue by contract with appropriated funds constituted an acquisition, id.  As such, the GAO determined that the Army was required to comply with FAR § 19.502-2(b) and conduct the appropriate "Rule of Two" analysis.  Id.  It stated: "[w]hatever the outcome of the FAR § 19.502-2(b) analysis, . . . the agency's intent to use a task order under LOGJAMSS as the contract vehicle did not eliminate the legal requirement that the agency undertake that analysis."[118]  Id.

---

[118]  The GAO, however, rejected LBM Inc.'s argument that transferring the services at issue to the LOGJAMSS contracts constituted improper bundling under the Small Business Act: "[W]hile it is true that the Small Business Act requires procuring agencies to cooperate, and consult, with the SBA in carrying out the requirements of the Small Business Act, we find no

In N&N Travel & Tours, Inc., the GAO sustained a protest on the grounds that the United States Air Force was required to set aside for a small business a task order for travel management services at Travis Air Force Base ("Travis") that were beyond the scope of the underlying GSA contract. 2000 WL 1254158, at *1-2. The GAO noted that the FASA did not apply in that case because, "as a preliminary matter, there [was] no dispute that the contention that this task order exceeds the scope of the GSA ID/IQ contract is properly before our Office." Id. at *3; see also id. at *5 (concluding that "the small business protesters are mounting a challenge to the terms of the underlying solicitation, and that the limitation on our bid protest jurisdiction in 10 U.S.C. § 2304c(d) therefore does not apply to this protest"). Although it recognized that the challenge presented before it "focuses on, and is triggered by, the decision to use a task order under [the] GSA's ID/IQ contract," id. at *5, the GAO considered "the question of whether the solicitation for the underlying ID/IQ contract properly included Travis despite the claimed independent requirement to reserve the Travis effort for small businesses" as an independent issue.[119] Id. at *5; see also id. at *6 n.2 ("[S]ince we ultimately sustain the small business set-aside challenge for the four small business protesters, we need not reach the issue of whether the task order here exceeds the scope of the underlying contract." (emphasis added)).

The GAO's decision in N&N Travel & Tours, Inc. supports GCE's position that its "Rule of Two" claim is distinct from its claim that Modifications 30 and 32 exceed the scope of the SETS II task order. To that end, GCE argues that N&N Travel & Tours, Inc. "makes clear that . . . a small business set-aside claim is logically independent from a beyond the scope claim." Perm. Inj. Hr'g Tr. 11:22-25. The government disagrees, arguing that N&N Travel & Tours, Inc. is more limited because the GAO did not decide whether the issuance of the new task order was outside the scope of the underlying ID/IQ contract. Id. 60:3-8. However, as GCE notes, "the obligation to comply with the Rule of Two is independent of the obligation to issue only in-scope modifications." Pl.'s Mem. 22. Therefore, the court rejects the government's position that only modifications that increase the scope of an order are subject to review under FAR § 19.502-2, as well as QSS's contention that "[s]uch a holding by the Court [determining that Modifications 30 and 32 exceed the scope of the SETS II task order] would moot this claim in any case." Def.-Intervenor's Mot. & Opp'n 32 n.17.

---

specific statute or regulation requiring notification of the SBA in this case." LBM, Inc., 2002 WL 31086989, at *8 n.7.

[119] Addressing the small business set-aside issue, the GAO stated that "the record shows that the competitive solicitation" for travel services at Travis yielded several proposals from small businesses. N&N Travel & Tours, Inc., 2000 WL 1254158, at *7. Consequently, the GAO concluded that "a challenge to the underlying solicitation . . . would likely have resulted in a decision that this work should be procured separately and reserved for small businesses," and that FAR § 19.502-2 "required that the purchase of these services . . . be conducted as a small business set-aside." Id.

Although the protest in <u>LBM, Inc.</u> concerned the underlying contracts (analogous in this case to the ITOP II contract), rather than task order modifications, the court nevertheless finds it instructive. <u>But see</u> <u>supra</u> note 116 (explaining why the GAO distinguished <u>LBM, Inc.</u>). First, LBM, Inc., like GCE here, did not challenge the issuance or proposed issuance of a task order under the existing contract. Therefore, this case is, in fact, similar to <u>LBM, Inc.</u> insofar as "the limitation on our bid protest jurisdiction in 10 U.S.C. § 2304c(d) does not apply here." 2002 WL 31086989, at *3; <u>supra</u> Parts IV.A.2.a-c. <u>But see</u> Def.-Intervenor's Opp'n & Reply 12 ("Plaintiff, however, does not challenge the GAO's reasoning that <u>LBM[, Inc.]</u> was not on point since Plaintiff, unlike the protester in <u>LBM[, Inc.]</u>, did not challenge the underlying contract.").

Moreover, the GAO indicated that FAR § 2.101 defined "acquisition" broadly and that the Army's purchase of services "by contract with appropriated funds is an 'acquisition,' subject to FAR § 19.502-2(b), regardless of the fact that the agency anticipated acquiring those services through their transfer to the LOGJAMSS scope of work." <u>LBM, Inc.</u>, 2002 WL 31086989, at *7. Here, too, the Coast Guard's issuance of Modifications 30 and 32 constituted "acquisitions" under the meaning of FAR § 2.101, because the work encompassed by Modification 30 exceeded the scope of the SETS II task order. <u>See</u> Def.'s Mot. & Opp'n 28 (recognizing that modifications to an existing contract within the contract's scope do not constitute new acquisitions); <u>see also</u> Perm. Inj. Hr'g Tr. 59:12-13 (stating the government's position that "the Rule of Two doesn't apply to in-scope modifications"). Thus, in this case, the modification was, in fact, not part of one continuing acquisition. <u>Cf.</u> Perm. Inj. Hr'g Tr. 58:22-23. It follows, then, that the Coast Guard, like the Army in <u>LBM, Inc.</u>, was required by law to undertake a "Rule of Two" analysis.[120]

---

[120] GCE explains that an agency presumably engages in a small business review at the time it conducts an initial procurement in cases where "you're simply modifying a contract to add on another 50 widgets . . . to an original task order that was for 100 widgets," thereby obviating the need for another small business review at the time of the modification. Perm. Inj. Hr'g Tr. 12:12-19. GCE cautions that it is not

> claiming that <u>all</u> task order modifications must be separately evaluated under the
> Rule of Two. As long as an agency conducts a proper Rule of Two analysis of all
> work included in a task order when that task order is originally issued, any work
> later procured through an in-scope modification would already have been
> evaluated. If no initial evaluation is conducted, and work that should be set aside
> is instead included within the scope of the task order, the agency violates the Rule
> of Two when it modifies the task order to procure the work.

Pl.'s Mem. 22 n.18; <u>see also</u> Prelim. Inj. Hr'g Tr. 27:17-21 (containing GCE's position that it is "not arguing that the Coast Guard is forbidden from doing this, although again, depending on the particular work assigned, . . . there could be small business problems"). In this case, GCE maintains that "the Coast Guard procured an entirely different line of work than it ever had under [the] SETS II [task order], and it has never considered whether this other line of work needs to be

In a more recent decision, the GAO determined that the "Rule of Two" applied to individually competed task or delivery orders under multiple-award contracts because, in part, "those orders are properly viewed as 'acquisitions.'" Delex Sys., Inc., B-400403, 2008 WL 4570635, at *6 (Comp. Gen. Oct. 8, 2008).  The GAO stated:

> Competitions for task and delivery orders are the stage when holders of multiple-award ID/IQ contracts offer prices and solutions to meet specific agency needs. This is therefore the most meaningful stage for a Rule of Two analysis, in which the contracting officer needs to judge the likelihood of receiving at least two fair-market priced submissions from small businesses for the services or supplies being acquired under a specific solicitation.[121]

Id. (footnote added).  GCE contends, "[e]ven if the financial systems work had been within the scope of [the] SETS II [task order], the Coast Guard would have been required–at some point–to determine whether that specific work should have been set aside for small businesses."  Pl.'s Mem. 22; see also id. at 23 ("[I]f in-scope work is not properly evaluated before the initial award, the subsequent procurement of that work–via task order or modification–violates the Rule of Two.").  That assessment, according to GCE, "could have been performed when [the] SETS II [task order] was issued . . . .  [I]f the Coast Guard had[,] at that time[,] determined that no two small businesses would have competed for the financial systems work, it would not have been required to set it aside."  Id. at 22; see also Pl.'s Cross-Mot. & Mot. Perm. Inj. 26-27 (stating that "an agency can easily avoid [bidding every minor modification] by properly designating small business set-asides at the outset of a procurement" and that "the Coast Guard's decision to award the financial systems work through [section] 2304c procedures does not relieve it of its responsibility to follow the Rule of Two").

GCE argues that "neither the Government nor QSS contends that the Coast Guard conducted any analysis of whether [FAR § 19.502-2(b)]'s requirements were satisfied" and, "[m]ore importantly, neither the Government nor QSS contests GCE's claim that, had the analysis been performed, the Rule of Two requirements would have been satisfied, mandating that the work be set aside for small businesses."  Pl.'s Cross-Mot. & Mot. Perm. Inj. 25; see also Perm. Inj. Hr'g Tr. 13:3-8 ("[T]he fact remains that the Coast Guard never reviewed this body of work, the financial systems IT work, to determine whether there were small businesses that could perform it.  It's an independent violation of the law.").  Neither the government nor QSS identify any portion of the administrative record that demonstrates that the Coast Guard engaged in such an assessment or made a reasonable effort to ascertain whether it was likely that offers would be

set aside for small businesses."  Perm. Inj. Hr'g Tr. 12:20-24.

[121]  The GAO observed that Congress "recognize[d] the possibility of limiting competition for task and delivery orders to small businesses when there is a sufficient number of small businesses to justify doing so."  Delex Sys., Inc., 2008 WL 4570635, at *6 (discussing the National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, 119 Stat. 3136).

received from at least two small businesses capable of performing audit-supporting federal financial management systems services.  Instead, the administrative record reflects that Coast Guard officials expressed concern that any competition for the agency's audit-supporting federal financial management systems not be limited to large businesses because of potential issues with the Small Business Act when the Coast Guard was contemplating issuing a solicitation under the EAGLE vehicle.  See AR 2381 (inquiring "whether you wanted an unrestricted solicitation (large and small vendors) or set-aside for the small vendors only" and indicating the Coast Guard's preference for a large vendor because of "[t]he complexity of Federal Financial Oracle Information system development required . . . to consolidate IT systems where systems perform duplicate functionality, [to] achieve real time integration of financial IT systems, and to consolidate to a single core accounting system general ledger"), 2380 (anticipating that "we are going to have some problems with [the SBA] representative" because the preference for a large vendor "is not acceptable since small business[es] could team with a large business and do the work as well").

It is apparent that the Coast Guard was aware that small businesses could perform this type of work, either individually or through teaming agreements.  See id. at 2380 There is, however, no indication that the Coast Guard engaged in any reasonable effort (i.e., there is no evidence of an assessment of, for example, prior procurement history, market surveys, or any other analysis) to determine the likelihood that it would receive offers from at least two responsible small businesses at fair market prices for audit-supporting federal financial management systems services, see MCS Mgmt., Inc., 48 Fed. Cl. at 511, and the government and QSS do not contest this point; cf. AR 503 (containing the SETS II acquisition plan, which explained that "even though the requirement has experienced significant growth, the larger firms in the [SBA's section] 8(a) program could still fulfill the requirement"), 504 (indicating that the Coast Guard "used extensively" an evaluation of section 8(a) suitability "in preparing for the SETS recompete" and determining that the SETS II task order solicitation "will be competed among the five qualified [section] 8(a) firms eligible to compete for providing the required services").  As a result, the Coast Guard violated FAR § 19.502-2(b).

### F.  The Coast Guard's Actions Prejudiced GCE

Although GCE has established that the Coast Guard violated the CICA, as well as FAR § 19.502-2, when it issued Modifications 30 and 32 to the SETS II task order, it must also establish that the Coast Guard's error was prejudicial.  See Bannum, 404 F.3d at 1351.  As discussed in Part III.A, supra, GCE need not establish that it would have, absent an error in the procurement process, been awarded a contract for audit-supporting federal financial management systems services.  Rather, GCE need only establish that "there was a substantial chance it would have received the contract award but for that error. "  Statistica, Inc., 102 F.3d at 1582; see also Asia Pac., 68 Fed. Cl. at 18 (requiring "more than a 'mere possibility . . . [of] receiv[ing] the contract but for the error").

GCE has made such a showing.  It has, since 2000, "been the systems integrator for the [Coast Guard] financial enterprise." AR 2860; see also Compl. ¶ 4 (alleging that GCE has, since 2000, "developed and maintained financial management systems of the . . . Coast Guard that create the Coast Guard's financial statements of record for audits using government-certified financial management systems software").  Its previous work was deemed satisfactory by the Coast Guard, see supra note 36, and GCE demonstrated a continued interest in future work with the Coast Guard, see supra Part I.E.4.  Indeed, GCE planned to participate in solicitations that the Coast Guard indicated would be forthcoming, see Compl. ¶ 29 (alleging that the Coast Guard "continued to inform GCE that a competition for the financial systems work performed by GCE would be forthcoming"); Pl.'s App. 24 (Lucas Decl. ¶ 43 (stating that the Coast Guard expected to compete separately various tasks associated with the August 2007 solicitation and that GCE "should wait for that competition")); see also Pl.'s App. 23 (Lucas Decl. ¶ 38 ("GCE understood that the Coast Guard would issue the solicitation under EAGLE . . . .  The DHS EAGLE website forecast the financial management systems work to be competed under EAGLE[,] and . . . the Coast Guard confirmed to me several times that the . . . financial systems work would be competed under EAGLE.")), 806-09 (containing the DHS EAGLE IT Forecast of Contract Opportunities website), and, according to Mr. Lucas, began discussing teaming arrangements in anticipation of future solicitations, Pl.'s App. 23 (Lucas Decl. ¶ 39).  GCE had been performing the work encompassed by Modification 30 and, "[a]s the incumbent, . . . has regularly competed in full-and-open competitions and won this work fairly.  GCE ha[d] a reasonable expectation that it will be re-competed." AR 2863.  It is therefore apparent that GCE "would have been within the zone of active consideration for an award," Pl.'s Mot. Prelim. Inj. & TRO 30, and that it not only "'could compete for the contract' if the bid process were made competitive,'" Myers Investigative & Sec. Servs., Inc., 275 F.3d at 1370-71, but that there was a substantial chance that it would have been awarded a contract for audit-supporting federal financial management systems work if the Coast Guard issued a competition.

## G.  GCE Is Entitled to Judgment on the Administrative Record

For the reasons discussed above, the Coast Guard's transfer, without competition, of audit-supporting federal financial management systems and related services to the SETS II task order via Modifications 30 and 32 constituted "'a clear and prejudicial violation of applicable statutes or regulations.'" Impresa Construzioni Geom. Domenica Garufi, 238 F.3d at 1333 (quoting Kentron Haw., Ltd., 480 F.2d at 1169).  Additionally, for the reasons discussed above, the Coast Guard was required to follow the "Rule of Two" and determine whether it would have reasonably anticipated receiving at least two offers from small businesses.  Because the Coast Guard failed to compete or set aside for small businesses the work at issue in this case, the Coast Guard's transfer of this work to QSS via Modifications 30 and 32 to the SETS II task order was not in accordance with law and must be set aside.  Accordingly, GCE's cross-motion for judgment on the administrative record is granted, the government's motion and opposition is denied, and QSS's motion and opposition is denied.

**H.  Award of a Permanent Injunction**

The Court of Federal Claims has the authority to award injunctive relief pursuant to 28 U.S.C. § 1491(b)(2) and is guided in making such an award by RCFC 65.  Injunctive relief, however, is an extraordinary remedy, and the Federal Circuit has cautioned that "equitable powers 'should be exercised in a way that best limits judicial interference in contract procurement.'"  Parcel 49C Ltd. P'ship v. United States, 31 F.3d 1147, 1153 (Fed. Cir. 1994) (quoting John C. Grimberg Co., 702 F.2d at 1372).  In determining whether to award a permanent injunction, a court must consider, as discussed in Part III.E, supra, whether (1) the plaintiff has succeeded on the merits; (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships favors the grant of injunctive relief; and (4) it is in the public interest to grant injunctive relief.  The court considers each factor seriatim.

**1.  Success on the Merits**

The court has concluded that the Coast Guard violated the CICA when it failed to employ competitive procedures to contract out audit-supporting federal financial management systems work it added to the SETS II task order via Modifications 30 and 32.  The court has determined that Modification 30 added audit-supporting federal financial management systems and related services that fell outside the scope of the SETS II task order and, as such, constituted a new acquisition that occurred after the ordering period of the underlying ITOP II contract expired.  The court has therefore concluded that the Coast Guard's decision to issue Modifications 30 and 32 without competition was not in accordance with the law.  Additionally, the court has determined that the Coast Guard violated FAR § 19.502-2 by not performing an analysis of whether audit-supporting federal financial management systems work should have been set aside for small businesses.

The court has also concluded that GCE was prejudiced by the Coast Guard's decision to transfer this work without competition.  Prior to the issuance of Modifications 30 and 32, GCE had been previously awarded–and had been performing–the audit-supporting federal financial management systems services that were encompassed by these modifications.  The court determined that GCE, as an incumbent contractor performing this work, had a substantial chance of being awarded a contract for audit-supporting federal financial management systems work if the Coast Guard issued a solicitation.  Accordingly, GCE has demonstrated success on the merits.

**2.  Irreparable Injury**

When the court assesses irreparable injury, "'[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction.'"  Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728, 743 (2000) (quoting Magellan Corp. v. United States, 27 Fed. Cl. 446, 447 (1993)).  GCE argues that it has four distinct injuries: (1) loss of an opportunity to compete for the Coast Guard's audit-supporting federal financial management systems work; (2) loss of an opportunity to earn profits; (3) loss of skilled employees; and (4) damage to its

reputation.  Pl.'s Mem. 23.  First, according to GCE, "without an injunction, the Coast Guard
will never conduct a competitive procurement for the financial management systems IT work at
issue."  Pl.'s Cross-Mot. & Mot. Perm. Inj. 27; see also Pl.'s Mem. 24 ("If the Modifications are
allowed to stand, GCE will forever lose the opportunity to compete in a valid procurement for the
work encompassed in them, an injury that is irreparable.").  The government maintains that if
"GCE were to ultimately succeed upon the merits, any lost opportunity to compete would be
temporary, not irreparable."  Def.'s Mot. & Opp'n 31.  QSS asserts that GCE's "sole-source
bridge contract merely expired on schedule" and that it "never had a right to have its contract
renewed automatically beyond March 31, 2008."  Def.-Intervenor's Opp'n & Reply 29.
However, GCE explains that its "current contract status is irrelevant: loss of an opportunity to
compete is equally irreparable whether the protester is the incumbent or a brand-new entrant."
Pl.'s Mem. 24.  The court agrees with GCE.  "It is well-settled that a party suffers irreparable
injury when it loses the opportunity to compete on a level playing field," and "when a plaintiff
shows that it was excluded from the bidding process, perhaps solely because of the government's
improper conduct, the plaintiff has satisfied [the] requirement for irreparable injury."  Cardinal
Maint. Serv., Inc. v. United States, 63 Fed. Cl. 98, 110 (2004).  No adequate remedy exists to
make up for GCE's potential loss of business.  Accordingly, GCE has been irreparably injured
because it was excluded from competing for audit-supporting federal financial management
systems services due to the Coast Guard's violation of the CICA.[122]  See id.

        Second, GCE claims that it has suffered a loss of profits: "[t]he Modifications caused
GCE to lose an opportunity to earn potential profits for the work contained in them . . . ."  Pl.'s
Mem. 24; see also id. at 24-25 (explaining that any type of short-term agreement with the Coast
Guard does not diminish GCE's economic harm because "the Coast Guard has never formally
announced [the possibility of a six-month sole-source contract to GCE], let alone made a formal
offer or entered into negotiations" and "the contract would not be equivalent to the work
encompassed by the Modifications").  QSS deems this claim "baseless," Def.-Intervenor's Opp'n
& Reply 29, and the government argues that any potential lost profits "would be completely
speculative," Def.'s Mot. & Opp'n 31; see also Def.'s Opp'n & Reply 26 (arguing that GCE's
"allegations of economic harms, in the form of lost profits and lost employees, are overstated"
and stating the likelihood that the Coast Guard would award a six-month sole source contract to
GCE "to obtain technical support services for resolving any emergency financial system
problems," among other tasks); Def.'s Opp'n & Reply Ex. 2 at 2 (Hill Supp'l Decl. ¶ 3
(indicating that the Coast Guard "is seeking to enter into an appropriate short-term contracting
vehicle . . . with GCE")).  According to QSS, "[s]ince Plaintiff does not allege that it should have
been awarded a contract, but only that it lost profits because it could not compete in and win a
procurement, it cannot claim irreparable harm."  Def.-Intervenor's Opp'n & Reply 29 (citation
omitted).  QSS maintains that a protester cannot claim alleged lost profits as an irreparable injury
when it cannot establish that it should be the proper awardee.  Id. (citing Consol. Eng'g Servs.,
Inc. v. United States, 64 Fed. Cl. 617, 640 (2005)).  However, the Consolidated Engineering

---

        [122]  Although the court determines that GCE has suffered an irreparable injury on this
basis alone, it nevertheless addresses GCE's additional, alleged injuries.

Services, Inc. court determined that the protester in that case, unlike GCE here, failed to show actual success on the merits.  See 64 Fed. Cl. at 640.  Therefore, QSS's reliance upon Consolidated Engineering Services, Inc. is misplaced.

The Court of Federal Claims "previously has held that a disappointed contractor suffers irreparable harm because it is deprived of lost profits . . . ."  Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. 388, 398 (1999) (citing Essex Electro Eng'rs, Inc. v. United States, 3 Cl. Ct. 277, 287 (1983), aff'd, 757 F.2d 247 (Fed. Cir. 1985)).  However, "'[o]nly economic loss that threatens the survival of a movant's business constitutes irreparable harm.'"  Sierra Military Health Servs., Inc. v. United States, 58 Fed. Cl. 573, 582 (2003) (quoting Found. Health Servs. v. United States, No. 93-1717NHJ, 1993 WL 738426, at *3 (D.D.C. Sept. 23, 1993)).  Absent injunctive relief, GCE "will lose the opportunity to earn the profit it would have made under [a procurement award].  Such a loss of profit, stemming from a lost opportunity to compete for a contract on a level playing field, has been found sufficient to constitute irreparable harm."  Hosp. Klean of Tex., Inc., 65 Fed. Cl. at 624; see also 28 U.S.C. § 1491(b)(2) (authorizing the court to award "any relief . . . including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs"); Bean Dredging Corp. v. United States, 22 Cl. Ct. 519, 524 (1991) (explaining that absent injunctive relief, "plaintiffs could recover only bid preparation costs, not lost profits, through an action at law"); Pl.'s Cross-Mot. & Mot. Perm. Inj. 29 ("GCE's potential profits have value, and no action for damages is available to compensate GCE for the loss of that value.").  Accordingly, GCE has demonstrated that the loss of an opportunity to earn potential profits for the audit-supporting federal financial management systems services encompassed by Modifications 30 and 32 constitutes an independent, irreparable injury.

Third, GCE asserts that without injunctive relief, it "will lose 'skilled employees critical to its ability to perform specialized financial management systems work,' an injury that constitutes irreparable harm."  Pl.'s Mem. 25 (quoting the court's March 31, 2008 temporary restraining order); see also Pl.'s App. 7 (Muslimani Decl. ¶¶ 26-27 (stating that the positions of approximately [. . .] GCE employees are in jeopardy, that these employees represent a "critical asset needed to successfully compete for future awards with the Coast Guard and other federal agencies," and that GCE will lose its competitive edge for future work because "any team that GCE hires in the future will not have the same institutional knowledge and experience")), 1011 (Second Supplemental Decl. Raed Muslimani ("Muslimani 2d Supp'l Decl.") ¶ 11 (stating that "[i]f GCE loses the extensive experience and specialized knowledge of its Coast Guard client team, GCE will lose a critical asset needed to successfully compete for future awards with the Coast Guard and other federal agencies")).  Indeed, GCE asserts that it already lost [. . .] members of its Coast Guard team, Pl.'s App. 1009 (Muslimani 2d Supp'l Decl. ¶ 7), and that some of these employees have been hired by GCE's competitors, id. at 1010 (Muslimani 2d Supp'l Decl. ¶ 10).  The government, however, questions GCE's contention:

> GCE claims that it will lose [. . .] employees if the Court does not grant injunctive relief.  In response to QSS's allegations that GCE lacks standing, however, GCE

-140-

claimed to have [. . .] United States citizens available to perform a new contract with the Coast Guard. GCE's math is fuzzy. It is unclear how GCE can claim that it has [. . .] United States citizens available to fully satisfy Coast Guard needs, while claiming that it would lose [. . .] employees if the Coast Guard transfers the software development and maintenance work to the SETS II task order.[123]

Def.'s Opp'n & Reply 26 (footnote added). But see Pl.'s Mem. 26 (responding that (1) there is "no 'fuzzy math'" as not all members of the Coast Guard team were citizens or permanent residents, (2) [. . .] citizens and [. . .] permanent residents were "immediately available" and were "more than enough for GCE to credibly bid on, and start performing, the financial systems IT work," and (3) GCE will lose employees "and suffer harms to its efforts to obtain other agency engagements"). QSS asserts that GCE's lost employees argument is "nebulous." Def.-Intervenor's Mot. & Opp'n 35.

A potential loss of employees is a monetary loss that several courts have determined is substantial but not irreparable. See, e.g., Computer Scis. Corp. v. United States, 51 Fed. Cl. 297, 324 (2002) ("[A] potential loss of employees is not an irreparable harm."); see also PGBA, LLC, 60 Fed. Cl. at 221 (recognizing that the loss of employees is "significant," but not an irreparable injury, because the court would then be required "to consider any incumbent contractor's loss of a successor contract to be irreparable harm"); Sierra Military Health Servs., Inc., 58 Fed. Cl. at 582 (determining that there was no evidence that any loss of employees was related to the plaintiff's lack of opportunity to compete for a contract). On the other hand, courts have recognized that "keeping a team together whose existence is eliminated in the absence of injunctive relief" can constitute an irreparable harm. Univ. Research Co. v. United States, 65 Fed. Cl. 500, 514 (2005). In light of the fact that GCE employs individuals with extensive experience and specialized knowledge on its Coast Guard client team, these individuals constitute a critical asset. The loss of these individuals would impact GCE's ability to compete successfully for future Coast Guard work in the future. Accordingly, GCE has demonstrated that the loss of skilled employees critical to its ability to perform audit-supporting federal financial management systems services constitutes an irreparable harm.

Finally, GCE states that it "faces reputation damage if it is not allowed to compete for work for which it is the incumbent when that work is sole-sourced to another firm." Pl.'s Mem. 26. According to Mr. Muslimani,

---

[123] Mr. Muslimani explained:

For the Coast Guard contracts, GCE has available approximately [. . .] employees who are U.S. citizens to work on the contracts. These employees are available to transfer to the Coast Guard work, but have not done so because the Coast Guard has never raised any concerns about GCE employees until now.

Pl.'s App. 926 (Muslimani Supp'l Decl. ¶ 14).

-141-

> [t]he community of financial management systems contractors is small, and partnerships are key to winning may financial systems contract awards.  By transferring the financial system work without a competition, the Coast Guard will send a signal that may be understood by the financial systems market and the broader government contracts industry to indicate that GCE's work was below standard, which it is not.

Pl.'s App. 8 (Muslimani Decl. ¶ 31).  Mr. Lucas opines that the "industry will view any procurement decision made non-competitively to remove GCE as the incumbent from performing the work and to transfer the work to another company as an indication that the Coast Guard lacked confidence in GCE."  Id. at 30 (Lucas Decl. ¶ 65).  He elaborates:

> Every company wins and loses contracts–that is the nature of the business; however, it is in my years of experience a red flag for potential partners and for potential customers if a contract is cancelled or an incumbent is prevented or discouraged from re-competing for the work.  Losing a flagship contract for a small firm, from its largest customer no less, through a non-competitive means signals to [the] industry that the contractor does not have a reference-able customer.

Id. at 935 (Lucas Supp'l Decl. ¶ 18).  GCE asserts that "it will be extremely difficult . . . to find teaming parties in the industry" because "[c]ontracting personnel and program managers at other federal agencies who learn of GCE's loss of work may also draw adverse conclusions about GCE's performance," particularly since the "federal financial management systems community is small . . . ."  Id. at 30 (Lucas Decl. ¶ 65).

    According to GCE, it "has already begun to suffer reputational harm from the Coast Guard's sole-sourcing of the work formerly performed by GCE to QSS."  Pl.'s App. 1012 (Muslimani 2d Supp'l Decl. ¶ 17).  But see Def.-Intervenor's Opp'n & Reply App. Ex. E (Bowen Supp'l Decl. ¶ 14 (stating that "no one in the Federal IT service procurement world ever considers the expiration of such a [limited-term, sole-source bridge] contract to indicate anything necessarily bad about the company that previously had the contract")).  GCE states that it "will continue to lose the personnel and reputation in the industry necessary to winning prime contracts" if the Coast Guard is not required to compete the work that GCE previously performed.  Pl.'s App. 1012 (Muslimani 2d Supp'l Decl. ¶ 18); see also Pl.'s Cross-Mot. & Mot. Perm. Inj. 30 (explaining that within the small, niche "group of market participants, GCE is strongly associated with the work it has done for the Coast Guard").

The government asserts that "GCE's reputational harm is speculative."[124]  Def.'s Opp'n &
Reply 26.  Although it finds as reasonable GCE's statement that a competitor's perceived
negative past performance hindered that company's ability to partner with others to perform
financial management systems work, id. at 27 (citing Pl.'s App. 923-24 (Muslimani Supp'l Decl.
¶ 6)), the government nevertheless emphasizes that

> [n]o one from GCE, however, has presented any facts to back up their opinion that
> GCE's competitors would "perceive negative past performance" simply because
> the Coast Guard chose to consolidate its IT support for financial management
> support systems with its IT support for other computer systems.  Rather, GCE's
> employees speak in generalities, such as "in my years of experience."  Even if
> GCE's reputational harm "evidence" is admissible, the Court should accord it no
> weight, because it lacks a foundation in both fact and logic.

Id.

Courts have recognized–and rejected–arguments that the loss of an intangible asset such
as reputation or goodwill can constitute an irreparable injury.  For example, the United States
Court of Appeals for the Eighth Circuit ("Eighth Circuit") affirmed the district court's entry of a
preliminary injunction because, while "[h]arm to reputation and goodwill is difficult, if not
impossible, to quantify in terms of dollars," the plaintiff established a threat of irreparable harm.
Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc., 336 F.3d 801, 805 (8th Cir. 2003); see also
McCann v. Barton, No. 04:08-CV-00574-GAF, 2009 WL 900741, at *22 (W.D. Mo. Apr. 1,
2009) (recognizing in a breach of contract action that "[t]he loss of intangible assets, including
reputation and good will, can constitute irreparable injury").  On the other hand, the Eighth
Circuit affirmed the district court's denial of a preliminary injunction where conflicting opinions
between the parties existed as to whether an intangible injury, such as a damaged reputation, rose
to the level of an irreparable injury.  Gen. Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312,
319 (8th Cir. 2009) (explaining that affidavits submitted by the plaintiff "stated only general
business principles and were too speculative to establish such injury").  The United States Court
of Appeals for the Third Circuit has recognized the "loss of control of reputation" as a ground for
irreparable injury in trademark infringement actions, see Pappan Enters., Inc. v. Hardee's Food
Sys., Inc., 143 F.3d 800, 805 (3d Cir. 1998); see also McDonald's Corp. v. Robertson, 147 F.3d
1301, 1313 (11th Cir. 1998) (affirming the district court's issuance of a preliminary injunction
and recognizing that in trademark infringement actions where "the likelihood of confusion is
particularly strong, the loss of reputation . . . flowing from the continued infringement justifies a
finding of irreparable injury"), but has rejected the position that "any showing of potential harm
to a plaintiff's reputation is sufficient to warrant a mandatory . . . injunction that fundamentally

---

[124]   The government also contends that GCE's claims of alleged reputational harm are
based upon inadmissible speculation.  Def.'s Opp'n & Reply 27.  The court, however, already
determined that for the reasons discussed in its concurrent decision, GCE's opinion testimony
facilitated meaningful judicial review and was admissible.

changes the status quo," Acierno v. New Castle County, 40 F.3d 645, 654 (3d Cir. 1994). Other courts have similarly rejected the argument that loss of reputation, outside the intellectual property context, constitutes an irreparable injury. See, e.g., Hartikka v. United States, 754 F.2d 1516, 1518 (9th Cir. 1985) (reversing the district court's judgment and vacating a preliminary injunction in a military discharge action because claims of irreparable injury resulting "from the stigma attaching to a less than honorable discharge" failed to comport with the employment discharge standards enunciated by the Supreme Court in Sampson v. Murray, 415 U.S. 61 (1974)); John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc., 588 F.2d 24, 29 (2d Cir. 1978) (recognizing in a civil antitrust action in which the court of appeals modified, and thereafter affirmed as modified, a preliminary injunction that "[t]hose cases in which loss of goodwill previously has been held to constitute irreparable injury have involved the termination of franchise or distributorship relationships"); Universal Settlements, Int'l, Inc. v. Nat'l Viatical, Inc., No. 1:07-CV-1243, 2009 WL 528925, at *1 (W.D. Mich. Mar. 2, 2009) ("Plaintiff's contention that it has presented evidence of 'possible irreparable injury' based on a 'possible loss of reputation' if it is not able to complete performance of its contract, is at best an extremely weak showing of irreparable harm.").

The court recognizes that GCE is part of a small group of contractors within a niche market. However, GCE's claims of reputational harm are too speculative to constitute irreparable harm. Mr. Muslimani's evidence that GCE's reputation within the industry has been adversely affected is based upon statements made by employees at other companies. While this evidence may not constitute hearsay, see Fed. R. Evid. 803(21) (excluding from the hearsay rule "[r]eputation of a person's character among associates or in the community"); see also Standard Forged Prods., Inc. v. Berwick Freight Car Co., No. 1:CV-92-0354, 1993 WL 193191, at *3-4 (M.D. Pa. Mar. 11, 1993) (refusing to strike affidavits alleging that a company engaged in predatory actions and would utilize confidential tax and financial information to gain a competitive advantage because Rule 803(21) did not exclude such statements), the court does not deem them sufficient to establish that the industry of which GCE is a part views GCE differently as a result of the Coast Guard's decision not to compete the work encompassed by Modification 30 of the SETS II task order.[125]  As such, GCE has not established that damage to its reputation constitutes an irreparable harm.

### 3.  Balance of Hardships

In order to assess the balance of hardships, the court must examine the harm to the government and to QSS in issuing a permanent injunction. See Overstreet Elec. Co., 47 Fed. Cl.

---

[125] To the contrary, one industry partner "inquired into the possibility of potentially subcontracting work to GCE if [it] were to compete for GCE's contract, on the assumption that GCE was unlikely to win as a prime contractor given the circumstances." Pl.'s App. 1012 (Muslimani 2d Supp'l Decl. ¶ 17). Thus, it is apparent that at least one company has remained confident in GCE's capabilities, regardless of whether GCE would receive a prime contract for work with the Coast Guard in the future.

at 744; PGBA, LLC v. United States, 57 Fed. Cl. 655, 663 (2003).  GCE asserts that "the cognizable harms that the Defendants might face if the Modifications are enjoined are trivial compared to the harms that GCE will suffer absent injunctive relief."  Pl.'s Mem. 27.  But see Def.'s Mot. & Opp'n 32 (contending that "the harm to GCE . . . would be minimal.").  It emphasizes that "[a] competition could be conducted quickly and with minimal disruption, and QSS could participate in that competition along with all other potential contractors."  Pl.'s Cross-Mot. & Mot. Perm. Inj. 31.  The court has already determined that GCE faces irreparable injury because it (1) lost an opportunity to compete for audit-supporting federal financial management systems services, (2) lost an opportunity to earn potential profits associated with that work, and (3) lost several skilled employees critical to its ability to perform audit-supporting federal financial management systems services.  The court balances these harms against those asserted by the government and QSS and, for the reasons stated below, determines that the balance of harms weighs in favor of GCE.

### a.  The Coast Guard's Harms Are Overstated

The government contends that the Coast Guard "could have serious operational deficiencies in its financial management system . . . ."  Def.'s Mot. & Opp'n 32.  Ms. Thompson indicated that the Coast Guard would have only four options if the court issued an injunction, all of which would cause significant harm.[126]  See Def.'s Mot. & Opp'n Ex. 3 at 4-13 (Thompson

---

[126]  Under the first option, the Coast Guard would immediately recompete the SETS II task order contract, but that process "would take a minimum of twelve to fifteen months."  Def.'s Mot. & Opp'n Ex. 3 at 5 (Thompson Decl. ¶ 10).  According to Ms. Thompson, electing this option would prevent the Coast Guard from possessing any support for financial systems application code maintenance and development until the recompetition was completed, thereby increasing the risk of a system failure.  Id.  Such a failure "may be catastrophic, bringing down the financial system so that it is unable to operate, or the failure may severely curtail current operation."  Id.  Under the second option, the Coast Guard could "enter into another interim sole source contract with GCE during the SETS II recompete period."  Id. at 6 (Thompson Decl. ¶ 11).  This second option would, Ms. Thompson states, result in [. . .].  This second option would also require the Coast Guard "to take on unplanned work and cost . . . ."  Def.'s Mot. & Opp'n Ex. 3 at 10 (Thompson Decl. ¶ 15).  Under the third option, the Coast Guard would conduct a competition through the EAGLE vehicle to award a short-term task order, a process that could take at least three months."  Id. at 10-11 (Thompson Decl. ¶¶ 16-17).  This third option, Ms. Thompson states, places the Coast Guard at risk of a major financial system failure and will cause irreparable delay to the agency's initiative to remediate its audit weaknesses."  Id. at 11 (Thompson Decl. ¶ 17).  Under the fourth option, the Coast Guard "is allowed to proceed with the use of the SETS II contractors only for the 12 month duration of the SETS II recompete period," which "may provide mitigation since [the] OSC is currently evaluating the source code . . . and building a development environment."  Id. at 13 (Thompson Decl. ¶ 19).  This fourth option, Ms. Thompson states, would enable the Coast Guard to "immediately start the acquisition planning and execution process for the SETS II recompete . . . ."  Id.  Mr. Winslow analyzed

---

Decl. ¶¶ 9-19); Def.'s Opp'n & Reply Ex. 2 at 12 (Supplemental Decl. Patricia A. Thompson ("Thompson Supp'l Decl.") ¶ 2 (stating that the immediate harm of a permanent injunction "is as stated" in Ms. Thompson's initial declaration)).  But see Pl.'s App. 944 (Winslow Supp'l Decl. ¶ 12 (suggesting that the Coast Guard has more than four options)),[127] 945 (Winslow Supp'l Decl. ¶ 15 ("The Government failed to consider an obvious option in its description of the Coast Guard's procurement options: compete the financial systems support work under GSA Schedule 70, as it has for the past 8 years or under DHS EAGLE in accordance with the FMLoB guidelines.")).[128]  The government indicates that the Coast Guard "is seeking to mitigate its risks by awarding a six-month sole source contract to GCE to obtain technical support services for resolving any emergency financial system problems . . . ."  Def.'s Opp'n & Reply 27.  Nevertheless, it asserts that the Coast Guard "would still be harmed significantly by a permanent injunction, primarily because the Coast Guard's audit remediation efforts would be delayed by over a year."  Id. at 28.

The government acknowledges that "the Coast Guard's decision to consolidate its software development and maintenance for financial management systems with the other software development and maintenance work at the OSC was a 'business decision.'"  Id.  This decision was made, according to the government, "in order to correct persistent problems" with the Coast Guard's previous model of developing systems separately.  Id.  According to the government, the Coast Guard's failure to have a clean financial audit since it joined the DHS in 2003 "is damaging . . . because it calls into question the Coast Guard's stewardship of public dollars and its ability to support the reported costs of its extensive operating assets, such as[] cutters, aircraft, small boats, etc."[129]  Id.  Captain Hill opines that "it's only a matter of time until

---

these four options and opines that the "scenarios are not as bleak as Ms. Thompson describes nor are they the only viable scenarios."  Pl.'s App. 944 (Winslow Supp'l Decl. ¶ 12); see also id. at 940-43 (Winslow Supp'l Decl. ¶ 10 (discussing each option)).

[127]  Ms. Thompson dismisses Mr. Winslow's assessment as merely "an opinion on what the Coast Guard's strategy should be that does not take into account our long-term objectives for enterprise systems integration."  Def.'s Opp'n & Reply Ex. 2 at 15 (Thompson Supp'l Decl. ¶ 9).

[128]  QSS argues that GCE's suggestion that the Coast Guard utilize GSA Schedule 70 evidences the fact that the IT systems and services at issue in this case "are not that special."  Prelim. Inj. Hr'g Tr. 83:8.

[129]  Captain Hill attributes the Coast Guard's financial system's material weaknesses, in large part, to a flawed business model.  Def.'s Opp'n & Reply Ex. 2 at 6 (Hill Supp'l Decl. ¶ 8).  He notes that "the Coast Guard must certainly accept a large portion of the blame," but he also finds GCE partially responsible, stating that GCE "has been an integral portion of our business model and [has a] [. . .] . . . ."  Id.; see also Def.'s Mot. & Opp'n Ex. 4 (Decl. David L Hill ¶ 6(d) (discussing GCE's apparent performance deficiencies)); AR 285 (stating in the Coast Guard's legal memorandum submitted to the GAO that GCE is "a [. . .]").  But see AR 2577 (identifying

DHS, OMB[,] and Congress start reducing the Coast Guard's budgetary resource base due to our inability to pass a basic financial statement audit." Id. Ex. 2 at 4 (Hill Supp'l Decl. ¶ 4(a)). Despite these statements, the Coast Guard acknowledges that it "recognized as early as 2004 that the agency had a need to cease its reliance on the traditional development of IT systems by individual programs [that are] developed separately, based only on the business requirements of one office or line of business." Id. at 12-13 (Thompson Supp'l Decl. ¶ 4). The SETS II vehicle was utilized, according to Ms. Thompson, because it "would provide us with the flexibility, while imposing the needed discipline, to add new systems development work for any type of application . . . ." Id. at 14 (Thompson Supp'l Decl. ¶ 7). However, it is apparent that the Coast Guard resorted to the SETS II vehicle only after it encountered unforeseen difficulties with issuing a new solicitation, see supra Part I.E.2, and that merely sought to avoid "significantly more complex contractual efforts which will require added Coast Guard staff work and time to plan, acquire[,] and administer in order to proceed with future financial and logistics systems integration." Def.'s Opp'n & Reply Ex. 2 at 14 (Thompson Supp'l Decl. ¶ 7).

Although Ms. Thompson opines that "if an injunction is granted, it will require at least one additional year before the Coast Guard is in position to resume development work with a new contractor, thus delaying the ability to tackle the IT system audit remediation and correct financial system deficiencies,"[130] id. at 17 (Thompson Supp'l Decl. ¶ 11), the court finds that the government's harms are overstated. First, it is apparent that any suspension of software maintenance will not create the disruptions the Coast Guard forecasts. Indeed, GCE states that the Coast Guard suspended software maintenance for two months beginning in May 2007 without any interruption to the Coast Guard's financial management systems, Pl.'s App. 946 (Winslow Supp'l Decl. ¶ 16(a)-(b)), and that it "never once heard during a routine suspension of software maintenance that the Coast Guard was unable to order supplies, pay bills, balance the

---

GCE as one of six companies that "[m]arket research and past experience have revealed . . . possess[es] the required technical expertise"); Pl.'s App. 455 (indicating that the DHS intended "to establish the . . . Oracle Baseline as a services platform to support DHS components migrated from their existing financial management systems"), 962 (Winslow Supp'l Decl. ¶ 35(d)-(e) (stating that the DHS system was maintained by GCE and that the DHS's decision suggests that GCE created "a viable solution for the entire department to migrate to and begin using")).

[130] Mr. Winslow states that "[b]ased on personal experience with the Coast Guard, I know the Coast Guard has not made, nor has tried to make[,] any serious progress on audit remediation since 2005. GCE developed an audit remediation plan in March 2006 . . . . The Coast Guard has yet to implement this plan and continues to show no progress." Pl.'s App. 956 (Winslow Supp'l Decl. ¶ 28). But see Def.'s Opp'n & Reply Ex. 2 at 5-6 (Hill Supp'l Decl. ¶ 7 (explaining that "we have chosen not to implement GCE's audit remediation plan . . . not due to the Coast Guard simply dallying around for two years, but rather, because we have chosen to move away from an IT-centric solution model that GCE proposed" and toward "a business process centric model where the government . . . is responsible for analyzing the related business processes and defining the necessary functional requirements")).

books, buy fuel, or pay employees" or to "perform search and rescue missions, marine safety boardings and inspections for drugs, or could not respond to oil spills and other maritime emergencies," id. (Winslow Supp'l Decl. ¶ 17).  Second, while it may be true that "[t]he longer the Coast Guard lacks the ability to resume IT development, the longer it will be unable to make software changes to correct its audit deficiencies," Def.'s Opp'n & Reply Ex. 2 at 18 (Thompson Supp'l Decl. ¶ 8), the fact remains that the Coast Guard identified these issues in 2004, see id. at 12-13 (Thompson Supp'l Decl. ¶ 4).  That it continued to encounter these issues without seeking and implementing an immediate resolution when they first arose was, as the Coast Guard itself recognizes, its own fault.  See supra note 129.  Courts have recognized that where some of the problems the government encounters are part of its own making, such a circumstance may tilt the balance of hardships in a plaintiff's favor.  See PGBA, LLC, 57 Fed. Cl. at 663; see also Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co., 290 F.3d 578, 596 (3d Cir. 2002) ("[T]he injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself.").  Such is the case here, and the Coast Guard certainly would not face a three-to-four year delay in its consolidation efforts by competing the work at issue.  Since the Coast Guard initially preferred to issue a solicitation for the services at issue, see supra Part I.E.2, any harm in doing so at this time appears insignificant.  See Order 2, Mar. 31, 2008 (stating that the government "could conduct a competition for [audit-supporting federal] financial management systems expeditiously[ and] can avoid significant disruption to its financial systems during the recompetition period").  Indeed, since the issuance of a temporary restraining order, the Coast Guard has not alleged that its operations have been compromised.  Thus, Ms. Thompson's statement that "[b]ased on the final ruling of the Court, the Coast Guard will either use this [complete development] test and development environment to proceed with the use of the QSS contractors or, if required, conduct a new competition for development and support services," Def.'s Opp'n & Reply Ex. 2 at 12 (Thompson Supp'l Decl. ¶ 3), merely suggests that the Coast Guard would prefer that the work begin sooner rather than later.  In short, a recompetition would not be catastrophic to the Coast Guard's long-term objectives or its current operations.

Third, Ms. Thompson herself acknowledges that a task order could be awarded under the EAGLE contract vehicle within three months.  See Def.'s Mot. & Opp'n Ex. 3 at 10-11 (Thompson Decl. ¶¶ 16-17).  While this may not be the Coast Guard's ideal scenario, it cannot insist upon implementing one solution that ultimately comports with "its long term strategy," id. at 5 (Thompson Decl. ¶ 10), to "transfer software development and technical support for its financial management system to [the OSC,] the software development center of excellence[,] . . . as quickly as possible," id. Ex. 2 at 2 (Hill Supp'l Decl. ¶ 3), but subjects it to the greatest potential harm as compared to alternative solutions.  But see Pl.'s App. 944 (Winslow Supp'l Decl. ¶ 12 (asserting that the Coast Guard's "consolidation of financial systems support and mission system support [is] not a prerequisite for audit success")).  Fourth, to the extent that the government eschews competition on the basis that the Coast Guard would be harmed due to delays in transitioning between contractors, see e.g., id. at 9-10 (Thompson Decl. ¶ 14 Table 2 (projecting at least a three-month delay during a transition period for a new contractor if an award is made to a contractor other than QSS)), 11-12 (Thompson Decl. ¶ 18 (same)), courts do

not consider such delays in a harm calculus, see, e.g., Univ. Research Co., 65 Fed. at 514 (stating that the "delay in transition to the new contract[] exists in virtually all bid protests" and that the Court of Federal Claims "has on occasion been skeptical as to whether delay in transition, and associated costs and inconveniences, can outweigh a plaintiff's harms").  As the court in Ellsworth Assocs., Inc. recognized, "[c]ertainly the delay and inconvenience to be anticipated in the normal course of resoliciting the bid would impose significant burdens . . . .  However, only in an exceptional case would these factors alone warrant a denial of injunctive relief . . . ."  45 Fed. Cl. at 399.  This case, however, is not one that falls within that exceptional category.

Finally, the government's concerns about GCE's potential security risks are overstated.  The Coast Guard has previously awarded contracts to GCE without concern.  See, e.g., Pl.'s App. 925 (Muslimani Supp'l Decl. ¶ 11 (stating that the August 2007 bridge contract "included a provision to use only U.S. citizen employees for the first time in GCE's contracting history with the Coast Guard")), 980A (McHargue Decl. ¶ 17 (stating that the "Coast Guard Financials Systems data has been provided to GCE in this secure manner for 38 months without incident").  But cf. Def.'s Opp'n & Reply Ex. 2 at 3 (Hill Supp'l Decl. ¶ 3 (stating that the Coast Guard "do[es] not intend to seek waivers for any non-U.S. citizens that might be employed" on a future short-term contract)); Def.'s Mot. & Opp'n Ex. 5 at 6-7 (Decl. Steven A. Munson ¶ 14 (stating that GCE's production database contains personal identifiable information and exists outside any government protected network, thereby posing a security risk).  According to GCE, its servers pose no serious risks and "[i]n the approximately 4 years that GCE has received personally identifiable information from the Coast Guard, it has never had a security breach . . . ."  Pl.'s App. 949 (Winslow Supp'l Decl. ¶ 21(c)).  This harm, therefore, is purely speculative.

### b.  QSS's Harms Do Not Outweigh GCE's Harms

QSS states that it might suffer from "the same harms" as GCE, namely lost profits and skilled employees.  Def.-Intervenor's Mot. & Opp'n 35.  With respect to lost profits, Mr. Bowen opines that his team "has already procured almost $800,000 worth of equipment, software[,] and licenses to perform the [Coast Guard] Financials work," Def.-Intervenor's Mot. Strike Ex. (Bowen Decl. ¶ 17), and anticipates that QSS would lose at least [. . .] in revenue per day and approximately [. . .] in profits if performance were stayed, id. (Bowen Decl. ¶ 18).  But see AR 2863 (indicating that GCE anticipated losing [. . .] in revenue).  The court discounts this assessment because it is highly speculative, particularly in light of the acrimonious relationship that developed between Mr. Bowen and employees at GCE.  See supra Part I.E.6.  With respect to lost skilled employees, QSS asserts that GCE's harm is "not quite as serious as it makes out" because while GCE might lose more employees than QSS, QSS can complete the work more efficiently.  Def.-Intervenor's Mot. & Opp'n 35.  Regardless of this theory, QSS advertised positions on the Internet seeking individuals who possessed expertise with audit-supporting federal financial management systems after those systems were transferred to it via Modification 30 to the SETS II task order.  See supra note 109.  As the University Research Co. court noted, "projecting the sort of team [a contractor] could assemble" is outweighed by an incumbent's actual likelihood of losing a team it already had assembled.  65 Fed. Cl. at 514.  GCE's loss of

skilled employees that were already part of its team outweighs any loss QSS may experience due to a recompetition.  Moreover, GCE's loss of an opportunity to compete outweighs QSS's interest in avoiding a competition.  See Hunt Bldg. Co. v. United States, 61 Fed. Cl. 243, 280 (2004) (recognizing that the "harm[] by having to undergo a recompetition" is not as severe as "hav[ing] been unfairly denied a meaningful opportunity to compete" and that "injunctive relief is warranted to remedy the unfair process").

### 4. Public Interest

The "public has an interest in honest, open[,] and fair competition," Magellan Corp., 27 Fed. Cl. at 448, and "[w]henever a plaintiff is improperly excluded from that process, that interest is compromised," Cincom Sys., Inc. v. United States, 37 Fed. Cl. 266, 269 (1997).  The government and QSS maintain that GCE failed to show that the procurement system was compromised in this case.  See Def.'s Mot. & Opp'n 38 (arguing that the public interest would be served by preventing harm–security breaches, delays in the Coast Guard's ability to resolve its audits, the Coast Guard's inability to perform critical operations–to the Coast Guard); Def.-Intervenor's Mot. & Opp'n 35-36 (arguing that GCE has already earned in excess of $15 million from the Coast Guard's sole-source bridge contract and that GCE "is merely . . . attempt[ing] to prolong that multi-million-dollar, non-competitive award in its own favor").  These arguments miss the mark.  The issue is whether a permanent injunction will serve the public interest by ensuring that the tasking of audit-supporting federal financial management systems services is conducted fairly, not whether GCE can successfully retain the work it previously performed.  Moreover, neither the government nor QSS explain how avoiding competition serves the public interest.  Instead, QSS states that it would "be in the public interest for QSS to perform the work it was awarded and has prepared to do, despite Plaintiff's lack of cooperation," Def.-Intervenor's Mot. & Opp'n 36, and the government contends that the public interest would be served "by preventing the significant harm to the Coast Guard if the injunction were granted," Def.'s Opp'n & Reply 29.  Indeed, granting injunctive relief in this case will not preclude the Coast Guard from pursuing its long-term goals for consolidating information systems and improving its financial audits.

"Healthy competition ensures that the costs to the taxpayer will be minimized."  SAI Indus. Corp. v. United States, 60 Fed. Cl. 731, 747 (2004).  The public interest is "clearly served when suppliers engage in fair and robust competition for government contracts," id., and granting injunctive relief in this case ensures that "public confidence and competition in the federal procurement process will be preserved," Metcalf Constr. Co., 53 Fed. Cl. at 645.

GCE has demonstrated that it is entitled to injunctive relief.  Accordingly, its motion for permanent injunctive relief is granted.

## V.  CONCLUSION

For the reasons stated above, it is hereby **ORDERED**:

1.  GCE's cross-motion for judgment on the administrative record is **GRANTED**.

2.  GCE's motion for permanent injunctive relief is **GRANTED**.  The government, its officers, agents, employees, representatives, and all other persons acting in connection therewith, are **ENJOINED** from performing IT support for the Coast Guard's audit-supporting federal financial management systems under Modifications 30 and 32 to the SETS II task order, number HSCGG3-05-F-TWV436, under the ITOP II contract, number GS-09F-0047Z.  The Coast Guard must procure these services in accordance with the law and in a manner that preserves the integrity of the procurement process, exercising its discretion in a reasonable manner.

3.  All of the remaining portions of the government's motion and opposition are **DENIED**.

4.  All of the remaining portions of QSS's motion and opposition are **DENIED**.

The court has filed this opinion under seal.  The parties shall confer to determine proposed redactions that are agreeable to all parties.  Then, **by no later than Friday, July 3, 2009**, the parties shall file a joint status report indicating their agreement with the proposed redactions and **attaching a complete copy of the court's opinion with all redactions clearly indicated**.

The clerk is directed to enter judgment accordingly.  No costs.

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge

## Appendix of Acronyms

| | |
|---|---|
| AAPS | Automated Aid Positioning System |
| AID | Agency for International Development |
| AMVER | Automated Mutual Assistance Vessel Rescue |
| AOPS | Abstract of Operations System |
| ARMS | Automated Requisition Management System |
| ASG | Application Support Group |
| ASPA | Armed Services Procurement Act |
| ATONIS | Aids to Navigation Information System |
| AUXDATA | Auxiliary Data |
| BI-EDW | Business Intelligence-Enterprise Data Warehouse |
| BI-RM | Business Intelligence-Readiness Management |
| C & A | Certification and Accreditation |
| CAS | Core Accounting System |
| CASP | Computer Assisted Search Planning |
| CFO | Chief Financial Officer |
| CGA | Committee on Governmental Affairs |
| CGHELP | CG Help |
| CGLS | Coast Guard List Server |
| CGRC | Coast Guard Recruiting Command |
| CICA | Competition in Contracting Act of 1984 |
| CIMS | Contract Information Management System |
| CIO | Chief Information Officer |
| CITRIX | G-O CITRIX Farm |
| CLIN | Contract Line Item Number |
| CM | Configuration Management |
| CMPLUS | Configuration Management Plus Client Server |
| CoreFLS | Core Financial and Logistics System |
| COTR | Contracting Officer's Technical Representative |
| COTS | Commercial-Off-the-Shelf |
| CUI | Common User Interface |
| DFAMS | Dining Facilities Automated Management System |
| DHS | Department of Homeland Security |
| DIRSERV | Department of Homeland Security Directory Services |
| DISA | Defense Information Systems Agency |
| DOC | Department of Commerce |
| DOE | Department of Energy |
| DOI | Department of the Interior |
| DOJ | Department of Justice |
| DOL | Department of Labor |
| DOT | Department of Transportation |
| DRBC | Disaster Recovery Business Continuity |

EAGLE               Enterprise Acquisition Gateway for Leading-Edge Solutions
EAJA                Equal Access to Justice Act
EMS                 Enterprise Management Support
EPA                 Environmental Protection Agency
EPMO                Electronic Program Management Office
ETTT                Emerging Technologies Technical Team
FAR                 Federal Acquisition Regulation
FASA                Federal Acquisition Streamlining Act of 1994
FCC                 Federal Communications Commission
FFMIA               Federal Financial Management Improvement Act of 1996
FLS                 Fleet Logistics System
FLSA                Fair Labor Standards Act
FMLoB               Financial Management Line of Business
FOIA                Freedom of Information Act
FPD                 Finance and Procurement Desktop
FSIO                Financial Systems Integration Office
FSTWG               Financial Systems Transition Work Group
FSWG                Financial Systems Working Group
GAO                 Government Accountability Office
GIS                 Geospatial Information System
GSA                 General Services Administration
GSABCA              General Services Administration Board of Contract Appeals
GWAC                Government Wide Acquisition Contract
HMI                 Housing Management Information
HUD                 Department of Housing and Urban Development
I-ATONIS            Integrated-Aids to Navigation Information System
ID/IQ               Indefinite-Delivery/Indefinite-Quantity
INS                 Immigration and Naturalization Service
ISE                 Information Systems Engineering
ISS                 Information Systems Security Support Services
IT                  Information Technology
ITOP                Information Technology Omnibus Procurement
JFMIP               Joint Financial Management Improvement Program
LAN                 Local Area Network
LOGJAMSS            Logistical Joint Administrative Management Support Services
LOIS                Long Range Aid to Navigation Operations Information System
MMLD                Merchant Mariner Licensing and Documentation
MSN                 Marine Safety Network
NASA                National Aeronautics and Space Administration
NESS                Naval and Electronic Supply Support System
O & M               Operations and Maintenance
OMB                 Office of Management and Budget
OPM                 Office of Personnel Management

| | |
|---|---|
| OSC | Operations Systems Center |
| PB-Views | Panorama Business Views |
| PBGC | Pension Benefit Guaranty Corporation |
| POP | Point of Presence |
| PWS | Performance Work Statement |
| RCFC | Rules of the United States Court of Federal Claims |
| RFP | Request for Proposal |
| SAM | Shore Asset Management |
| SAN | Ship Arrival Notification |
| SBA | Small Business Administration |
| SETS | Systems Engineering and Technical Services |
| SLDMB | Self-Locating Datum Marker Buoy |
| SOM | Systems Operations and Management |
| SOW | Statement of Work |
| SPERTT | System Performance Tiger Team |
| SRM | Systems Resource Management |
| SSP | Shared Service Provider |
| TMT | Training Management Tool |
| USDA | United States Department of Agriculture |
| USSS | United States Secret Service |
| VA | Department of Veterans Affairs |
| VDS | Vessel Documentation System |
| WINS | Workflow Imaging Network System |